IN UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
Civil Division

DR. JUDY MIKOVITS
140 Acacia Ave, #5
Carlsbad CA 92008

   Plaintiff,

v.

THE WHITTEMORE PETERSON INSTITUTE
University of Nevada, Reno MS 0552
1664 N. Virginia St.
Reno, NV 89557-0552

   Defendant.

Civil Action No. _____

Complaint for Violations 31 U.S.C. § 3730(h) (False Claims Act Retaliation)

ORIGINAL

## INTRODUCTION

1. Plaintiff Dr. Judy Mikovits, individually, on her own behalf, files this complaint against Defendant the Whittemore Peterson Institute (WPI) to recover damages, penalties, and attorney's fees for violations of the federal False Claims Act anti-retaliation provisions, 31 U.S.C. §§ 3730(h).

2. Mikovits began working for WPI in 2006.

3. WPI is a research institute founded by Harvey and Annette Whittemore to study neuroimmune diseases, in particular Chronic Fatigue Immune Dysfunction Syndrome (CFIDS).

4. In or around the summer of 2011, Dr. Mikovits discovered that one of the researchers at WPI, Vincent Lombardi, had been using federally-funded research materials for use in research for a for-profit entity owned by the Whittemores, VIPDx.

1

5. Dr. Mikovits informed Lombardi and the Whittemores about the perceived misappropriation of federal funds.

6. Dr. Mikovits demanded that Lombardi cease the misappropriation of these resources, and refused to provide these resources to him.

7. Dr. Mikovits also co-authored a paper asserting that product of the Whittemores' for-profit entity, VIPDx, was based on contaminated research.

8. Shortly after reporting these problems, Mikovits was terminated on September 29, 2011.

9. Within weeks of her termination, on November 18, Mikovits was arrested on criminal charges for alleged failure to hand over documents to which WPI claimed title.

10. Mikovits was held in jail without bail until November 22, 2014 for being a "fugitive from justice."

11. Despite Mikovits's incarceration, the Whittemores and WPI pressed forward with civil claims against Mikovits, resulting in an injunction requiring Mikovits to hand over the documents that precipitated the arrest.

12. As a result of failure to comply with the order because of concerns for the safety of patient data, Dr. Mikovits lost the civil case on default judgment.

13. In the resulting bankruptcy proceeding, WPI successfully claimed that Mikovits owed the Institute $5.5 million.

14. The set of proceedings WPI commenced against Dr. Mikovits were intended to retaliate against Mikovits because of her role in furthering a potential qui tam proceeding, and seeking to stop perceived fraud against the government.

15. The proceedings commenced and prosecuted by WPI and the Whittemores succeeded in blackballing and bankrupting Mikovits.

**JUSRISDICTION AND VENUE**

16. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a).

17. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this judicial district.

18. Venue is proper in this Court under 28 U.S.C. §1391(c) and 1395(a), and 31 U.S.C. § 3732(a) because Plaintiff is a resident of this district and because Defendants transact business within this judicial district.

## PARTIES

*The Whittemore Peterson Institute and the Whittemores*

19. Harvey Whittemore and Annette Whittemore are well-known wealthy socialites in the state of Nevada.

20. Harvey Whittemore is widely considered one of the most influential citizens of Nevada.

21. Harvey Whittemore's is also a prolific fundraiser for Nevada politicians.

22. In addition to this, Harvey Whittemore is a lawyer who was a lobbyist for the gaming industry in Nevada, as well as the petrochemical industry.

23. Annette Whittemore is a socialite known for throwing lavish, well-attended parties.

24. The Whittemore Peterson Institute is an organization founded by the Whittemores to study a condition known as Chronic Fatigue Immune Dysfunction Syndrome (CFIDS).

25. CFIDS is poorly understood, but is the term for a set of symptoms including malaise after exertion; unrefreshing sleep, generalized muscle and joint pain, sore throat, abnormal headaches, cognitive difficulties, chronic and severe mental and physical exhaustion, and other symptoms in a previously healthy and active person.

1    26.   The Whittemores have a daughter named Andrea who suffers from
2    (CFIDS).
3    27.   Andrea Whittemore is severely impacted by the condition.
4    28.   Harvey Whittemore and Annette Whittemore sought a cure for their
5    daughter's illness.
6    29.   Mr. and Mrs. Whittemore decided to endow the University of Nevada
7    with enough funds to open a research laboratory to research treatments and cures for
8    CFIDS.
9    30.   Together, with another prominent doctor named Peterson, the
10   Whittemores founded the Whittemore Peterson Institute (WPI).
11   31.   WPI is a non-profit 501(c)(3) organization at the University of Nevada.
12   32.   Annette Whittemore was the president and CEO of WPI.
13   33.   Harvey Whittemore was also heavily involved with the administration of
14   the organization.
15
16   *Dr. Judy Mikovits*
17   34.   The Whittemores tapped plaintiff, Dr. Judy Mikovits, to head up the
18   research of WPI.
19   35.   Dr. Mikovits had more than 20 years' experience at NIH and was the CSO
20   of a biotech company in Santa Barbara, CA.
21   36.   Dr. Mikovits was well-known and highly regarded as an immunologist
22   and virologist, developing cancer therapies targeting viral causes of immune deficiency.
23   37.   WPI hired Dr. Mikovits as the research director.
24   38.   Dr. Mikovits was the only principal investigator at the institute.
25   39.   Dr. Mikovits did most of the Institutes's work, including writing and
26   winning grants to fund the research.
27

1                          FACTUAL ALLEGATIONS

*Dr. Mikovits publishes research on XMRV*

40.     In 2009 Dr. Mikovits and her colleague, Dr. Frank Ruscetti isolated a retrovirus known as XMRV (Xenotropic murine leukemia virus-related virus) from humans for the first time and associated it with CFIDS.

41.     Dr. Mikovits's research was published in the Journal, *Science*.

42.     This paper was the subject of many international news articles due to the potential impact for those suffering from CFIDS and related problems.

43.     Those suffering from CFIDS and other diseases started to contact WPI looking hoping for more and better information on the disease.

*The Whittemores commercialize an XMRV diagnostic test*

44.     After the publication of Dr. Mikovits's work on XMRV, the Whittemores developed and commercialized a diagnostic test for XMRV.

45.     They sold this test from a Whittemore-owned company known as VIPDx (Viral Immune Pathology Diagnostics).

*Dr. Mikovits attract government research money*

46.     As Dr. Mikovits's work progressed in the laboratory, links were anticipated between XMRV and other neuroimmune diseases such as fibromyalgia, chronic Lyme disease, atypical multiple sclerosis and autism spectrum disorder.

47.     Under Dr. Mikovits's direction, WPI grew from a small foundation to an internationally recognized center for the study of neuroimmune diseases.

48.     As a result of the intense attention that Dr. Mikovits's lab was receiving, Dr. Mikovits began to attract federal funds from the National Institutes of Health (NIH) and the United States Department of Defense.

1    49.    The Department of Defense was interested in the implications of the
2    research for Gulf War Syndrome.
3
*Dr. Mikovits learn of contamination of her research*
5    50.    In the late summer of 2011, Dr. Mikovits discovered that there were
6    discrepancies in the previously published research on XMRV.
7    51.    Dr. Mikovits had participated in several multi-center studies, including
8    one to determine the threat to the blood supply.
9    52.    No one could detect XMRV, and Dr. Mikovits's colleague Bob Silverman of
10   the Cleveland Clinic identified contamination in samples from WPI.
11   53.    Solverman began to doubt the scientific integrity of Dr. Mikovits's recently
12   published work.
13   54.    Dr. Mikovits learned from Silverman that contaminated samples were sent
14   by Dr. Mikovits's postdoctoral fellow, Vincent C. Lombardi in late March of 2009.
15   55.    This occurred without Dr. Mikovits's knowledge and against strict orders.
16   56.    Dr. Mikovits also discovered Lombardi had done little to no work in at
17   least a year on NIH grants for which he was being paid 50% of his salary.
18   57.    The other 50% of his salary was for his work with VIPDx, the for-profit
19   company selling the XMRV diagnostic test.
20
*Lombardi uses grant-funded materials for profit*
22   58.    Lombardi took reagents from Dr. Mikovits's lab that were paid for by the
23   grant.
24   59.    Lombardi used grant-funded reagents in his for-profit work at VIPDx.
25   60.    Lombardi worked in the VIPDx building several miles away from the WPI
26   research center, and claimed that he conducted his grant-related work at the VIPDx
27   building for convenience.

1    61.    Dr. Mikovits asked Lombardi repeatedly for his data, which he refused to
2  provide.

3    62.    Dr. Mikovits ultimately determined he had made up the data he provided
4  Dr. Mikovits.

5    63.    No one else at the institute was able to replicate Lombardi's data.

6    64.    In an email on July 27, 2014, Dr. Mikovits alerted Lombardi to theft of Dr.
7  Mikovits's materials.

8    65.    In that email, Dr. Mikovits accused Lombardi and another employee
9  named Svetlana of misappropriating materials.

10

### Dr. Mikovits confronts Lombardi and the Whittemores about data problems

12   66.    When Dr. Mikovits approached Lombardi, he became instantly defensive,
13  citing proprietary information belonging to VIPDx.

14   67.    Dr. Mikovits then went directly to Harvey Whittemore, telling him all
15  work and diagnostic testing must stop and collaborators must be notified immediately
16  of the potential problems with the original data.

17   68.    Dr. Mikovits emailed Harvey Whittemore and Annette Whittemore on or
18  about July 8, 2011 and demanded that Lombardi's access to the research lab be
19  immediately suspended.

20   69.    Harvey Whittemore took over management of Lombardi and told Dr.
21  Mikovits not to divulge any information to anyone until he permitted it.

22   70.    Dr. Mikovits refused that order and told her colleague Dr. Ruscetti
23  immediately.

24   71.    Dr. Mikovits told the Whittemores to stop funding Lombardi or any
25  VIPDx staff from NIH grants.

26   72.    Dr. Mikovits demanded several times in July and August to see all the
27  accounting on the annual progress report for the grants.

*Dr. Mikovits is terminated*

73. On August 1, 2011, when the data for the last phase of the blood working group was unblinded, it revealed that the tests being done were not valid.

74. Dr. Mikovits told Harvey Whittemore and Annette Whittemore to stop the testing at VIPDx.

75. Annette Whittemore instructed Dr. Mikovits by email to change the data in order to preserve the project and the thousands of tests done in the past two years.

76. Mike Busch, head of the blood working group, came to Reno to vouch for Dr. Mikovits's integrity and tour the labs.

77. Busch wrote a letter to Annette Whittemore saying he was "disturbed by what he saw in the clinical lab."

78. Harvey Whittemore and Annette Whittemore threatened Dr. Mikovits and her research assistant and student Max Pfost and Frank Ruscetti if Dr. Mikovits co-authored a paper showing the flaws of the VIPDx diagnostic test for XMRV.

79. The paper was published on September 23, 2011 with Pfost and Dr. Mikovits as co-authors.

80. Despite being asked to do so by Annette Whittemore and Harvey Whittemore, Dr. Mikovits refused to permit Lombardi access to reagents and resources purchased for the NIH grant.

81. Dr. Mikovits was fired on Thursday September 29th, 2011 for "insolence and insubordination."

*Dr. Mikovits's lab is locked down*

82. Within an hour of Dr. Mikovits's termination, her labs—accessed by key card—were locked down by the University of Nevada.

83. Lombardi texted Pfost and Dr. Mikovits's staff and said there had been a shake up and no one was to enter the lab.

84. Annette and Harvey Whittemore were in Washington, DC.

85. Annette Whittemore sent an email to the staff giving them a week off with pay.

86. The lab and Dr. Mikovits's office were cleaned out in that time period.

87. Dr. Mikovits left that day with nothing in her hands and all data locked in the labs and office.

88. The keys to Dr. Mikovits's office were locked in her lab.

89. Dr. Mikovits had her keycard with her, but could not access it or her office after 6pm on September 29th, 2011.

*Dr. Mikovits is accused of theft*

90. On November 2, 2011, Dr. Mikovits was accused of stealing a laptop and 19 laboratory notebooks, which were all Dr. Mikovits's property.

91. Dr. Mikovits refused to sign a document sent to her home in late October telling Dr. Mikovits to return these items to WPI, along with any copies of any data.

92. Dr. Mikovits had no idea where they were.

93. Dr. Mikovits also assert that they were her own intellectual property and her personal property, as Dr. Mikovits had purchased all notebooks, flashdrives and personal computers.

94. The laboratory notebooks represented the totality of Dr. Mikovits's work, including that done prior to her work with WPI.

*WPI files suit against Dr. Mikovits*

95. On November 4, 2011, WPI filed a lawsuit against Dr. Mikovits.

96. In that suit they alleged breach of contract, trade secret misappropriation, conversion, breach of implied covenant of good faith and fair dealing, and sought specific performance and replevin against Dr. Mikovits.

9

97. On November 7, 2011, WPI filed a motion for a temporary restraining order seeking the return of the computer and all copies of the Dr. Mikovits's lab notebooks.

98. The judge entered the TRO against Dr. Mikovits.

99. On November 9, 2011, service was made of the complaint and TRO.

100. Dr. Mikovits was not home because she was away on a boating trip.

101. Dr. Mikovits returned to her home on November 13, 2011 to find the summons and complaint on the porch of Dr. Mikovits's house.

102. On November 14, 2011, Dr. Mikovits contacted and hired an attorney.

*Dr. Mikovits is put in jail without bail*

103. On November 18, 2011, while on Dr. her way to meet with her new attorney, Dr. Mikovits was arrested at her home at 1:00 PM by California and University of Nevada campus police.

104. Dr. Mikovits was taken to the Ventura County Jail where she was held until November 22, 2011.

105. Because Dr. Mikovits was considered a "fugitive from justice" based on Dr. Mikovits's going to longtime home in California, there was a bail hold placed upon her.

106. The bail bondsman reported to Dr. Mikovits's attorney that he had never seen anything like this happen before.

107. Dr. Mikovits's attorneys filed an opposition to the motion for preliminary injunction asserting that Dr. Mikovits did not have possession or control of any misappropriated property.

*Dr. Mikovits misses a hearing while in jail*

118. The judge struck Dr. Mikovits's answer entirely, and granted default judgment against Dr. Mikovits.

*The default judgment leads to Dr. Mikovits's bankruptcy*

119. On January 24, 2012, the judge entered the default judgment, stating that he was doing so for willful and wanton disregard of the orders of the court in a manner which flaunts and otherwise mocks and ignores the essential discovery of the very information which is the subject of this lawsuit.

120. The judge issued a permanent injunction and scheduled a damages hearing for January 25, 2012.

121. That default judgment directly resulted in Dr. Mikovits's bankruptcy.

*Dr. Mikovits liquidates her assets*

122. Pursuant to Dr. Mikovits's bankruptcy filing, WPI made a claim that Dr. Mikovits owed WPI $5.5 million.

123. Dr. Mikovits has been forced to liquidate all of her property and to turn over the proceeds to WPI, by order of the US Bankruptcy Court.

124. Dr. Mikovits represented herself pro se in an effort to get a hearing, but was denied.

125. Because of the actions of Harvey Whittemore, Annette Whittemore, and WPI, Dr. Mikovits now has lost all of her career's research materials, all of her accumulated property and assets, and has been maligned in the press such that she can no longer find employment.

**Count I**
**Federal False Claims Act Claim Pursuant to 31 U.S.C. § 3730(h) Retaliation Against Mikovits for Engaging in Protected Acts**

126. Plaintiff reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

127. As set forth above, and in connection with the foregoing scheme, Dr. Mikovits reasonably believed defendant WPI submitted, or caused to be submitted, false claims for payment by the United States in violation of the FCA.

128. Dr. Mikovits engaged in activity protected under the FCA by engaging in lawful acts in the furtherance of a *qui tam* action under the FCA and other efforts to stop Defendants' violation of the FCA.

129. During her employment, Dr. Mikovits reported activity that she reasonably believed evidenced violations of the rules applicable to the institute's federally grants.

130. Dr. Mikovits also repeatedly urged the Whittemores to cease funding Vincent Lombardi, who Dr. Mikovits reasonably believed was stealing federally funded research materials for use at VIPDx, a for-profit entity.

131. Mikovits also participated in the publication of a paper that demonstrated the Whittemores' for-profit arm, VIPDx, was selling diagnostic tests for a virus which did not exist in humans.

132. Dr. Mikovits's protected activity motivated, at least in part, WPI's decision to terminate her.

133. Following Dr. Mikovits's termination, WPI and the Whittemores continued to take adverse actions against her by pressing criminal charges, resulting in the arrest and jailing of Dr. Mikovits.

134. The Whittemores and WPI further took adverse action against Mikovits following her termination by filing and prosecuting a civil case against Mikovits, which directly led to Dr. Mikovits filing for bankruptcy.

135. The Whittemores and WPI further took adverse action against Mikovits by filing a $5.5 million claim against Whittemore in bankruptcy proceedings, forcing Mikovits to liquidate the entirety of her assets.

136. To redress the harms he has suffered as a result of the acts and conduct of WPI in violations of 31 U.S.C. § 3730(h), Dr. Mikovits is entitled to damages including two times the amount of back pay, interest on back pay, and any other damages available by law including litigation costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

137. WHEREFORE, the plaintiff Dr. Judy Mikovits prays that judgment be entered against Defendants for violation of the False Claims Act as follows:

138. In favor of the Relator for the maximum amount pursuant to 31 U.S.C. § 3730(h) to include two times the amount of back pay, interest on back pay, reasonable expenses, attorney's fees, and costs incurred by the Relator;

139. For all costs of the False Claims Act civil action; and

140. In favor of the Relator and the United States for further relief as this court deems just and equitable.

Respectfully Submitted,

_____
Dr. Judy Mikovits, Ph.D, *pro se*

One version of this complaint prepared by

David Scher
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2803

(202) 261-2835 (facsimile)
dscher@employmentlawgroup.com
soswald@employmentlawgroup.com

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Mikovits hereby demands a jury trial.