Judy A. Mikovits, PhD
137 Maple Ave, #2
Carlsbad, CA ~~92007~~ 92008
Telephone: 805-797-6967
jamikovits@gmail.com



___ FILED            ___ RECEIVED
___ ENTERED          ___ SERVED ON
            COUNSEL/PARTIES OF RECORD

APR 15 2019

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:_____ DEPUTY

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. Mikovits, individually, | ) Case No.: 3:15-cv-00409-RCJ |
| | ) |
| | ) **NOTICE TO THE COURT** |
| Plaintiffs, | ) |
| vs. | ) SUBMISSION OF CRIMINAL |
| WHITMORE PETERSON | ) AFFIDAVIT AND CRIMINAL |
| INSTITUTE, et al., | ) COMPLAINT BY PLAINTIFF Judy A. |
| Defendants | ) Mikovits |
| | ) 28 U.S.C. 1361 |
| | ) |
| | ) Honorable Robert C. Jones |

**COMES NOW:**

Plaintiff, Judy Mikovits, in the above encaptioned matter, to notice this
honorable court of Plaintiff's criminal affidavit to be lodge on the record of
this case.

Dated this April 15 , 2019

*Please see attached
certificate for Notary

Judy A. Mikovits



1 of 268

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _Ventura_____

Subscribed and sworn to (or affirmed) before me on this __11th___
day of _April_____, 20 _19_, by _Judy A. Mikovits_____
_____,
proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.



JUSTIN PAUL DREYFUSS
Notary Public - California
Ventura County
Commission # 2152003
My Comm. Expires May 30, 2020

(Seal)                    Signature _____

commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

shall be punished as provided in paragraph (3).

**(2)** Whoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to—

(A)influence, delay, or prevent the testimony of any person in an official proceeding;

**(B)** cause or induce any person to—

(i) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

(ii) alter, destroy, mutilate, or conceal an object with intent to impair the integrity or availability of the object for use in an official proceeding;

(iii) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

(iv) be absent from an official proceeding to which that person has been summoned by legal process; or

(C) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

shall be punished as provided in paragraph (3).

(3) The punishment for an offense under this subsection is—

(A) in the case of a killing, the punishment provided in sections 1111 and 1112;

(B) in the case of— (i)an attempt to murder; or

(ii) the use or attempted use of physical force against any person;

imprisonment for not more than 30 years; and

(C) in the case of the threat of use of physical force against any person, imprisonment for not more than 20 years.

**(b)** Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

**(1)** influence, delay, or prevent the testimony of any person in an official proceeding;

(2) cause or induce any person to—

**(A)** withhold testimony, or withhold a record, document, or other object, from an official proceeding;

**(B)** alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;



4 of ■ 268

(C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

(D) be absent from an official proceeding to which such person has been summoned by legal process; or

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation [1] supervised release,,[1] parole, or release pending judicial proceedings;

shall be fined under this title or imprisoned not more than 20 years, or both.

(c) Whoever corruptly—

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

(d) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—

(1) attending or testifying in an official proceeding;

(2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation 1 supervised release,,1 parole, or release pending judicial proceedings;

(3) arresting or seeking the arrest of another person in connection with a Federal offense; or

(4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding;

or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.

(e) In a prosecution for an offense under this section, it is an affirmative defense, as to which the defendant has the burden of proof by a preponderance of the evidence, that the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully.

(f) For the purposes of this section—

(1) an official proceeding need not be pending or about to be instituted at the time of the offense; and

(2) the testimony, or the record, document, or other object need not be admissible in evidence or free of a claim of privilege.

(g) In a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance—

(1) that the official proceeding before a judge, court, magistrate judge, grand jury, or government agency is before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a Federal grand jury, or a Federal Government agency; or

(2) that the judge is a judge of the United States or that the law enforcement officer is an officer or employee of the Federal Government or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant.

(h) There is extraterritorial Federal jurisdiction over an offense under this section.

**(i)** A prosecution under this section or section 1503 may be brought in the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected or in the district in which the conduct constituting the alleged offense occurred.

(j) If the offense under this section occurs in connection with a trial of a criminal case, the maximum term of imprisonment which may be imposed for the offense shall be the higher of that otherwise provided by law or the maximum term that could have been imposed for any offense charged in such case.

(k) Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

## 5.      Facts of Original Jurisdiction of this Court

As you should know. . . **[BOLDED and underlines are added as emphasis for purposeful clarity of a point by point focus.]**

**Mandatory Judicial Notice of Adjudicative Facts are as follows. . . .** Under Public Law 93-595: **"A Court shall take Judicial Notice if requested by a party and supplied with the necessary information."** This notice is being "requested" as follows . . . **Judicial Notice is discretionary. With judicial cognizance, the judge is bound to act**: See Black's Law, 6th Ed, pg 847



**Part A: Jurisdiction of this Court, on its face, is invoked as follows:**

**18 U.S.C. § 1964(a) and (c);** 28 U.S.C. §§ 1343; which provides for a federal court forum in which citizens may seek regress from the deprivation of rights, privileges, and immunities under color of state law; 18 U.S.C. §§ 1961-1964. The Racketeer Influenced Corrupt Organizations Act (herein after "RICO").

**42 U.S.C. § 1988; Proceedings in vindication of civil rights**
   **a) Applicability of statutory and common law**
   The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect. . . so far as the same is not inconsistent with the  Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty. . ."
   (b) Attorney's fees
   In *any action* or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318 [20 U.S.C. 1681 et seq.],. . . **the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs,** except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, **unless such action was clearly in excess of such officer's jurisdiction.**
   (c) **Expert fees**
   In awarding an attorney's fee under subsection (b) of this section in any action or proceeding to enforce a provision of section 1981 or 1981a of this title, the court, in its discretion, **may include expert fees as part of the attorney's fee.**

**6.**    " . . . "Pleadings in this case are being filed by Affiant / Plaintiff in Propria Persona, wherein pleadings are to be considered without regard to technicalities. Propria, pleadings are not to be held to the same high standards of perfection as practicing lawyers. . ." See Haines v. Kerner 92 Sct 594, also See Power 914 F2d 1459 (11ᵗʰ Cir1990), also See Hulsey v.

Ownes 63 F3d 354 (5th Cir 1995). also See In Re: HALL v. BELLMON 935 F.2d 1106 (10th Cir. 1991)."

In Puckett v. Cox, " . . . **"it was held that a pro-se pleading requires less stringent reading than one drafted by a lawyer."** (456 F2d 233 (1972 Sixth Circuit USCA). Justice Black in Conley v. Gibson, 355 U.S. 41 at 48 (1957)

**7.** Also . . . Under the pains and penalties of perjury, by a sound mind and body, I claim the following as true and accurate to the best of my knowledge as an eye witness of the circumstances of these "referenced" Federal Criminal Charges as follows . . .

FACTS of these claims which Federal Statutes Sentencing Guides provide a remedy is a follows . . .

**8.    INTRODUCTION AND SUMMARY OF PROBABLE CAUSE**

The primary objective of the defendants is a widespread criminal *enterprise* engaged in a *pattern of racketeering activity* across State lines, and a conspiracy to engage in *racketeering activity* involving numerous RICO predicate acts during the past ten (9) calendar years which started in September, 2010.

The predicate acts alleged herein cluster around criminal scientific fraud, Welfare Fraud, trafficking in counterfeit securities, tampering with and retaliation against a qualified Federal Witness, interstate transportation of stolen property, obstruction of justice, extortion of rights under color of law, conspiracy to obstruct Justice by State and local law enforcement and the State and Federal court officials.

The defendants qualify as a "R.I.C.O." enterprise. Another objective of this racketeering *enterprise* has been to inflict severe and sustained economic hardship upon Affiant, with the intent of impairing, obstructing, preventing and discouraging Affiant from writing, publishing, investigating and exposing the criminal fraud behind the defendants' efforts to legitimize their junk science to protect their monetary scheme and financial interest in the contaminated blood sources nationwide.

Affiant is a well-known and highly regarded immunologist and virologist, developing cancer therapies targeting viral causes of immune deficiency. Affiant had more than 20 years of experience at NIH (National Institute of Health) and was the CSO (Chief Science Officer) of a biotech company in Santa Barbara, California.



Affiant began working for WPI (Whitmore Peterson Institute) in 2006. WPI is a research institute founded by Harvey and Annette Whittemore to study neuroimmune diseases, in particular Chronic Fatigue Immune Dysfunction Syndrome (CFIDS).

Harvey Whittemore and Annette Whittemore are well-known wealthy socialites in the state of Nevada. Harvey Whittemore is widely considered one of the most influential citizens of Nevada. Harvey Whittemore's is also a prolific fundraiser for Nevada politicians. In addition to this, Harvey Whittemore is a lawyer who was a lobbyist for the gaming industry in Nevada, as well as the petrochemical industry. The Whittemore Peterson Institute is an organization founded by the Whittemores to study a condition known as Chronic Fatigue Immune Dysfunction Syndrome (CFIDS). The Whittemores have a daughter named Andrea who suffers from (CFIDS). Andrea Whittemore is severely impacted by the condition.

Harvey Whittemore and Annette Whittemore sought a cure for their daughter's illness. Mr. and Mrs. Whittemore decided to endow the University of Nevada with enough funds to open a research laboratory to research treatments and cures for CFIDS.

Together, with another prominent doctor named Peterson, the Whittemores founded the Whittemore Peterson Institute (WPI). WPI is a non-profit 501(c)(3) organization at the University of Nevada. Annette Whittemore was the president and CEO of WPI. Harvey Whittemore was also heavily involved with the administration of the organization.

Harvey Whittemore made Affiant his Institute's first Research Director. In addition to the above referenced duties as director, Affiant was responsible for establishing a translational research program aimed at identifying biomarkers and underlying causes of chronic fatigue syndrome and other debilitating neuro-immune diseases with overlapping symptoms such as fibromyalgia, chronic Lyme disease, atypical multiple sclerosis and autism spectrum disorder.

As research director Affiant was responsible for planning, establishing and directing the institute's scientific research program including the selection training and supervision of staff, writing, and managing grants and collaborating with other scientific organizations.

As Affiant's work progressed in the laboratory, links were being anticipated for the XMRV and other neuroimmune diseases such as fibromyalgia, chronic Lyme disease, atypical multiple sclerosis and autism spectrum disorder. Affiant's work was heralded in the media across the globe. The media had frenzy as Affiant began to link her newly discovered

Xenotrophic Murine Leukemia Virus-Related Virus also known as (XMRV) to many of the world's most perplexing and insidious diseases.

Eventually, in or around April 23, 2010, Affiant and Dr. Ruscetti earned a patent from the United States Patent and Trademark Office under **Patent No. US 61/321,147** incorporated herein and attached hereto under **Exhibit (A); includes 49 pages.**

**9.**   Mr. & Mrs. Whittemore's investment appeared to be working out. Their daughter was improving on a daily basis, and patients came great distances to participate in the seemingly successful studies. Under Affiant's direction WPI grew from a small foundation to an internationally recognized center for the study of neuroimmune diseases. As a result of the intense attention that her lab was getting, Affiant began to attract federal funds from the National Institute of Health (NIH) in the United States Department of Defense. A good portion of those dollars were being unlawfully misappropriated by Harvey and Annette Whittemore, Lombardi, Hillerby, Kinne, giving rise to embezzlement and defrauding the Federal Government by Medicare Fraud.

**10.**   In or around the summer of 2011, Affiant discovered that one of the researchers at WPI, Vincent Lombardi, had been using federally-funded research materials for use in research for a "for-profit" entity owned by the Whittemores, VIPDx. Affiant informed Lombardi and the Whittemores about the perceived misappropriation of federal funds.

Affiant demanded that Lombardi cease the misappropriation of these resources, and refused to provide further resources to him. Additionally, Affiant gave noticed to Lombardi by email and sent certified copies to Annette Whittemore, Harvey Whittemore and Carli West-Kinne, that certain individuals in the WPI lab had been tampering with and removing reagents and samples from the lab in violation of protocol and against Affiant's specific authorization. See Affiant's email of Wed, July 27, 2011 attached hereto and made apart hereof as **Exhibit (B).** Additionally, Affiant gave notice of Lombardi's misconduct to the Whittemores with the request to have Lombardi fired. The Whittermores refused this request.

**11.**   On or about September 29, 2011 Affiant caught Lombardi again attempting to misappropriate resources and fabricate data on the XMRV study. Again, Affiant warned the Whittemores of Lambardi's misconduct. Shortly thereafter, Affiant was called by Annette Whittmore on the telephone and Annette instructed Affiant to change the study to protect the

misconduct and fraudulent data imposed by Lombardi in order to preserve the project. Affiant refused.  Affiant also co-authored a paper asserting that the final research paper of the Whittemores' for-profit entity, VIPDx, was based on contaminated and fraudulent data. This was scientific fraud.

Shortly after reporting these problems, Affiant was terminated on September 29, 2011. See also email correspondence in late June of 2014 between Dr. Frank Ruscetii, Kent Heckenlively and Affiant were Dr. Ruscetii expressed his concerns over the mistreatment of Affiant by the Whittmores as well as the fraudulent XMRV study. Attached and made apart hereof as **Exhibit (C).**

**12.**    Additionally, **Exhibit (D)** attached hereto and made apart hereof shows news articles, publications from "Science" the Journal, and email correspondence by Affiant expressing her grave concerns about the fraudulent XMRV study proposed by the Whittemores where WPI and their co-conspirators are attempting to cover up the fact that more than 20 percent of the country's blood supply is contaminated with tainted XMRV viruses being transmitted to Americans largely through vaccines. Further, Dr. Ruscetii and Affiant developed the methodology on testing for XMRV viruses. See **Exhibit (D).** The Whittemores' plans were to steal this technique, discredit Affiant, and market this technique as their own for the profits and gains under one of their other company's name, RED Labs DBA VIPDx. See also pages 2 & 3; and pages 5 through 14 of **Exhibit (D).**

**13.**    There were additional years of extensive Medicare fraud by Redlabs/VIPdx; additional misappropriation of federal funds using fraudulent data to support unvalidated clinical lab testing done by RED Labs and patent fraud, all done to cover up the extensive crime network of the Whittemore's, WPI, RED Labs/VIPdx, other privately owned companies, and the UNR foundation defrauding the taxpayers of tens of million each year, which dates back to at least 2004 before Affiant met the Whittemores.

Harvey and Annette Whittemore, as well as Vincent Lombardi have all been listed as owners of Redlabs/VIPDx entities since 2004. They have several entities named or associated with or as Redlabs USA listed in the State of Nevada business listings.

**14.**    The retaliation against Affiant did not end with her wrongful termination of September 29, 2011, instead it escalated to false arrest and imprisonment in November of 2011 and the bankruptcy fraud of March 2014 detailed below.  See also, an email from Affiant's attorney, Robert J. Liskey

to Assistant United States Attorney Troy K. Flake dated July 15, 2016, attached hereto and made a part hereof as **Exhibit (E).**

**15.**    Within weeks of Affiant's termination, on November 18, Affiant was arrested on trumped up criminal charges by the Whittemores for allegedly failing to hand over Affiant's <u>own documents</u> to which WPI claimed title.

There was no lawful warrant of arrest; there was no lawful probable cause affidavit; there was no lawful, certified charging document by a prosecutor to warrant the unlawful criminal prosecution against Affiant. At no time was Plaintiff shown an Arrest Warrant or a Search Warrant.  Nor was Affiant's husband ever shown such documents at the time of the unlawful search and unlawful arrest of Affiant. Affiant was never told what her charges were other than a "Fugitive from Justice". Additionally, Affiant was denied reasonable access to counsel and denied access to a judicial tribunal, until the hearing on Affiant's release five days after the warrantless arrest, and was still unaware of what she was charged with. Affiant was unlawfully held in jail without bail until November 22, 2014, all under the directives of Adam Garcia, Richard Gammick and John W. Helzer.

**16.**    Eventually, Affiant was able to obtain copies of the fraudulent affidavits and fraudulent charging documents. Those documents are attached hereto and made a part hereof as **Exhibit (F).**

Affiant charges Todd Hourigan, Jamie McGuire, Richard Gammick, John W. Helzer, and the judicial officer who signed the fraudulent non-lawful affidavit with false swearing or perjury of oath. None of these defendants were first-hand witnesses, nor where they alleged victims to any of the acts alleged within these documents.

Affidavits are required to be drawn up by the victim with first-hand personal knowledge of the specified crime if the victim is not diseased. Neither Hourigan, McGuire, Gammick or Helzer were the purported victim in this matter. The fact that defendants submit statements under penalty of perjury with or with out signatures does not diminish this specific requirement or defendants' liability.

**17.**    The fact that Todd Hourigan chose not to sign his affidavit further evidences his intent to corrupt the process for a warrantless arrest and unlawful search of Affiant's homes.

A careful perusal of this phony rubber-stamped affidavit shows that no California judge signed it. A judge's signature is but one of the several requirements to authenticate a lawful search warrant under the 4th

Amendment to the U.S. Constitution. The rubber stamped fraudulent affidavit submitted by Hourigan was set into motion and used to violate Affiant's rights at the directives of Geoff Dean.

**18.**   The document entitled "IN THE MATTER OF AN APPLICATION FOR AN ARREST WARRANT FOR JUDY MIKOVITS" submitted by Jaime McGuire, McGuire does not allege that she is a victim of a crime. This document has no other attachments or sworn statements from any reported victim rendering it grossly deficient and fraudulent constitutionally. It is filed date stamped the 11th of November 2011 as "witnessed" by some judicial officer who's signature is illegible.

Finally, the Second Criminal Complaint bearing the file date stamp of November 11, 2011 with a DA#: 434736 and Agency #: UNRPD 11-893 on its upper left corner, indicates that it has been drafted, filed and prosecuted by Jaime Mcguire, who is not a state prosecutor. In fact at the top of the criminal complaint it reads: **"JAIME MCGUIRE of The University of Nevada Police Department, County of Washoe, State of Nevada, verifies and declares upon information and belief, and under penalty of perjury, that JUDY MIKOVITS, the defendant above-named has committed the crime of:"**

**19.**   The writing in this document is a second count of false swearing and perjury of oath by Jaime McGuire. Additionally, McGuire is charged with practicing law without a license which also constitutes fraud upon the court, fraud upon Affiant, obstruction of justice, conspiracy to obstruct justice, extortion of Affiant's rights under color of law, and conspiracy to extort Affiant's rights under color or law.  Affiant hired Scott Freeman and Tammy Riggs for $~~150,000.00~~ 46,000 at the request of Dennis Jones to represent her in the criminal matter. Freeman and Riggs tried verbally to coax Affiant into coming to Reno Nevada to turn herself back in because she was still a "fugitive from justice", although there were no criminal charges pending against Affiant.

Despite Affiant's incarceration, the Whittemores and WPI pressed forward with fraudulent civil claims against Affiant, resulting in a Nevada Court granting an injunction requiring Affiant to hand over the documents that precipitated the unlawful search and arrest. This fraudulent civil action was being headed by defendants Annette and Harry Whittemore, Ann Hall and Carli Kinne-West on behalf of WPI.

Affiant hired attorneys Dennis Jones and Tammy Riggs on November 15, 2011 to represent her in the WPI civil action. Affiant paid Jones' law firm

MYERS, WIDERS, GIBSON, HONES & SCHNEIDER, L.L.P. $150.000 for their representation. Dennis Jones advised Affiant to withhold Affiant's emails due to client/patient privacy and HIPPA regulations. As a result of Affiant following the advice of Dennis Jones, and for the safety of patient data, Judge Brent Adams ruled against Affiant and colluded with the Whittemores, Ann Hall, and Carli West Kinne in further discrediting Affiant by an illegitimate court process.

**20.**    Judge Adams was the assigned judge in the civil contempt hearing. Affiant's attorneys Dennis Jones and Tammy Riggs never filed any opposition papers nor did they advocate for Affiant at anytime during these proceedings. It is Affiants belief that Dennis Jones, Tammy Riggs and Scott Freeman colluded with the judges and the Whittermores to take my money and railroad Affiant into prison. Judge Adams eventually issued a judgment against Affiant on Jan. 24, 2012. In March, while in chambers, Judge Adams talked with the lawyers from WPI, Dennis Jones and Tammy Riggs about the hearing on damages. Judge Adams disclosed that he had in the past, received campaign contributions from Harry Whittemore. Days later judge Adams recused himself from the case. Interestingly, Judge Adams was already aware of his connection to the Whittemores long before this damages hearing and long before the media began reporting that the FBI was investigation the Whittemore's campaign contribution fraud. Therefore , Judge Adams should have recused himself sua sponte before he made any rulings on the matter. It was obvious to Affiant during these proceedings that Judge Adams had a bias and prejudice against Affiant. After judge Adams' ruling and after the criminal case had been dismissed, Affiant hired new counsel, David Follin. David Follin sent a request for a copy of Affiant's criminal file from Dennis Jones. Dennis Jones has yet to respond to this request.

**21.**    In the resulting bankruptcy proceeding, **Case No. 9:12-BK-13335-RR,** WPI, at the direction of Annette and Harvey Whittemore, fraudulently claimed that Affiant owed the Institute over $5.5 million dollars. See **WPI's Proof of Claim No. 6-1** dated 03/01/13 under **Exhibit (G)** attached hereto and made a part hereof.  This fraudulent claim was filed on the record by WPI's attorneys J. Scott Bovits and submitted by Lisa Fenning on July 25, 2013. Said claim was also signed by Carli Kinne-West. This claim of $5, 565,745.52 dollars was allegedly for "litigation" costs but lacking any declarations of accounting attached thereto. WPI's attorneys J. Scott Bovits,

Lisa Fenning and Carli Kinne-West knew these claims were fraudulent and unsubstantiated.

During the bankruptcy proceedings, defendant Jeremy Faith, the U.S. Bankruptcy Trustee, in his **Motion For Order Authorizing Trustee To Compromise Controversy**, Docket No. 64, page 5, second paragraph, lines 10 through 12, stated, ***"After investigation of WPI's allegations and a thorough analysis, the Trustee finds the amount of damages asserted in the Amended Proof of Claim is objectionable."*** What analysis did Jeremy Faith do? Did he look to any attached accounting to defendants' claim? Obviously the answer to that question is NO! Jeremy faith did NOTHING. Further, his whole argument in his memorandum, conclusion and declaration is a total fabrication. See **Exhibit (H)** attached hereto and made apart hereof.

22.   The set of illegitimate lawsuits WPI commenced against Affiant were intended to retaliate against Affiant because of her role as a "Whistle Blower" in instituting Affiant's own qui tam proceeding, and seeking to stop the conspiracy and fraud against the government. The fraudulent court proceedings commenced and prosecuted by WPI and the Whittemores so far has succeeded in blackballing and bankrupting Affiant.

23.   Reminder of a **"judicial notice"**. **All named Defendants qualify as an association-in-fact and was an "enterprise" within the meaning of "RICO", 18 U.S.C. § 1961(4).**
**A "R.I.C.O." enterprise may include courts.** *United States v. Angelilli*, 660 F.2d 23 (2nd Cir. 1981). (See *United States v. Thompson*, 685 F.2d 993 (6thCir.1982), alleging that governor's office in Tennessee was a criminal enterprise.) See also *United States v. Stratton*, 649 F.2d 1066 (1981) alleging that Florida's Third Judicial Circuit met the requisite of a "RICO" enterprise;
*United States v. Clark*, 646 F.2d1259 (8th Cir. 1981), holding that a governmental agency can be a RICO enterprise, and listed several, including examples: the office of county judge to be an enterprise under the "RICO" Act and any other government agencies or offices; *United States v. Altomare*, 625 F.2d 5, 7, n.7 (4th Cir. 1980), the office of county prosecutor; *United States v. Grzywacz*, 603 F.2d 682, 686 (7th Cir.1979), the city police department. Among the government units that have been held to be" enterprises" are offices of governors and <u>state legislators,</u> courts and court clerks' offices. See e.g., *United States v. Stratton*, 649 F.2d 1066, 1072-75 (5th Cir. 1981);

**24.**   The following statements of Federal claims made on each of the named defendants, which a remedy will be applied, such as, Defendant(s) [including but not limited through discovery] Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), the WHITMORE PETERSON INSTITUTE (WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams  (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California), J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings) [including others to be named though discovery process,] did in fact and "in concert," violated numerous Federal Laws as follows…. **Each numbered FACTS of Law" (1 through 29) will equal multiple Federal Criminal Charges within that number, equaling each Count as a separate Felony for a total of 45 counts.**

**1. FACT OF LAW of Federal Criminal Charges as COUNT No. 1 of the Federal "RICO" Act found at Title 18 U.S.C § 1961.**

**Fact of LAW** via a claim under which has a remedy, and cause of action at the Federal level, in fact that all the Defendant(s), [including but not limited through discovery] Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams  (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California), J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings), in concert, did in fact violate their "Oaths of Office" per se, and endangering the "public welfare" by committing 62 Federal Felony Crimes, and are also guilty of violating the Racketeer Influenced and Corrupt Organizations Act (1970) individually, and in concert, as members

of their "organized" crime syndicate. All above listed Defendant(s) are guilty of violating the Federal Law . . . Title 18 U.S.C. § 1961 as follows . . .

(1). "racketeering activity" means (A) any act or threat involving murder, **kidnapping**, gambling, arson, **robbery**, **bribery**, **extortion**, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section **1341 (relating to mail fraud), section 1343 (relating to wire fraud)**, section 1344 (relating to financial institution fraud), **section 1503 (relating to obstruction of justice), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering).**

-More specifically, the named defendants violated Sections (1)(A) involving bribery, kidnapping, section 1503 (relating to obstruction of justice), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering);

-18 U.S.C. § 1962(d)), Conspiracy to pervert or obstruct justice with the intent to corruptly influence the outcome of the state criminal, civil and bankruptcy proceedings against Affiant;

-Perjury of Oath in violation of § 1503, during all court proceedings against Affiant;

-Perjury of Oath in violation of § 1503 as evidenced by Exhibit (F) and any other court documents filed in all the other court proceedings.

Additionally, The predicate act of Obstruction of Justice, **18 U.S.C. §1503 provides:**
-Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under

which any pending proceeding is being had before any department or agency of the United States, or the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress.

- Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede...... or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b).

(b) The punishment for an offense under this section is—

(1) In the case of a killing, the punishment provided in sections 1111 and 1112;

*(2) In the case of an attempted killing, or a case in which the offense was committed against a petit juror and in which a class A or B felony was charged, imprisonment for not more than 20 years, a fine under this title, or both; **and;***

Acts of the named Defendant(s) listed herein, as they made up and falsified affidavits and copied and pasted manufactured conjectures, fathomed out of their no-law-filled minds to produce fraudulent "blanket and rubber stamped" pretend-a-affidavits and search warrants. Refer to Exhibit (F).

Additionally, Defendants are charged with violations of 18 U.S.C. **§** 1951, Interference with commerce by threats or violence, which provides:

a). Whoever, in any way or degree obstructs, delays, or affects commerce, or the movement of any article or commodity in commerce, by robbery or extortion, or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section.

Affiants lap top computers which defendants stole and later conspired to extort from Affiant; along with sham legal proceedings as further illustrated in Exhibit (F) and later the false and forged documents in the bankruptcy proceedings illustrate these violations done to Affiant.

Additionally, Defendants are charged with violations of 18 U.S.C. **§** 1951-Extortion.

Extortion within the meaning of the Hobbs Act require that the defendants obtain "property" or "liberty" from another, with his consent, induced by wrongful use of actual or threatened force, or fear, under color of official right. All named Defendants turned the criminal, civil and bankruptcy

proceedings into a "racket" within the meaning of the Hobbs Act in violation of 18 U.S.C. § 1961 and 18 U.S.C. § 1962(d)).

Defendants' conduct and violations of this section is stated in paragraphs 1 through 22 above including all attached exhibits.

**1. State Offenses**

Section 1961(1)(A) defines racketeering activity as follows:

**any act** or threat involving murder, **kidnapping**, gambling, arson, robbery, bribery, **extortion**, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act) [i.e., 21 U.S.C. § 802], **which is chargeable under State law and punishable by imprisonment for more than one year.** This definition does not identify specific state statutes that may provide the basis for a RICO predicate act of racketeering. Rather, Congress intended the state offenses referenced in Section 1961(1)(A) to identify "generically" the kind of conduct proscribed by RICO, and therefore it is immaterial whether a state statute uses the same labels or classifications as specified in Section 1961(1)(A). **Thus, a state statutory offense may constitute a proper "RICO" predicate racketeering act under Section 1961(1)(A) provided it substantially conforms to the "generic" definition of the state.** [Entirety quoted from "18 U.S.C. §§ 1961-1968 A Manual for Federal Prosecutors FIFTH REVISED EDITION."

**18 USC § 18 - Organization defined**

**As used in this title, the term "organization" means a person other than an individual.** [Referenced to to the Federal RICO Act under Title 18 United States Code connects to Title 42 of same Title 18.]

Precedence Case Law . . .

" . . . United States v. Tackett, 113 F.3d 603, 611 (6th Cir. 1997)("Although the omnibus clause of §1503 requires that a defendant's actions were intended to obstruct an **actual judicial proceeding, the government need not prove that the actions had their intended effect**. Furthermore, an endeavor to obstruct justice violates the law even if, **unbeknownst to the defendant**, the plan is doomed to failure from the start"), citing, United States v. Osborn, 385 U.S. 323, 333 (1966).

18 U.S.C. § 1962(d)) - Conspiracy to Obstruct or Pervert Justice by perjury of Oaths:

The California Constitution Article 20 Section 3 provides:

Members of the Legislature, and all public officers and employees, executive, legislative, and judicial, except such inferior officers and

employees as may be by law exempted, shall, before they enter upon the duties of their respective offices, take and subscribe the following oath or affirmation:

One of the 40 plus Federal and State Felonies committed by the Defendant(s) as follows . . .

QUOTE . . . An individual, except the President, elected or appointed to an office of honor or profit in the civil service or uniformed services, shall take the following oath:

**"I, AB, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States** against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; **that I take this obligation freely, without any mental reservation <u>or purpose of evasion</u>;** and that I will well and faithfully discharge the duties of the office on which I am about to enter. **So help me God."** This section does not affect other oaths required by law."

18 USC 2381 **"TREASON"**

JUDICIAL NOTICE : THE UNITED STATES SUPREME COURT HAS REPEATEDLY HELD THAT ANY JUDGE WHO ACTS WITHOUT JURISDICTION IS ENGAGED IN AN ACT OF TREASON. U.S. V. WILL 499 US 200, 216, S.CT. 471, 66 L.ED 2D 392, 406 (1980); Cohens v. Virginia , 19 U.S. (6 WHEAT) 264, 404, 5 L.ED. 257 (1821).

". . . Holding: The Court held that, in order to prove an **"association in fact enterprise"** engaged in racketeering activity, **the government need not prove additional structural attributes beyond that inherent in the pattern of racketeering.** Thus, the government need only show that the enterprise **has a purpose, relationships among those associated, and longevity sufficient to allow the associates to pursue the purpose. . . "** Boyle v. U.S., 07-1309 (6/8/09)

" . . . But in view of our construction of the word **"willfully,"** the jury **should have been further instructed that it was not sufficient that petitioners had a generally bad purpose. To convict, it was necessary for them to find that petitioners had the purpose to deprive the prisoner of a constitutional right,** *e.g.,* **the right to be tried by a court, rather than by ordeal.** And in determining whether that requisite bad purpose was present, the jury would be entitled to consider all the attendant circumstances . . . **Congress has made it a federal offense for a state officer to violate the law of his State. But there is no warrant for treating the question in state law terms.** The problem is not whether state

law has been violated, **but whether an inhabitant of a State has been deprived of a federal right by one who acts under "color of any law."** He who acts under "color" of law may be a federal officer or a state officer. He may act under "color" of federal law or of state law. . . **The statute does not come into play merely because the federal law or the state law under which the officer purports to act is violated. It is applicable when and only when someone is deprived of a federal right by that action. The fact that it is also a violation of state law does not make it any the less a federal offense punishable as such. Nor does its punishment by federal authority encroach on state authority or relieve the state from its responsibility for punishing state offenses . . ."** Page 107, Screws v. United States, 325 U.S. 91 (1945)

Fact of Law and common sense: if all of the Defendant(s) did in fact had "willfully" (or without the conjunctive wordage "will" and "fully,") as willfully (intended) or intent, but did in fact *"deprive* [this Plaintiff] *of a federal right by that action."* It will be proven, without a shadow of a doubt, that when anyone, deprives anyone else from a *"federal right,"* that they did NOT go out to directly with the exact purpose of, depriving, but as stated by the Supreme Court Justices, *"the jury should have been further instructed that it was not sufficient that petitioners had a generally bad purpose."* End of their quote.

QUOTE:
". . . Malfeasance has been defined by appellate courts in other jurisdictions **as a wrongful act which the actor has no legal right to do; as any wrongful conduct which affects, interrupts or interferes with the performance of official duty; as an act for which there is no authority or warrant of law; as an act which a person ought not to do; as an act which is wholly wrongful and unlawful; as that which an officer has no authority to do and is positively wrong or unlawful; and as the unjust performance of some act which the party performing it has no right, or has contracted not, to do** . . . The court then went on to use yet another definition, **". . . malfeasance is the doing of an act which an officer had no legal right to do at all and that when an officer, through ignorance, inattention,** or malice, **does that which they have no legal right to do at all, or acts without any authority whatsoever, or exceeds, ignores, or abuses their powers, they are guilty of malfeasance."** —*Daugherty v. Ellis,* 142 W. Va. 340, 357-8, 97 S.E.2d 33, 42-3 (W. Va. 1956)

A.    ". . . **Law enforcement personnel are held to personal standards <u>higher</u> than other members of our communities. Conduct unbecoming has been a common and historical charge used in controlling and censuring police officers and other public employees, for both on and off duty actions. . ."** The "**Police Officer's Code of Ethics,**" written back in the 1950s, has a provision that is routinely referenced in training as well as court decisions that promises, under oath:

B.    ". . . **I will keep my personal life unsullied as an example to all.**" . . .

   " . . Court decisions regarding public employee misconduct involving conduct unbecoming commonly requires that the act of misconduct have a nexus or connection to the employee's job performance or ability to perform or **have an adverse affect on the agency's** "morale," **"operations," or "efficiency. . ."**

C.    ". . . **Historically, law enforcement employees have been held to this higher standard of conduct, both on and off the job. This heightened standard of conduct also applies to other public employees. . ."** [A, B, C, Above are Quoted from. . . http://patc.com/weeklyarticles/conduct-unbecoming.shtml#i also found at Beecham v. Henderson County, 422 F.3d 372 (6th Cir 2005)]

   ". . . <u>**However, the State contended that the officer was bound by a state statute**</u> which <u>**extended the limit to 10 years for "public officers.**"</u> The court found that a police officer was **"considered on duty 24 hours a day."** Since it was concluded that the officer was "on-duty 24 hours a day, the "public official" extension of the statute of limitations applied to officers who were off-duty at the time of the incident giving rise to the discipline. **What the court found specifically important was that the officer signed these oaths and codes. . .** " State of Washington v. Cook, 125 Wn. App. 709; 106 P.3d 251 (Wash. App. Ct. 2005)

   ". . . As a final point, the Court of Appeals said the factor was "troubling" because petitioners, **as police officers, held positions of trust they had abused.** Section 3B1.3 **of the Guidelines increases,** rather than decreases, **punishment for those who abuse positions of trust. 34 F.3d, at 1454. . ."** Koon v. United States 518 U.S. 81116 S.Ct. 2035135 L.Ed.2d 392)

   " . . . **It is well recognized that the Fourth Amendment** "imposes substantive standards for searches and seizures; but with them one of the important safeguards it establishes is **a procedure;** and [that] central to **this procedure** is an independent control over the actions **of officers effecting searches of private premises.**" *Abel v. United States,* 362 U.S. 217 [Emphasis added.]

Acts of the Defendant(s) listed herein, as they made up by falsified "affidavits and copied and pasted manufactured evidential conjectures, to be seized, fathomed out of their no-law-filled minds (or filed reports,) to produce fraudulent "blanket and rubber stamped" pretend-a-affidavits and search warrants.

### 2. FACT OF LAW of Federal Criminal Charges as COUNT No. 2 of Title 18 USC § 242

This is a claim which relief can be granted, **that the Defendant(s) Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), the WHITMORE PETERSON INSTITUTE (WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams  (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada),  [including others to be named though discovery process,] with the assistance of Richard Gammich (District Attorney of Washoe County Nevada) "in concert," on numerous occasions, in fact did violate 18 U.S.C. § 242, by A. "Rubber stamping" and using "Blanket" search warrants which can be proved without a shadow of doubt, "under the color of law," did in fact violate 18 U.S.C. § 242 as follows . . .**

Title 18 U.S.C. § 242

**Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States,** or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, **shall be fined under this title or imprisoned not more than one year, or both**; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or **threatened use of a dangerous weapon**, explosives, or fire, **shall be fined under this title or imprisoned not more than ten years, or both**; and if death results from the acts committed in violation of this section or if such acts **include kidnapping or an attempt**

**to kidnap,** aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

**A. " . . . It prohibits, among other things, subjecting any person under color of law "to the deprivation of any rights," privileges, or immunities secured or protected by the Constitution or laws of the United States." A violation of § 242 can arise in a myriad of forms, and the Guideline applicable to the statute applies to any violation of § 242 regardless of the form it takes . . ."**

**B. ". . . Most Guidelines prescribe punishment for a single discrete statutory offense or a few similar statutory offenses with rather predictable fact patterns. Petitioners were convicted of violating 18 U.S.C. § 242, however, a statute unusual for its application in so many varied circumstances. "the harm involved both the underlying conduct and activity intended to deprive a person of his civil rights," *ibid.* . . ." ."** [Note. A, B, as quoted from Koon v. United States 518 U.S. 81.]

**". . .** The Government acknowledges as much but says its position is required by **18 U.S.C. § 3553(a)(2). The statute provides:**

"The court, in determining the particular sentence to be imposed, **shall consider -- . . .**

"(2) the need for the sentence imposed -- **"(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; "(B) to afford adequate deterrence to criminal conduct; "(C) to protect the public from further crimes of the defendant**[s]; . . ."

**FACT** of this case, that demands a stricter basis of conduct for all public officers who are supposed to be upholding the Statues [laws] of this country and the state that employs them, and what is referred to as "higher standards" than the public, the "public officers" should **NOT brake 30 or 40 times MORE "laws"** while pretending to be enforcing a single "unconstitutional" law against any citizen of this country. Case Law Precedence of US Supreme Court and Federal Courts case laws as follows. . .

**". . .** Holding: In order to establish a conspiracy, **no proof of a formal agreement is required; a "tacit or <u>mutual understanding</u>" is all that is necessary.** . . In a § 241 conspiracy case, the **government need not prove that defendant[s] himself committed any of the overt acts, only that some member of the conspiracy committed the overt acts.** . ." 18 USC § 241 - Conspiracy - Civil Rights  U.S. v. Conaster, 06-5694 (2/4/08)

"... "Defendants Koon and Powell will be subjected to a multiplicity of adversarial proceedings. **The LAPD Board of Rights will charge Koon and Powell with a felony conviction and, in a quasi-judicial proceeding, will strip them of their positions and tenure. Koon and Powell will be disqualified from other law enforcement careers. In combination, the additional proceedings, the loss of employment and tenure, prospective disqualification from the field of law enforcement, and the anguish and disgrace these deprivations entail, will constitute substantial punishment in addition to any court-imposed sentence.** In short, because Koon and Powell are <u>**police officers, certain unique burdens flow from their convictions.**</u> " 833 F. Supp., at 789 (footnotes omitted). . " [Emphasis added.] Koon v. United States 518 U.S. 81116 S.Ct. 2035135 L.Ed.2d 392)

### 3.  FACT of a claim at LAW of Federal Criminal Charges as COUNT No. 3 under Title 18 U.S.C. § 241

Fact of a claim which only a Federal remedy which relief can be granted is as Defendant(s) Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams  (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California), J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings), with the assistance of Brent Adams  (Nevada District Judge), Janet Berry, (Nevada District Judge), did "in concert," in numerous times, in fact did violate **Title 18 USC § 242 - Deprivation of rights under color of law; and,**

**18 USC § 241 - Conspiracy against rights . . .**

**If two or more persons conspire to** injure, **oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same;** or

If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap . . . they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

Defendants Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department),violated Title 18 USC § 2234 - Authority exceeded in executing warrant which provides: Whoever, in executing a search warrant, willfully exceeds his authority or exercises it with unnecessary severity, shall be fined under this title or imprisoned not more than one year. U.S. Code as of: 01/02/01 Section 2235. Search warrant procured maliciously Whoever maliciously and without probable cause procures a search warrant to be issued and executed, shall be fined under this title or imprisoned not more than one year."

Quote . . . **"Just two Terms ago in *United States v. Leon, supra,* the Court vigorously reaffirmed that the probable-cause decision must be made by a neutral and detached magistrate, stating that "the courts must . . . insist that the magistrate purport to 'perform his "neutral and detached" function and not serve merely as a rubber stamp for the police.'** *Id.,* 468 U.S., at 914, 104 S.Ct., at 3417 (quoting *Aguilar v. Texas, supra,* 378 U.S., at 111, 84 S.Ct., at 1512). And, as we explained in *Shadwick v. City of Tampa, supra,* 407 U.S., at 350, 92 S.Ct., at 2123, **"[w]hatever else neutrality and detachment might entail, it is clear that they require severance and disengagement from activities of law enforcement." There existed NO true State Statute Procedure in Defendant(s) actions, denying this Affiant 'due process" at Law.** [Emphasis added.]      [Refer to Exhibit F,] and "unjust" and completely "unconstitutional" statute against any citizen of this country. Especially because of the *"fruit of a poisonous tree,"* such as the bogus "search warrant" and false charges were "Dismissed," FACT of this immediate case is set in Case Law Precedence as follows. . .

" 298 F. 3d, at 1027. The court added that "[t]he leaders of the search team **must** also make sure that a **copy of the warrant is available to give to the person whose property is being searched** <u>at the commencement of the search</u>, and that such copy has no missing pages or **other obvious defects**." Ibid. (footnote omitted). We granted certiorari. 537 U. S. 1231 (2003).

Facts of this claim . . .1. NO one gave anyone a *"copy of the warrant"* . . . *"at the commencement of the search."* 2. NOR did anyone of the members of the crime syndicate "breaking and entering" Gang have any idea, concept nor precepts of what are *"other obvious defects,"* even looked like, even if someone pointed out, directly to them, what an *"obvious defects"* would be.

## 4.   FACT of a claim which has a remedy at Federal Criminal Charges as COUNT No. 4 of the Federal RICO Act at 18 U.S.C § 1505

This is a claim which relief can be granted that all the **Defendant(s)** [included but not limited through discovery] Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams   (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California), J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings) **did in fact violate, 18 U.S.C. § 1505 by their un-just and unlaw-full procedures** (or the lack of proper procedures thereof did in fact violate the following . . .

**Federal Criminal Charges as 18 USC Chapter 73 - OBSTRUCTION OF JUSTICE, 18 USC § 1505 - Obstruction of proceedings before departments, agencies, and committees. . .**

**Whoever, with intent to avoid, evade, prevent, or obstruct compliance, in whole or in part,** with any civil investigative demand duly and properly made under the Antitrust Civil Process Act, **willfully withholds, <u>misrepresents</u>,** removes from any place, **conceals, covers up,** destroys, mutilates, alters, **<u>or by other means falsifies any documentary material,</u>** answers to written interrogatories, or oral testimony, which is the subject of such demand; or attempts to do so **or solicits another to do so;** or

**Whoever corruptly,** or by threats or force, or by any threatening letter or communication **influences, obstructs, or impedes or endeavors to influence,** obstruct, or **impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency** . . . . [shall be] **imprisoned not more than 5 years** . . . or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. [Emphasis added.]

Fact as in this Case Quote. . . "Although in a given case the same misconduct may be punishable under other federal statutes — some like 18 U.S.C. 1001 equally broad and others like 18 U.S.C. 1516[3] more narrowly drawn, this report focuses on selected aspects of the general obstruction of justice provisions found in 18 U.S.C. 1503, 1505, and 1512. . . Section 1503 condemns obstructing pending judicial proceedings by means of any of four methods. . ." [See United States v. Collis, 128 F.3d 313, 318 (6th Cir. 1997). . . **"The action taken by the accused must be with an intent to influence judicial** or grand jury **proceedings** . . . Some courts have phrased this showing as a `nexus' requirement — that **the act must have the `natural and probable effect' of interfering with the due administration of justice"),** quoting United States v. Aguilar, 515 U.S. at 599; see also, United States v. Furkin, 119 F.3d 1276, 1281 (7th Cir. 1997). 515 U.S. at 599; see also, United States v. Furkin, 119 F.3d 1276, 1281 (7th Cir. 1997).

Facts that ALL of the above stated Defendant(s), without a doubt, 1. wanted to *"influence judicial proceedings,"* as they made out Statutorily lacking affidavits and warrants, and filed said papers for the record. 2. *"Act*[s] were `*natural and probable effect' of interfering with the due administration of justice."* And none of that statement had anything to do with BAD intent, or "will-full intent" but by their lack of Law-full competence, or reckless indifference to the rule of law by using the courts as "racket" to further *"interfer with the due administration of justice."*

**5.   Fact of a claim at which Federal Criminal Charges can be charged as COUNT No. 5 of the Federal RICO Act. . . 18 USC § 1506, as follows**
**. . .**

This is a claim which relief can be granted, beyond a **shadow of doubt, under Federal Law, 18 USC § 1506 which has a remedy and cause of action that this claim against all of the Defendant(s)** [included but not limited through discovery] Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County

Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams  (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California), J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings) See [Exhibits B and H ] and **did in fact and "in concert" violate, and did in fact** *feloniously alter, and "falsify, ". . .* **"***in ANY COURT of the United States***". . ." did in concert, via "rubber stamped" and "blanket search warrants," violated. . . 18 USC § 1506 as follows . . .** [See Exhibits F].

**18 USC § 1506**
    **Whoever feloniously** steals, takes away, **falsifies,** or otherwise **avoids any** record, writ, **process, or other proceeding, in any court** of the United States, **whereby any judgment is reversed, made void,** or does not take effect. . .  [Emphasis added. See "charges" being "dismissed on Exhibit F].
**Affiant  will prove beyond any shadow of doubt that Defendant(s) listed herein ALL "falsified" affidavits, and absolutely to** *"avoided all process"* **by violating the Nevada and California Rules of Criminal Procedure,** *"in a court,"* (justice of the peace court,) *"of the United States."* [Emphasis added.]

**6.  Fact of this claim of an actual remedy of Federal Criminal Charges as COUNT No. 6 of Federal RICO Act under Title 18 USC § 513 as follows . . .**
    This is a claim which relief can be granted  by this **cause of action, each of the Defendant(s),** [included but not limited through discovery] Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams  (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S.

Bankruptcy Trustee, Santa Barbara California), J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings) **did "in concert" violate 18 USC § 513 as follows . . .**

NOTICE TO THE COURT AND CLERK pursuant to **Title 18 USC § 4** of the commission of crimes cognizable by a Court of the United States under **Title 18 USC § 513** to wit: " *513(a) Whoever makes, utters or possesses a counterfeited security of a State or a political subdivision thereof or of an organization, or whoever makes, utters or possesses a forged security of a State or political subdivision thereof or of an organization, with intent to deceive another person, organization, or government* **shall be fined not more than $250,000 or imprisoned not more than ten years, or both.**"

See also **Sections 2311, 2314** and **2320** for additional fines and sanctions. Among the securities defined at **18 USC § 2311** is included "*evidence of indebtedness*" which, in a broad sense, may mean anything that is due and owing which would include a **duty, obligation** or **right of action**.

The below referenced documents including but limited to [Exhibits F, G & H] qualify as "*counterfeited securities*" in that the makers (The named Defendants) have stated them to have been officially signed and sealed as valid claims of a Duty, Obligation or Right Of Action owed by Affiant, Judy Mikovits to the Defendants, United States of America, The STATE of NEVADA and STATE of CALIFORNIA by the following:

1. Counterfeit Securities, 2 Criminal Complaints filed against Affiant one dated 11/17/11. See attached Exhibit F.;
2. Counterfeit Security, Affidavit in Support of Second Complaint and Warrant of Arrest Filed 11/17/11. See attached Exhibit F;
3. Counterfeit Security, Ventura County Search Warrant issued on 11/29/11. See attached Exhibit F;
4. Counterfeit Security, Notice of Dismissal filed on 06/11/12. See attached Exhibit F.
5. Counterfeit Security, Form B-10 Claim against Affiant in Bankruptcy proceedings filed on 01/24/12 by WPI for $5,565,745.52 submitted by J. Scott Bovitz on 03/01/13 Amended on 07/25/13, submitted by Lisa Fenning, signed by Carli Kinne-West with attached affidavits from Annette Whittemore, Vicent Lombardi and Harvey Whittemore.
6. Counterfeit Security dated 11/07/11, Affidavit by Annette Whittemore.

7. Counterfeit Security dated 11/07/11, Affidavit by Vincent Lambardi.

8. Counterfeit Security dated 11/07/11, Affidavit by Harvey Whittemore.

All the above referenced documents are "counterfeit securities" because they fail to comply with evidences of law, procedure or evidence under Nevada, California or United States law.

**Legal meaning of *"willfully,"*** But language of a statute affixing a punishment to acts done willfully may be restricted to such acts done with an **unlawful** intent. U.S. v. Boyd (C. C.) 45 Fed. 855; State v. Clark, 29 N. J. Law, 90. **Black's Law Dictionary, 4th Edition**

**The meaning of *"willfully"* or willful:**
*will·ful*
[wil-fuhl] adjective
1. **deliberate, voluntary, or intentional:** The coroner ruled the death willful murder.
2. **unreasonably stubborn or headstrong; self-willed.**

*Origin:* 1150–1200; Middle English; Old English willful, willing.
Synonyms
1. volitional.
2. intransigent; **contrary**, refractory, **pigheaded, inflexible, obdurate,** adamant. Willful, **headstrong**, perverse, wayward refer to one who **stubbornly insists upon doing as he or she pleases. Willful suggests a stubborn persistence in doing what one wishes, especially in opposition to those whose wishes or commands ought to be respected or obeyed:** that willful child who disregarded his parents' advice. **One who is headstrong is often foolishly, and sometimes violently, self-willed: reckless** and headstrong youths. The perverse person is unreasonably or obstinately intractable or contrary, often with the express intention of being disagreeable: perverse out of sheer spite. . .
Antonyms
2. **obedient, tractable.** Dictionary.com Unabridged Dictionary.com Unabridged http://dictionary.reference.com/browse/willful
* (1) **Legal Definition of *"unlawful"*:** ***Contrary to or unauthorized by law; illegal.*** http://legal-dictionary.thefreedictionary.com/unlawful
* (2) **Legal Definition of *"unlawful"*:** "When applied to promises, **agreements**, or contracts, the term denotes that such agreements have no

legal effect. The law disapproves of such conduct because it is immoral or contrary to public policy. _**Unlawful does not necessarily imply criminality,**_ **although the term is sufficiently broad to include it. West's Encyclopedia of American Law, edition 2**

**\* Legal Definition of** _**"illegal":**_ **adj. in violation of statute, regulation** or **ordinance, which** **may be criminal or merely not in conformity.** http://legal-dictionary.thefreedictionary.com/illegal

**Maxim of Law:** is that . . . **"Ignorance of the Law is NO excuse,"** especially by alleged **"Law Enforcement"** personal. _**"Lawful"**_ **equals the wordage of "law-FILLED," as the word** _**"lawful"**_ **is an actual conjunction of the two words "law and FULL which is an** _adj._ **Obeying the law; law-abiding.**

So that sentence above would actually read. . . _**"acts done willfully**_ **[Contrary to** <u>**or unauthorized by law**</u>**]** _**may be restricted to such acts done with an**_ **[not** <u>**law-abiding**</u>**]** _**intent."**_

**Judicial Notice: of this Supreme Court Case as setting the Precedence to this immediate case,**

" . . . _And see 254 U. S. District of Columbia,_ 254 U. S. 135, 254 U. S. 137; _Nash v. United States,_ 229 U. S. 373, 229 U. S. 377. Under that test, a local law enforcement officer violates § 20 and commits a federal offense for which he can be sent to the penitentiary if he does an act which some court later holds deprives a person of due process of law. **And he is a criminal though his motive was pure and though his purpose was unrelated to the disregard of any constitutional guarantee. The treacherous ground on which state officials -- police, prosecutors, legislators, and judges -- would walk is indicated by the character and closeness of decisions of this Court interpreting the due process clause of the Fourteenth Amendment. . .** "Screws v. United States, 325 U.S. 91 (1945) [Stating non-overruled Precedence.]

[Emphasis added.]

7. Case Law Precedence as follows . . .

" . . . The court's power to act is controlled solely by jurisdiction. The judge's jurisdiction to act depends on two factors: 1) the jurisdiction of the court that he represents, and 2) his [her] **personal compatibility with such court's jurisdiction.** <u>**A judge can be acting in total absence of jurisdiction ab initio despite that the court that he**</u> [she] <u>**pretends to represent had jurisdiction.**</u> **Such is the case of a judge presiding his [her]**

*own* **case.** See Life Ins. Co. v. Lavoie 106 S.Ct. 1580 (1986); In re Murchison 349 U.S. at 1 3 6, 75 S.Ct at 625. **The judge also can lose jurisdiction that initially may have by <u>violating the laws or rules governing said jurisdiction</u>.** See In Interest of M. V. 288 Ill. App. 3d 300, 681 N.E. 2d 532 (1st Dist. 1997). **Such is the case of a judge *committing fraud,*** involved in a scheme of bribery or extortion, **or not acting impartially while presiding the case.** See Bracey v. Warden, U.S. Supreme Court No. 96-6133, (June 9, 1997); Vallely v. Northern Fire & Marine Ins. Co 254 U.S. 348, 41 S. Ct. 116 (1920 ); In re Village of Willowbrook 37 Ill. App. 3d 393 (1962); Armstrong v. Obucino 300 Ill. 140 (1921); Johnson v. Zerbst, 304 U.S. 458, 58 S. Ct. 1019 (1938); Pure Oil Co. v. City of Northlake, 10 Ill. 2d 241 , 140 N.E. 2d 289 (1956).**The alleged court orders [warrants] <u>issued in such cases are null and void, of no legal force or effect, for being issued by a judge in total absence of jurisdiction. They are void even prior to reversal.</u> .”** See Old Wayne Mut. I. Assoc. v. McDonough 204 U.S. 8, 27 S. Ct. 236 (1907). [“Void prior to reversal” or in this case “suppressed” and “dismissed search warrant.”]

 “. . . **<u>Should the judge violate jurisdiction, he</u>** [she] **<u>has not only violated the law, but he</u>** [or she] **<u>is also a trespasser of the law,</u>** (Von Kettlet et al. V. Johnson, 57 Ill.109 1870; Elliott v. Peirsol, 1 Pet. 328, 340., 26 U.S. 328, 1828). *Judicial notice be taken that acting in total absence of jurisdiction is cause for indictment and impeachment. . .”* (end of quotes.)
**Article 6** (second paragraph of the Constitution of the United States )

 This Constitution, **and the Laws of the United States** which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; **and the Judges in every State shall be bound thereby,** any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

Defendants Brent Adams (Nevada District Judge), Janet Berry, (Nevada District Judge) lack all in persona and subject matter jurisdiction due to the sham warrants and criminal complaints filed against Affiant.

**8.   Fact of LAW Federal Criminal Charges as COUNT No. 7 of the Rico Act Title 18 U.S.C. § 1961 as follows . . .**
**Of a claim that Fraud vitiates everything including the pretended “subject matter jurisdiction” The Defendant(s),** [included but not limited through discovery] Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire

(University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada),with the assistance of Richard Gammich (District Attorney of Washoe County Nevada), see [Exhibits F Search Warrant] and **"in concert," did commit Felony Federal Fraud violating Federal Law Title 18 U.S.C. § 1961 by "kidnapping"** this Affiant.

**As used in this chapter—**
**(1) "racketeering activity"** means **(A)** <u>**any act**</u> or threat involving murder, **kidnapping,** gambling, arson, **robbery,** bribery, **extortion,** . . ."

The **"any act"** was incited by issuance of false claims of a **"rubber stamped"** and **"blanket"** search warrant, and pretend-a-affidavits that were actually sworn to under penalty of perjury, are truly **"RUBBER STAMPED,"** pretend-a-warrants pretending **"probable cause," in this immediate case.** (See Exhibits F).

**Or "Civil Rights violation as under 42 U.S.C. § 1983, 1985, 1986.**

**Take "Judicial Notice" under** Public Law 93-595:   A Court shall take Judicial Notice if requested by a party and supplied with the necessary information.. . . **to the following FACTS….**
Legal Definition of "**probable cause**" is as follows . . .

**Oxford Companion to American Law** defines probable cause as . . .

"information sufficient to warrant a **prudent** person's belief that the wanted individual had committed a crime (for an arrest warrant) or that evidence of a crime or contraband would be found in a search (for a search warrant)". <u>**"Probable cause" is a stronger standard of evidence than a reasonable suspicion**</u> . . ." according to the *Aguilar–Spinelli test*.

[Notice: ALL of Defendant(s) need to re-read that until they understand the validly of that statement of FACT noting the words *"stronger standard of evidence" . . . than reasonable suspicion,"* as in way beyond heresy, or "erroneous conjectures" of the no eye witnesses to the actual <u>*specific evidence to each individual case*</u> **and not a generalized blanket statements, pretending to be covering all similar cases pretended to be** <u>**standard**</u> criminal evidence.

QUOTE . . .

". . . In the colonies, smuggling rather than seditious libel afforded the leading examples of the **necessity for protection against unreasonable searches and seizures**. In order to enforce the revenue laws, English authorities made use of **writs of assistance, [search warrants,]** which were **general warrants authorizing the bearer to enter any house or other place to search for and seize "prohibited and uncustomed" goods,** and commanding all subjects to assist in these endeavors. The writs once issued remained in force throughout the lifetime of the sovereign and six months thereafter. When, upon the death of George II in 1760, **the authorities were required to obtain the issuance of new writs. . .** "[7]  . . . background material are contained in Quincy's MASSACHUSETTS REPORTS, 1761-1772, App. I, pp. 395-540, and in 2 LEGAL PAPERS OF JOHN ADAMS 106-47 (Wroth & Zobel eds., 1965). *See also* Dickerson, *Writs of Assistance as a Cause of the American Revolution,* in THE ERA OF THE AMERICAN REVOLUTION: STUDIES INSCRIBED TO EVARTS BOUTELL GREENE 40 (R. Morris, ed., 1939).

9.   **FACT of this "Judicial Notice" is that** quoted . . .

". . . **general** warrants authorizing the bearer to enter any house or other place to search for and **seize "prohibited and uncustomed" goods** . . . [Found at: https://law.justia.com/constitution/us/amendment-04/01-search-and-seizure.html]

This is the subject matter FACT that Defendants violated 18 U.S.C. § 1961, §1962, 18 U.S.C. § 513(a), 42 U.S.C. § 1983 with fraudulent court proceedings, fraudulent and deficient documents filed into the record and through the **"BLANKET WARRANTS," and criminal complaints** against Affiant.

QUOTE: **quantum of evidence necessary to proving probable cause,** . . .  [See Exhibits A through E and "rubber stamped," Exhibit F proves ie bogus "Search warrant."]

QUOTE: . . . "Similarly, inasmuch as the existence of probable cause must be established **by fresh facts,** so the execution of the warrant should be done in timely fashion so as **to ensure so far as possible the continued existence of probable cause**. . ." Sgro v. United States, 287 U.S. 206 (1932).

(This Affiant/ Plaintiff will also prove beyond on any doubt, that Defendant(s) do not understand the wordage . . . *__by fresh facts__*," Defendant(s) rely on heresy of pretended *"past experiences."* Fact of this case, as stated by their own admissions, is that the Defendant(s) relied on **"past experiences"** more than they relied on the **"evidence at hand,"** [See Exhibits D, E and F for the numerous *"past experience"* statements that Prove this Fact.]

". . . "The requirement that **officer __articulate__ his reasons for making a search before he searches is a substantial deterrent to impulsive and arbitrary official conduct and a real safeguard against after-the-fact justification"),** cert. denied, 423 U.S. 897 (1975); 4 W.R. LaFave, Search and Seizure Section 10.10 (d), at 147-148 (2d ed. 1987) & at 8-9 (1988 Supp.)

". . . **The state should not base its judgments on stereotypes, __assumptions__, guilt-by-association, or __other generalities__. . ."**
[*Gully v. First National Bank*, 299 U.S 109, 112 (1936)]. . .

". . . **The Court** relied specifically on its probable-cause jurisprudence, at least concerning how reliable, credible, **and specific the information** upon which the state relied had to be to establish the **necessary individualized suspicion**. . . [See the word "**specific?**" Means not just a **"blanket" search warrant**, copied from other drug warrants, written by police, (not the "judge," via a prosecuting attorney) but than signed by the judge and the unlaw-fully executed, with no member of the public present.**"**]

**10.**   JUDICIAL NOTICE:   **[This Court]** ". . . questioned whether there was hard evidence to support such **__generalizations__**. Even more critical to its holding was that **__generalizations were not enough__**; there had to be additional **case-specific facts** that, when **combined with the __supportable__ generalizations, established reasonable suspicion** to believe that *this suspect, at this time* . . ."
29. *See infra* II.A (defining "individualized suspicion").
30. Safford Unified Sch. Dist. No. 1 v. Redding, 129 S. Ct.  2633, 2643 (2009).

". . . *Terry* noted as well that **"due weight must be given, not to [the officer's] inchoate and unparticularized suspicion or 'hunch,' but to the __specific__ reasonable inferences which he is entitled to draw from the facts in light of his experience."** *Id. Terry v. Ohio*, 392 U.S. 1, 27 (1968)

" . . . probable cause *noun* **adequate legal basis, ample legal basis** to pursue, **just** and adequate basis, **just** evidence, just meritorious evidence, just qualified evidence, legally adequate basis to proceed, legally compelling basis, **legally competent evidence, legally sufficient cause,** satisfactory **legal basis,** sufficient evidence, sufficient legal basis." Burton's Legal Thesaurus, 4E. [Defendant(s) should learn this post haste.]

Legal definition of "**legal:**" *Conforming to the law; required or permitted by law; not forbidden by law. . . .* The term *legal* is often used by the courts **in reference to an inference of the law formulated as a matter of construction**, rather than established by actual proof, such as legal malice." West's Encyclopedia of American Law, edition 2

Facts: 1. All the Defendant(s) *relied* on *"inchoate and un-prarticularized suspicions"* or *"hunches"* and than had the mitigated gall to pretend that it was gleaned by *"experience,"* when just copied and  pasted from one affidavit of **generalized statements** and than pasted them in another case. 2. And all the while delusionally pretending to be making *"reasonable inferences"* on some king of a pretended *"experience,"* when in fact, it was plain as day, UN_LAW_FILLED, **speculated generalizations** of things to be searched for, copied from one case then pasted into the next.

Answer: for no-law-filled. no *"adequate legal basis, ample legal basis,"* nor any *"legally sufficient cause,"* copied and pasted generalized pretend-a-evidence to be searched for, made out on pretend-a-affidavits  and "rubber stamped" pretend-a-search warrants, so actors to break and enter private dwelling(s) and rummage at will!
[Emphasis added.]

## 11. Fact of LAW Federal Criminal Charges as COUNT No. 8 under the Federal Rico Act 18 U.S.C. § 1961 which directly relates to the 4th Amendment of the Bill of Rights.

That is a claims by which a relief can be granted, the "enterprise" (association) who was includes all the named Defendant(s) [included but not limited through discovery] Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams  (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Geoff Dean

(Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California), J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings) did "in concert," violate this Affiant's / Plaintiff's constitutional rights of the Fourth Amendment and can invoke the original jurisdiction in this Federal Courts either by anticipating a "federal prosecution of Federal Charges." **Or "Civil RICO violations as under 18 U.S.C. § 1961 of RICO Act as follows...**

As used in this chapter—

(1) "racketeering activity" means (A) **any act** or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code . . . section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), [See Sections for obstruction related charges herein.]

Legal definition of enterprise:

". . . as **defines "enterprise"** as "**any individual,** partnership, **corporation,** association, **or other legal entity, (relating to racketeering)," pointing to section 1957** (relating to engaging in monetary transactions in property derived from specified unlawful activity),

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and **the last of which occurred within ten years** (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

[Emphasis added.]


**12. Fact of LAW Federal Criminal Charges as COUNT No 9 of the Federal Rico Act 18 U.S.C. § 1962.**

Under Federal RICO **18 U.S.C. § 1962** which provide the remedy thereof as all counts pled against the each Individual defendants [included but not limited through discovery] Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California), J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings) "in concert" in numerous occasions violated said RICO statutes. . ."

**Title 18 Sec. 1962. Prohibited activities**
**-STATUTE-**
  **(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity. . . OR. . . "**

Defendant(s) "derived an income". . . above $80,000 plus USD per year . . . "from a pattern of racketeering activity. . ." by violating numerous Federal Crimes against the peace and dignity of this Affiant / Plaintiff and 100s and this country. Defendant(s) "ran wrought shod over, the Constitution and Bill of Rights, and California and Nevada State Statutes.

**Sec. 1963. Criminal penalties**

**-STATUTE-**
  **(a) Whoever violates any provision of section 1962 of this chapter shall be fined under this title or imprisoned not more than 20 years (or for life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment), or both, and shall forfeit to the United States, irrespective of any provision of State law -**
    **(1) any interest the person has acquired or maintained in violation of section 1962;**

**As Precedence from Case Law :**

**As Precedence from Case Law . . .**

". . . United States v. Sheridan, supra, 329 U.S. at page 391, 67 S.Ct. at page 338. The trial court charged the jury that **one who 'aids, abets, counsels, commands, <u>induces, or procures</u>' the commission of  an act is as responsible for that act as if he had directly committed the act himself.** *10 See 18 U.S.C. (Supp. V) s 2(a), 18 U.S.C.A. s 2(a).   Nye & Nissen 74 S.Ct. 358  347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 **(Cite as: 347 U.S. 1, 74 S.Ct. 358)** v. United States, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919. The jury found Brading guilty in the light of this instruction. The Court of Appeals, 9 Cir., 168 F.2d 846, **affirmed on the ground that the evidence supported conviction under this charge. . ."**

". . . Aiding, abetting, and counseling are <u>not</u> terms which presuppose the existence of an agreement.  Those terms have a broader application, making the defendant a principal when he consciously shares in a criminal act, <u>**regardless of the existence of a conspiracy.**</u> Nye & Nissen v. United States, supra, 336 U.S. at page 620, 69 S.Ct. at page 770. . ."

[Emphasis added.]

## 13.   Fact of LAW Federal Criminal Charges as COUNT No. 10 of the Federal Rico Act 18 U.S.C. § 1961 . . .

Which state a Federal claim that can provide a remedy in this present case by the punishment for the following violation of **18 U.S.C. § 1961.** . . the Defendants [included but not limited through discovery] Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams  (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California), J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings), did "in concert" and numerous occasions violated **18 U.S.C. § 1961** . . . by committing many **"act(s) indictable under section 659 is felonious," both__Federal and __ State felonies.**

[Also see 18 U.S.C. § 1961] . . . **TITLE 18 - CRIMES AND CRIMINAL PROCEDURE**
   **PART I – CRIMES   CHAPTER 96 - RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS**
**-HEAD-**
   **Sec. 1961. Definitions**
   **(1) "racketeering activity" means (A) any act** or threat involving murder, **kidnapping, . . .** if the act indictable under section 659 is felonious,

   **". . . There is ample evidence of the petitioners' collaboration and close cooperation in the <u>fraud</u> from** *11 which the jury could conclude that [Defendants] **aided, abetted, or counseled   in the commission of the <u>specific acts charged</u>.** See Nye & Nissen v. United States, supra, 336 U.S. at page 619, 69 S.Ct. at page 769. . ."

   **". . . <u>When two or more persons unite in a deceit upon another, they</u> <u>may be indicted for a conspiracy</u> . . ."** (q. v.) Vide, generally, 2 Bouv. Inst. n. 2321-29; Skin. 119; Sid. 375; 3 T. R. 52-65; 1 Lev. 247; 1 Strange, 583; D Roll. Abr. 106; 7 Barr, Rep. 296; 11 Serg. & R. 309, 310; Com. Dig. Action upon the case for a deceit; Chancery, 3 F 1 and 2; 3 M 1; 3 N 1; 4 D 3; 4 H 4; 4 L 1; 4 O 2; Covin; Justices of the Peace, B 30; Pleader, 2 H; 1 Vin. Ab. 560; 8 Vin. Ab. 490; Doct. Pl. 51; Dane's Ab. Index, h. t.; 1 Chit. Pr. 832 Ham. N. P. c. 2, s. 4; Ayl. Pand. 99 2 Day, 531; 12 Mass. 20; 3 Johns. 269; 6 Johns. 181; 2 Day, 205, 381; 4 Yeates, 522; 18 John. 395: 8 John. 23; 4 Bibb, 91; 1 N. & M. 197. Vide, also, articles **Equality; Fraud; Lie. . .**

A.  ". . . .**RICO attempts to accomplish these goals by providing severe criminal penalties for violations of § 1962[c], see § 1963, and also** by means of a civil cause of action for any person "injured in his business **or property by reason of a violation of section 1962," 18 U.S.C. § 1964(c) (1994 ed., Supp. IV). . .** B.

B.  ". . . **Section 1962,** in turn, consists of four subsections: Subsection (a) makes it **"unlawful for any person who has received <u>any income</u> derived, directly or indirectly,** from a pattern of racketeering activity or through collection of an unlawful debt . . ." [Yes that said **"ANY income,"** directly or indirectly such as "payroll" during their crime spree.]

C.  ". . . **subsection (b)** makes it **"unlawful for any person** through a pattern **\*\*1612** of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, **<u>any interest in or control</u> <u>of any enterprise</u>** which is engaged in, or the activities of which affect,

interstate or foreign commerce"; subsection (c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate  or foreign commerce, **to conduct or participate,** directly **or <u>indirectly</u>, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt";** and, finally, **subsection (d) makes it unlawful "for <u>any person</u> to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." [Confiscating any** "monies or <u>property</u>" **without "eye witness" of a crime, an affidavit or the victim... is . . . collection of an unlawful debt."] [A, B and C Beck v. Prupis, 120 S. Ct. 1608 (U.S. Apr. 26, 2000),**

> **Legal Definition of "conspire,"** in part: **"**An agreement between two or more persons to engage jointly in an unlawful or criminal act, **<u>or an act that is innocent in itself</u> but becomes unlawful when done by the combination of actors."**  A Law Dictionary, Adapted to the Constitution and Laws of the United States. By John Bouvier. Published 1856.

[Emphasis added.]

**14.    Fact of LAW Federal Criminal Charges as COUNT No. 11 of Federal Rico Act 18 USC 1961(4),** as follows . . .

**As Count 4 of  Federal RICO, the Defendant(s)** Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California), J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings), **did in fact and "in concert," numerous occasions, all violated** 18 USC Section 1961**(4)**

Legal Definition of "enterprise"    ". . . as **defines "enterprise" as "any individual,** partnership, **corporation,** association, **or <u>other legal entity</u>,** (http://www.lectlaw.com/def/e022.htm relating to racketeering)," **pointing**

**to section 1957** (relating to engaging in monetary transactions in property derived from specified unlawful activity),

Fact in this immediate case will set Precedence is . . .

FACT: Confiscation of money, household items, or ANY other "private" personal items, including Affiant's lap top and note books (papers, money, parole, salaries, tangible items or otherwise), will be adjudicated as, and considered as, "**relating to engaging in monetary transactions in property derived from specified <u>unlawful</u> activity**)," [Note the word "unlawful" will be proved to mean: Not Law Full, or Not Filled Fully by the Law or Statutes. Any "Intent" that is not backed wholly by Statutes, or Federal or State Rules of Criminal Procedure is in fact, "**un-law-full intent.**"] Fact in this case that since, quote . .


" . . . The warning was issued in response to the recent ruling that upheld that the **local Police Departments** in North Carolina **are classified as "private entities" and NOT connected to the state of North Carolina."** **[As well as in Texas, and other 49 other States.]** See QUOTE:
    "Judicial Review Judge, Paul C. Ridgeway, Wake County General Court Of Justice, Superior Court Division, **upheld a lower court ruling that most Public Officials / Agencies are "private entities."** Judge Ridgeway upheld the earlier (1/17/11) ruling of lower court Judge J. Randall May in Class v. North Carolina, Case No. 10 DOT  7047 (now known as 11 CVS 1559)."

**Challenge under Rule 52. Alleging a Corporation**

    An allegation that a corporation is incorporated shall be taken as true, unless denied by the affidavit of the adverse party, his agent or attorney, whether such corporation is a public or private corporation and however created. Source. Art. 1999.

**See 28 USC § 3002 - Definitions**
**(15) "United States" means—**
    **(A)        a Federal corporation;**

(10) "Person" includes a natural person (including an individual Indian), **a corporation**, a partnership, an unincorporated association, a trust, or an estate, **or any other public or private entity, including a State or local government** or an Indian tribe.



(12) **"Property"** includes any present or future interest, whether legal or equitable, **in real, personal** (including choses in action), **or mixed property, tangible or intangible, vested or contingent, wherever located and** however held **(including community property and property held in trust** (including spendthrift and **pension** trusts) . . ."

Precedence and judicial notice as follows . . .

A.   ". . . We granted certiorari, 526 U.S. 1158, 119 S.Ct. 2046, 144 L.Ed.2d 213 (1999), to **resolve a conflict among the Courts of Appeals on the question whether a person injured by an overt act in furtherance of a conspiracy may assert a civil RICO** conspiracy claim under § 1964(c) for a violation of § 1962(d) even if the overt act does not constitute "racketeering activity. . . " This case turns on the combined effect of two provisions of RICO that, read in conjunction, provide a civil cause of action for conspiracy. **Section 1964(c) states that a cause of action is available to anyone "injured . . . by reason of a violation of section 1962." Section 1962(d) makes it unlawful for a person "to conspire" to violate any of the provisions of subsection  (a), (b), or (c) of this section."** To determine what it means to be "injured ... by reason of" a "conspir[acy]," we turn to the well-established common law of civil conspiracy. . ."  Beck v. Prupis, 120 S. Ct. 1608 (U.S. Apr. 26, 2000),

"[this]. . . **Petitioner suggests that we should look to criminal**, rather than civil, common-law principles to interpret the statute. **We have turned to the common law of criminal conspiracy to define what constitutes A violation of § 1962(d)**, see *Salinas v. United States,* 522 U.S. 52, 63–65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), **a mere violation being all that is necessary for criminal liability. . ."** *Salinas v. United States,* 522 U.S. 52, 63–65 [Note*: "a mere violation being all that is necessary for criminal liability."*]

**15.     FACT at LAW** that none of the mentioned individual Defendants, [included but not limited through discovery] Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams  (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police,

Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California), J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings) **do NOT have any kind of "immunity" against violating any of this Affiant's / Plaintiff's constitutional RIGHTS, ie the Fourth Amendment (right of privacy and search and seizure), the Fifth Amendment (right to be free from having liberty, property taken without just compensation), violating the "due process" of these facts** as follows . . .

**QUOTE: "**. . . But the  Mitchell, 472 U.S. at 526, 105 S.Ct. 2806. litigation. **"immunity is forfeited if an officer's conduct violates "clearly established statutory or constitutional rights of which a reasonable** Wilson v. Layne, 526 U.S. 603, 614, 119 **person would have known."** S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting Harlow v. Fitzgerald, 457  To determine in  U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).  this case whether the officers have lost their immunity, we must engage  First, we must decide "whether in a two step analysis. **constitutional right would have been violated on the facts alleged"** Saucier v. Katz, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272    Because we consider an appeal by the officers from the denial (2001).  of their motion for summary judgment, we must evaluate the undisputed facts based on the summary judgment record, **drawing all inferences in** Behrens, 516 U.S. at 309, 116 S.Ct. 834; **favor of the plaintiff.   Second, if we believe that a constitutional** Torres, 163 F.3d at 170. **violation did occur, we must consider whether the right was "clearly** Saucier, 533 U.S. at 201, 121 S.Ct. 2151; **established."** see Groh v.Ramirez, 540 U.S. 551, 124 S.Ct. 1284, 1293, 157 L.Ed.2d 1068, 2004 WL 330057 (U.S. filed Feb. 24, 2004).[2] The question is "whether it would be clear to a reasonable officer  Id. at that his conduct was unlawful in the situation he confronted." **This is an objective inquiry, to be decided by** 202, 121 S.Ct. 2151.  Bartholomew v. Pennsylvania, 221 F.3d **the court as a matter of law. 425,** 428 (3d Cir.2000). . ."

". . . **To be sure, a warrant must be read in a common sense,** non-technical United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, fashion.  **But it may not be read in a way that violates** 13 L.Ed.2d 684 (1965).  **As the text of the Fourth Amendment itself its fundamental purposes.**  U.S. denotes, a **particular description** **is the touchstone of a warrant.**   IV. The requirement of a particular description in  Const. amend. First, it memorializes **precisely** writing accomplishes three things. what search or seizure the issuing magistrate intended to permit.  **Second, it**

confines the discretion of the officers who are executing the **Marron v. United States**, 275 U.S. 192, 196, 48 S.Ct. 74, 72 **warrant. Third, it "inform[s] the subject of the search what can be seized. . ."** L.Ed. 231 (1927)

"**. . . As a matter of common sense, as well as logic, the absence of a reference to the affidavit must therefore be viewed as negating any incorporation of that affidavit . . . Tellingly, the court observed that had the police searched more broadly, Id. at 472. the fruits of that search would have been suppressed . . .** " Doe v. Groody BNI BNI Argued Sept. 15, 2003. -- March 19, 2004 found at: http://caselaw.findlaw.com/us-3rd-circuit/1207065.html

"**. . . A RICO claim is broad but a RICO conspiracy claim is even broader. Anyone who agrees or** conspires to pursue the same criminal objective can be held liable for a RICO violation. *Salinas v. United States*, 522 U.S. 52, 63-64 (1997). "If conspirators have a plan which calls for some conspirators to perpetrate the crime and **others to provide support, the supporters are as guilty as the perpetrators.**" *Id.* at 64. **A conspirator must simply intend to further an endeavor which**, if completed, would satisfy all elements of a civil RICO claim. *Id.* at 65. [Emphasis added.]

**16.  Fact of LAW Federal Criminal Charges as COUNT No. 12 of the Federal Rico Act** Title 18 USC § 1962 **(c).** as follows . . .

And another claim under Federal RICO Act Title 18 Sec. 1962**(c)** that the Defendants  [included  but  not  limited  through  discovery]  Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams  (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California), J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings) Exhibits B through F) and in concert, **did in fact violate the follow Federal LAW which a remedy can be applied. . .**

### A. Section 1962(c) Claims

**Section 1962(c) prohibits any defendant person from operating or managing an enterprise through a pattern** of racketeering activity. So long as a civil RICO plaintiff is injured by reason of the defendant's operation or management of the enterprise through a pattern of racketeering, **the plaintiff is entitled to treble damages, attorneys' fees and costs under section 1964(c) (commonly referred to as RICO's civil liability provision).**

**Under section 1962(b), a civil plaintiff has standing only if he has been injured by reason of the defendants' acquisition or maintenance of an interest in or control over an enterprise through a pattern of racketeering activity. . .**

**FACT: This Affiant / Plaintiff has been** *"injured"* flowing from the "racketeering" activity, **against my "due process," and Forth, Fifth and Fourteenth Amendment guaranteed RIGHTS by all the defendants, in concert, ruining my reputation by their "infamous crimes," against my life,** by factious / lies and fabricated court processes via **"rubber stamped," and "blanket" search warrants, by the "just change names, dates and the address," pretend-a-warrants brake and enter gang. Defendant(s) have also ruined hundreds of other's lives.**
[Emphasis added.]


**17.   Fact of LAW Federal Criminal Charges as COUNT No. 13 of the Federal Rico Act 42 USC § 1983 as follows . . .**

The individual person of the Defendants, [included but not limited through discovery] Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California), J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings) **did "in concert," did violate my constitutional RIGHTS, and the "Rights under Federal LAW, which provide a remedy as follows. . . .**

**Every person who, under color of any statute, ordinance, regulation, custom,** or usage, **of any State** or Territory or the District of Columbia, **subjects, or causes to be subjected, any citizen of the United States** or other person within the jurisdiction **thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law,** suit in equity, or other proper proceeding for redress, **except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity,** injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

A. QUOTE: ". . . Title **42 USC § 1983** provides in relevant part that: "**every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State**....subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the **deprivation of any rights, privileges, or immunities secured by the Constitution. ..shall be liable to the party injured....**"

". . . An <u>unconstitutional policy</u> may also exist if an isolated action of a government employee is dictated by a "final policymaker. . ." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469 (1986). Bryan County v. Brown, 520 U.S. 397 (1997).

" . . . The Supreme Court has **rejected the notion that a plaintiff must meet a heightened pleading standard to state a claim against a municipality for an unconstitutional** custom or **policy. . .**" Leatherman v. Tarrant County, 507 U.S. 163 (1993).

" . . . With respect to incorporated substantive due process, the plaintiff may state a claim by proving a violation of one of the Bill of Rights. The Supreme Court has held that one of the substantive elements of the **Due Process Clause protects those rights that are fundamental--rights** that are implicit in the concept of ordered liberty, and has, over time, held that virtually all of **the Bill of Rights protect such fundamental rights and has likewise held that they apply to the states through the "liberty" interest of the Due Process Clause . . .** " Palko v. Connecticut, 302 U.S. 319, 325 (1937). For example, the Supreme Court has held that the Fourth Amendment proscription against unreasonable searches and seizures, Mapp v. Ohio, 367 U.S. 643 (1961), and the Sixth Amendment right to a speedy public trial, Klopfer v. North Carolina, 386 U.S. 213 (1967), apply to the states.

[Emphasis added.]

**18.    Fact of LAW Federal Criminal Charges as COUNT No. 14 of Federal Rico Act Title 42 USC § 1985**

The independent Defendants, [included but not limited through discovery] Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams  (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California), J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings)**did in concert, and more than one occasion, did violate this Plaintiff's constitutional RIGHTS under Federal LAW, which provide a remedy as follows. . . .** Each LETTER carries a FEDERAL Charge with it….

**B. TITLE 42 - THE PUBLIC HEALTH AND WELFARE**

   **CHAPTER 21 - CIVIL RIGHTS**

   **SUBCHAPTER I - GENERALLY**

**Sec. 1985. Conspiracy to interfere with civil rights**

**(2) Obstructing justice; intimidating party,** witness, or juror . . .

   **(3) Depriving persons of rights or privileges**

   **If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of**

**preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws. . .**

**C. -STATUTE-**

   **Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act,**

which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action. . ."

**Judicial Notice as follows : Public Law 93-595:** A Court shall take Judicial Notice if requested by a party and supplied with the necessary information. Notice to all Defendant(s) judges, and this court's clerks, lawyers, attorneys, ETC.

**FACTS of Law** the independent Defendants, [included but not limited through discovery] Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California), J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings), in concert, did violate this Affiant / Plaintiff's constitutional RIGHTS under Federal LAW, which provide a remedy as follows. . . .

TITLE 42 - THE PUBLIC HEALTH AND WELFARE
    CHAPTER 21 - **CIVIL RIGHTS**
    SUBCHAPTER I - GENERALLY

### Sec. 1987. Prosecution of violation of certain laws

**-STATUTE-**
    The United States attorneys, marshals, and deputy marshals, the United States magistrate judges appointed by the district and territorial courts, with power to arrest, imprison, or bail offenders . . . **at the expense of the United States, to institute prosecutions against all persons violating any of the provisions of section 1990 of this title or of sections 5506 to 5516 and 5518 to 5532 of the Revised Statutes, and to cause such persons to be arrested, and imprisoned or bailed, for trial before the court of the United States or the territorial court having cognizance of the offense. ."

**TITLE 42 - THE PUBLIC HEALTH AND WELFARE**
   **CHAPTER 21 - CIVIL RIGHTS**
   **SUBCHAPTER I - GENERALLY**

-HEAD-
   Sec. 1990. **Marshal to obey precepts; refusing to receive or execute process**

-STATUTE-
   **Every marshal and deputy marshal shall obey and execute all warrants or other process, when directed to him, issued under the provisions of section 1989 of this title. Every marshal and deputy marshal who refuses to receive any warrant or other process when tendered to him, issued in pursuance of the provisions of this section, or refuses or neglects to use all proper means diligently to execute the same, shall be liable to a fine in the sum of $1,000, for the benefit of the party aggrieved thereby.**

   ". . . Supreme Court has ruled that "private parties" may be held to the same standard of "**state actors**" in cases such as the instant cause where the <u>**final and decisive act was carried out in conspiracy with a state official.** **.**</u>**."**
See Dennis v. Sparks, 449 U.S. 24, 101 S. Ct., 183 and Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598.

[Emphasis added.]

   19.   **FACT OF LAW of Federal Criminal Charges as COUNT No. 15 of the Federal Rico Act, violation of Title 42 USC § 1985(3).**

Which is a lawful claim in this case against the **"rubber stamping"** unknown magistrates, and co-conspirators after the fact,  Brent Adams (Nevada District Judge), Janet Berry, (Nevada District Judge), who accepted the  "blanket"  and  **"RUBBER STAMPED"**  search warrants that Defendant(s) fathomed up out of their un-law-filled intentions and handed hundreds of others fake **"color of law"** pretend-a-jurisdiction, on pretend-a-search warrants and fraudulent affidavits did in fact under their **"color of law"** scheme, **violated, 42 USC § 1985** . [See Exhibits F, and for more Absolute proof allocated through discovery process.]
As follows . . .

**42 USC § 1985 (c) - Conspiracy to interfere with civil rights**
**(3) Depriving persons of rights or privileges**
**If two or more persons in any State** or Territory conspire **or go in disguise on the highway or on the premises of another,** for the purpose of depriving, either directly **or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;** . . . or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . **or to injure any citizen in person or property on account of such support or advocacy;** in any case of conspiracy set forth in this section, **if one or more persons engaged therein do, or cause to be done,** any act in furtherance of the object of such conspiracy, **whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.** [Emphasis added.]

QUOTE: ". . . **A complaint is actionable against Judges under** Title 42 U.S.C. 1985 (3), **whose immunity does not extend into a conspiracy under color of law. Section 1985(3) reaches both conspiracies under color of law and conspiracies effectuated through purely private conduct...**"

Legal Definition of **"color of law"**: **The appearance or semblance, without the substance, of legal right.** McCain v. Des Moines, 174 U. S. 108, 19 Sup. Ct. (H4, 43 L. Ed. 936   Blacks Law Dictionary   found at http://thelawdictionary.org/color-of-law/.

Also . . .
Legal Definition of **"color"** is: **An appearance, semblance,** or simulacrum, as **distinguished from that which Is real.** A prima facie or **apparent right.** Hence, a **deceptive appearance**; a plausible, assumed exterior, <u>**concealing a lack of reality ; a disguise or pretext.**</u> Railroad Co. v. Allfree, 64 Iowa, 500, 20 N. W. 779; Berks County v. Railroad Co., 107 Pa. 102, 31 Atl. 474; Broughton   v.   Haywood,   01   N.   C.   383.   [Emphasis   added.] http://thelawdictionary.org/color/
*Color of Law is the The appearance of a legal right.* **The act of a state officer, regardless of whether or not the act is within the limits of his or**

her authority, is considered an act under color of law if the officer purports to be conducting himself or herself in the course of official duties.

Under the civil rights act of 1871 (42 U.S.C.A. Section 1983), color of law is synonymous with State Action, **which is conduct by an officer that bears a sufficiently close nexus to a state so that the action is treated as though it is by the state.**

**color of law** n. **the appearance of an act** being performed based upon legal right or enforcement of statute, **when in reality no such right exists. An outstanding example is found in the civil rights acts which penalize law enforcement officers for violating civil rights by making arrests under color of law"** . . . **It could apply to phony** traffic arrests [search warrants,] **in order to raise revenue from fines or extort payoffs to forget the ticket . . . ."** http://legal- dictionary.thefreedictionary.com/Color+of+Law

And . . . **Color of Law**: noun **The conduct of a police officer, judge, or another person clothed with governmental authority that, although it superficially appears to be within the individual's lawful power, is actually in contravention of the law.** For example, a police officer who makes a false arrest while on duty, or while off duty but when they are wearing a uniform or badge, is acting under color of law. In some circumstances, the phrase also applies to the conduct of private individuals that is specifically authorized or approved by a statute. **Depriving a person of his or her federal civil rights under color of law is, in and of itself, a federal crime and a ground for a cause of action.** Also called under color of law. If the conduct violates a federal civil right **or criminal law**, it is also called state action. . . ." end of quote(s) Emphasis added. From Webster's New World Law Dictionary http://law.yourdictionary.com/color-of-law

Legal FACT: There is **NO immunity for any "judge"** [or pretend-a-LEOs] **who violates their "OATH of OFFICE"** by **under Title 42 U.S.C. 1985 (3),** which is to defend the Constitution (Federal and State,) and **ALL laws made pursuant thereof.**

Case Law Precedence quoted as follows . . .

**The U.S. Supreme Court in Griffen emphasized 1985(3)**
        **" . . . legislative history was directed to the prevention of deprivations which shall attack the equality of rights of American citizens; <u>that any violation of the right,</u>** the animus and effect of which is to strike down the citizen, to the end that he may not enjoy equality of rights as contrasted with his and other citizens' rights, **shall be within the scope of remedies..."** Id. at 100.

"... The Supreme Court emphasized that **a reasonably competent public official should know the law governing his conduct and ruled that victims can hold almost all public administrators personally liable for conduct that violates clearly established ...** "constitutional rights of which a reasonable person would have known. . ."  Harlow v. Fitzgerald, 457 U.S. 800 at 818 (1982).

The Supreme Court, ruling, **declared that:**
**". . . local governmental bodies have no sovereign immunity from civil litigation initiated by the injured party, according to Civil Rights Act of 1871. . ."** (42 U.S.C. §1983). Monell v. New York City Dept. of Social Services, 436 U.S. 658  (1978)

**A.** "... In addition, **municipalities cannot have arranged their affairs on an assumption that they can violate constitutional rights** for an indefinite period; **accordingly, municipalities have no reliance interest that would support an absolute immunity. Pp. 699-700. . ."**

**B.**      **". . . Municipalities have responsibility for constitutional and federal statutory violations, and the injured has the right to recover attorney's fees from the defendant government. . .**

**Again take Judicial Notice at the following    ". . . A municipality has no immunity from liability under 1983 flowing from its constitutional violations and may not assert the good faith of its officers as a defense to such liability. . ."** [A and B found at Pp. 635-658. . ." Owen v. City of Independence, 445 US 622 (1980)
Exclusionary circumstances:
- **The officer provided information to the judge that he reasonably should have known was false.** [Means any statement made that was NOT wholly true.]
- **The judge abandoned his impartial role and became a rubber stamp for the officer.**
- **The warrant was so obviously deficient that a reasonable officer would not have relied on it.**
- The officer relies on a warrant based on an affidavit that is, **"so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."**
**". . . A police officer is required to read a search warrant and make sure that it is not obviously defective before executing it. A police officer**

does not have qualified immunity when executing an obviously defective
search warrant . . ." Groh v. Ramirez,  U.S. 02-811 (2004)

**EXCLUSIONARY RULE**
**§ 7.01 General Rule** Evidence gathered in violation of the Fourth
Amendment is not admissible in a criminal trial against the defendant.
**[2] Circumstances Suggesting Invalidity of Warrant**
Circumstances which should suggest to a police officer **that a search
warrant is not valid include:**
 (1) **the magistrate who issued the warrant relied on information
supplied by an affiant who knew that the statements in the document
were false or who <u>recklessly disregarded the truth;</u>**
        (2) **the <u>magistrate's behavior was so lacking in neutrality that it
would have been apparent to a reasonable officer,</u>** *e.g.,* **where the
magistrate acts as a <u>rubber stamp</u> for the police by signing the warrant
without reading it, while in the presence of the officer who later claims
reliance;**
(3) **the warrant is based on an affidavit lacking sufficient indicia of
reliability,** *e.g.,* **if a warrant is issued based on a wholly conclusory
affidavit;**
(4) the warrant is facially deficient in that it fails to particularize the place to
be searched **<u>or the things to be seized</u>**.
 **[3] Improperly Executed Warrants**
The *Leon* [468 U.S. 897] "good faith" rule does **not cure *improperly
executed* warrants**.
 **§ 7.03 "Fruit of the Poisonous Tree" Doctrine**
In general, the exclusionary rule extends <u>not only to the direct products of an
**unconstitutional search**</u> **and seizure but also to ancillary evidence that
results from the illegal search.**
Like the exclusionary rule, the fruit of the poisonous tree doctrine was
established primarily to deter law enforcement from violating rights against
unreasonable searches and seizures.
The name ***fruit of the poisonous tree*** is thus a metaphor: **the poisonous tree
is evidence seized in an illegal** arrest, **search**, or interrogation **by law
enforcement. The fruit of this poisonous tree is evidence later discovered
because of knowledge gained from the first illegal search, arrest, or
interrogation."**

*http://legal-ictionary.thefreedictionary.com/Fruit+of+the+Poisonous+Tree*

[Fact: Defendant(s) need to re-read that last sentence until they can understand and stop generalizing searches from "pretended" experience.]

". . . In determining whether evidence is fruit of a poisonous tree, the trial court judge must examine all the facts surrounding the initial seizure of evidence and the subsequent gathering of evidence. **This determination is usually made by the judge in a suppression hearing held before trial.** In this hearing, the judge must first determine that an illegal search or seizure occurred and then decide whether the evidence was obtained as a result of the illegal search or seizure. . ." *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) [See Exhibit A for reference to this statement.]

" . . . On appeal, the Supreme Court reversed the contempt judgment. In its argument to the High Court, the government conceded that the search was illegal and that the prosecution was not entitled to keep the documents obtained in it. However, the government held that it was entitled to copy the documents and use knowledge gained from the documents for future prosecution. The Court rejected this argument. According to the Court, **"[T]he essence of forbidding the acquisition of evidence in a certain way is that ... it shall not be used at all."** *Silverthorne* **concerned only evidence gained in the first illegal search or seizure, but the wording of the opinion paved the way for the exclusion of evidence gained in subsequent searches and seizures. . ."** *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S. Ct. 182, 64 L. Ed. 319 (1920) [Emphasis added.]

## 20.  FACT OF LAW of Federal Criminal Charges as COUNT No. 16 via Federal  Rico Act under Title 18 USD 1962(d)

For claims via case law that covers the exact happenstance of the following case as did the Defendants Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), with the assistance of Richard Gammick (District Attorney of Washoe County Nevada),  in this case, on or about date of the signed bogus search warrant committed FRAUD by the attesting their "**rubber stamped**" warrant did so in fact . . .

Commit another count of Fraud as follows under Title 18 d. 18 U.S.C. 1962(d) by conspiring to violate any of the provisions of 18 U.S.C. 1962(e). **aided and abetted in the commission of at least two predicate offenses**

which were part of the pattern of racketeering in violation of the common law doctrine of aiding and abetting.

As it should be in this immediate case . . . QUOTE: . . . "**A federal magistrate recommended that all evidence seized on April 4 and 5, 1990, be suppressed primarily because the <u>state judge signing the defective April 4, 1990, search warrant</u> did so without reading it, and thereby acted as a rubber stamp**. The district court agreed with and adopted the magistrate's recommendation. **According to the district court, the <u>foremost defect of the search warrant was that it did not state the items to be seized.</u>** This defect was not cured by the details of the affidavit, which the district court found was neither attached to nor incorporated by the warrant. **The second defect, according to the district court, was that the prosecutor failed to sign the warrant as required by state law; the prosecutor did sign the affidavit but admitted that he did not prepare or read it. The district court also noted that the issuing judge signed a preprinted form warrant that failed to specify the property to be seized** . . ." AT 956 F.2d 773, No. 91-1512

And

As in this immediate case . . .

**QUOTE**: ". . .Based on these facts and the testimony of the issuing judge, the district court concluded that **the judge abandoned his neutral and detached role and that this abandonment precluded the application of the Leon good faith exception.** See United States v. Leon, 468 U.S. 897, 913, 104 S.Ct. 3405, 3415, 82 L.Ed.2d 677 (1984). The district court further reasoned **that the search warrant was so <u>facially deficient that the executing officers could not have read and executed it in good faith.</u>** The district court also ruled that the April 4 and 5, 1990, **searches were in flagrant disregard for the limitations of a valid search warrant and constituted a general search. . ."**

I. **Issuing Judge as Rubber Stamp**

11 **The district court found that the issuing judge signed the warrant without reading it** and that he failed to note both that the prosecutor had not signed the warrant and that the warrant did not list the property to be seized. **Consequently, the district court concluded that the issuing judge acted as a rubber stamp**. . ." End of Quote.

[Emphasis added.]

**21.  FACT OF LAW of Federal Criminal Charges as COUNT No. 17 of the Federal Rico Act under  5 USC § 3331.**

Fact of LAW via a claim under Federal Law which has a remedy and cause of action. . . **from the Defendants, [included but not limited through discovery] Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams  (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California),** [Exhibits  B through H] and in concert, did in fact violate their **"Oaths of Office"** per se and endangering the **"public welfare"** by committing 26 Federal Felony Crimes, and are also guilty of "malfeasance of Office," individually, and in concert, as members of an "organized" crime sydicate. **Defendants are guilty of breaking the Federal Law of their "Oaths of Office, 5 USC § 3331 - Oath of office**

QUOTE . . . An individual, except the President, elected or appointed to an office of honor or profit in the civil service or uniformed services, shall take the following oath:

**"I, AB, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God."**

This section does not affect other oaths required by law.

**Legal Definition of "Malfeasance":** *The commission of an unlawful act.* *Source:* U.S. Courts at https://www.justia.com/dictionary/malfeasance.html
*Legal Definition of "unlawful":*   Contrary to or unauthorized by law; illegal.

When applied to promises, **agreements**, or contracts, the term denotes that such agreements have no legal effect. The law disapproves of such conduct because it is immoral or contrary to public policy. **Unlawful does not necessarily imply criminality, although the term is sufficiently broad to include it**. West's Encyclopedia of American Law, edition 2
QUOTE:

". . . Malfeasance has been defined by appellate courts in other jurisdictions **as a wrongful act which the actor has no legal right to do; as any wrongful conduct which affects, interrupts or interferes with the performance of official duty; as an act for which there is no authority or warrant of law; as an act which a person ought not to do; as an act which is wholly wrongful and unlawful; as that which an officer has no authority to do and is positively wrong or unlawful; and as the unjust performance of some act which the party performing it has no right, or has contracted not, to do.**

[Emphasis added.]

**22.    FACT OF LAW of Federal Criminal Charges as COUNT No. 18 of the Federal Rico Act Title 18 USC § 371.**
**Fact of LAW via a claim under Federal Law which has a remedy and cause of action.** . . from the Defendants, [included but not limited through discovery] Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), the WHITMORE PETERSON INSTITUTE (WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams   (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California), J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings) **[Exhibits B through H] in concert, did in fact violate Federal Law under 18 USC § 371** as follows . . .
**18 USC §371- Conspiracy to Commit Offense or to Defraud the United States**
1. Title 18 USC § 371, the general Federal conspiracy statute, defines the crime of conspiracy as follows: **"If two or more persons conspire either to commit any offense against the United States, or** to defraud the United States, **or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be [guilty of a felony]** . . . .

" . . . See Haas v. Henkel, 1909, 30 S. Ct. 249, 216 U. S. 462, 54 L. Ed. 569, 17 Ann. Cas. 1112, where court said: **"The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing, or defeating the lawful functions of any department of government."**

" . . . Holding: To prove conspiracy, the government must show . . . **(3) an overt act constituting actual participation in the conspiracy. . . "** 18 USC § 371 – Conspiracy  U.S. v. Blackwell, 05-4588 (8/29/06)

" . . . Holding: **In order to establish a conspiracy under § 371, the government must prove an agreement between two or more people to act together in committing an offense,** [See Exhibits D to H as "agreements."] and the commission of **an overt act** in furtherance of the offense. The agreement may be **"a tacit or mutual understanding among the parties."**. . ." 18 USC § 371 – Conspiracy,  U.S. v. Hunt, 06-6300 (4/11/08)

" . . . Holding: The elements of conspiracy to defraud the government are . . .  (2) **one or more overt acts in furtherance of the agreement** . . . The agreement may be tacit, **and it may be proven by circumstantial evidence."** 18 USC § 371 - Conspiracy to Defraud  U.S. v. White, 05-3403 (6/11/07)

[Emphasis added.]


**23.   FACT OF LAW of Federal Criminal Charges as COUNT No. 19 of the Federal Rico Act under Title 18 USC § 1001.**

**Fact of LAW via a claim under Federal Law which has a remedy and cause of action.** . . from the Defendants, [included but not limited through discovery] Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams  (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California), J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings) see attached **[Exhibits F through H] and in concert, did in fact violate Federal Law under 18 USC § 1001 as follows . . .**

**18 USC §1001 - Statements or Entries Generally**
1. Title 18 USC §1001 makes it a crime to knowingly or willfully:
   **A. falsify or conceal a material fact**
   **B. make a materially false, fictitious or fraudulent statement or representation**

**18 USC §1001 - Elements of the Offense**
1. The elements of the offense under 18 USC §1001 are:
   **A. The defendant made a false statement or representation, or made or used a false document.**
   **B. In a matter within the jurisdiction of** the executive, **legislative or judicial branch of the Government of the United States.**
   **C. The false statement, representation or document related to a material matter.**

**18 USC §1001 - False Statements and Materiality**
1. **Title 18 USC §1001 prohibits false statements generally, not just statements or documents required by law or regulation.**

2 **The term "statement" includes both oral and written statements, and there is no requirement that the statement be under oath.**

4. The present wording of the statute clearly makes materiality an element of all aspects of this offense. **The commonly used test for determining whether a matter is material is whether the falsity or concealment had a natural tendency to influence, or was capable of influencing, the agency or department.**

[Emphasis added.]

**24.   FACT OF LAW of Federal Criminal Charges as COUNT No. 20 of the Federal Rico Act Title 18 USC § 1621.**

**Fact of LAW via a claim under Federal Law which has a remedy and cause of action. . .** from the Defendants, [included but not limited through discovery] Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams  (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California),

J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings) see attached **[Exhibits F through H] and in concert, did in fact violate Federal Law under 18 USC § 1621 as follows . . .**

18 USC §1621 - Elements of the Offense

1. The elements of the offense under 18 USC §1621 are:

   A. **the defendant(s) made a statement under an oath before a competent tribunal, officer or person, in any case in which a Federal law authorizes an oath to be administered**

   B. **the false statement was material to the proceedings**

**18 USC §1621 - Materiality**

1. **The false statement at issue must be material to the proceedings. A false statement is material if it is capable of influencing (regardless of whether it actually influenced) the decision-making body to which it was addressed.**

Perjury is considered a serious offense as it can be used to usurp the power of the courts, resulting in miscarriages of justice. In the United States, for example, the general perjury statute under **Federal law classifies perjury as a felony and provides for a prison sentence of up to five years. 18 U.S.C. § 1621; 28 U.S.C. § 1746.**

[Emphasis added.]

**25.   FACT OF LAW of Federal Criminal Charges as COUNT No. 21 of the Federal Rico Act Title 18 USC §1622.**

**Fact of LAW via a claim under Federal Law which has a remedy and cause of action. . .** from the Defendants, [included but not limited through discovery] Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Brent Adams (Nevada District Judge), Janet Berry, (Nevada District Judge), Dennis Jones, Tammy Riggs, Geoff Dean (Sheriff of Ventura County, California), Todd Hourigan (detective for the City of Ventura California), Adam Garcia (Chief of Police, Dept. of the Univ. of Nevada-Reno), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California), J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings) see attached **[Exhibits F, G & H] and "in concert," did in fact violate Federal Law by perjury by signing affidavits, warrants and complaints under oath, under 18 USC § 1622 as follows . . .**

**18 USC §1622 - Subornation of Perjury**

1. **Title 18 USC §1622 makes it a crime to procure another person to commit perjury.**

[Emphasis added.]

**26.  FACT OF LAW of Federal Criminal Charges as COUNT No. 22 of the Federal Rico Act under Title 18 USC §1623.**

**Fact of LAW via a claim under Federal Law which has a remedy and cause of action.** . . from the Defendants, [included but not limited through discovery] Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Todd Hourigan (detective for the City of Ventura California), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California) J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings) **and in concert, did in fact violate Federal Law under 18 USC § 1623  as follows** . . .

**18 USC §1623 - False Declarations Before** Grand Jury **or Court**

1. Title 18 USC §1623 prohibits knowingly **making (or using any material containing) a false material declaration in a judicial or grand jury**
2. **proceeding when one is under oath or penalty of perjury.**

Judicial Notice :

☐  **The "two witness" rule (see discussion of 18 USC §1621, ) does not apply to prosecutions under this statute. Rather, it is sufficient for the government to prove that the defendant made two or more statements under oath that were inconsistent to the degree that one of them was necessarily false. In such prosecutions, <u>the government does not have to prove which irreconcilably contradictory declaration was false</u>.** . . [See Exhibits F, G & H] attached for the "**two or more false statements under oath.]**

☐  An admission of having made a false declaration can be a defense to 18 USC §1623. See 18 USC §1623(d) for specific details. **This defense is not applicable in prosecutions brought under 18 USC §1621.**

Judicial Notice: to be taken by all Clerks, all Judges, and Defendant(s)

**Title 18 Violations Aiding, abetting, counseling, commanding, inducing, or procuring the commission of an offense relating to a violation listed in this section 18 USC §2**

**18 USC §3571 – Sentence of Fine**

1. **The criminal statutes described above generally provide a maximum fine that may be imposed as punishment for the offense. However, 18 USC §3571 raises the maximum permissible fines for all Federal criminal offenses,** unless the law setting forth the offense specifies no fine or explicitly exempts the offense from the application of 18 USC §3571.

[Emphasis added.]

**27.   FACT OF LAW of State Criminal Charges as COUNT No. 23 under the Federal Rico Act in violation of, section 1503 (relating to obstruction of justice), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering).**

**Fact of another claim which has remedy via Federal Law is that, the Defendant(s)** Todd Hourigan (detective for the City of Ventura California), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada) with the assistance of Richard Gammich (District Attorney of Washoe County Nevada) again **violated their Oath of Office, and forfeited their Bonds by not OBEYING another simple Nevada Statute as follows . .**

   **Nevada Revised Statutes 171.202 provides:**
The **District Attorney** to prosecute at preliminary examination where felony or gross misdemeanor charged.

   The primary pleading in a **criminal action** on the part of the State of Nevada is the **indictment, information or D.A's complaint.** See N.R.S. 171.085  Limitations for felonies which provides in pertinent parts:
Except as otherwise provided in NRS 171.080, 171.083, 171.084 and 171.095, an indictment for:
   1.    Theft, robbery, burglary, forgery, arson, sex trafficking, a violation of NRS 90.570, a violation punishable pursuant to paragraph (c) of subsection 3 of NRS 598.0999 or a violation of NRS 205.377 must be found, or an information or complaint filed, within 4 years after the commission of the offense.

**NRS 171.102   Complaint defined; oath or declaration required.**   The [Sic] D.A.'s complaint is a written statement of the essential facts constituting the public offense charged. It must be made upon:

1.   Oath before a magistrate or a notary public; or
2.   Declaration which is made subject to the penalty for perjury.
(Added to NRS by <u>1967, 1400</u>; A <u>1969, 387</u>; <u>1983, 446</u>)

**Affiant has not waived the filing of the indictment, information or prosecutor's complaint which should have been "certified" under oath and properly filed in this matter.**

**Legal Definition of "information:"** The name of the document, sometimes called a criminal complaint or petition**, in which a prosecutor charges a criminal defendant with a crime, either a felony or a misdemeanor.** The information tells the defendant what crime he or she is being charged with, as well as against whom and when the offense allegedly occurred. At: http://www.nolo.com/dictionary/information-term.html

Yes that said . . . QUOTE:  *The name of the document, sometimes called a criminal complaint or petition,* **"prosecutor charges a criminal defendant."**

So just exactly who was the **"prosecutor"** in this instant case, or any **"criminal complaint"** to begin a **"criminal action on part of the State?"**
Name the **"prosecutor"** as a matter of **"discovery"** for this State of Nevada's **"requirement,"** for this case (or thousands of others?)

Under California law the officer cannot prosecute this case. See Cal. Penal Code §691(d) which states "Prosecuting Attorney" whether designated as District Attorney, City Attorney, City Prosecutor, Prosecuting Attorney, or by any other title, have by law the right or duty to prosecute, on the behalf of the people, any charge of public offense. The officer doesn't have a "Bar License" (card), he cannot prosecute nor can he have an opinion in court. If the court does not follow procedures prescribed by law, the court and its officers may held liable under "RICO Act." See U.S. V. FREGA, 179 F.3rd 793 (9th Cir. 1999) where three judges were charged with using the court as a "Racketeering Enterprise to Extort Money."

**A. This Affiant / Plaintiff was NOT INDICTED by an "indictment" to start a "criminal action." Another LAW that this "Criminal Organization" VIOLATED.**

B. According to the LAW, there is **NO "criminal action on the part of the State"** unless it is by ***"indictment, complaint or information,". . . <u>"made out by a city or county attorney</u>,"*** who happens to be REAL LAW, and real "intent" in these legal matters, as being a **"prosecutor"** and not some sub-contracting, **special forces crime syndicate member** who made out a "false report(s)," and sham court documents to justify padding their pockets with the Taxpayer's hard earned money.

C. Without the certain and **"spelled out"** law following **of process / procedure,** there exists **NO real "process" for this or any Affiant(s) / Plaintiff(s),** which also means, **NO "Due Process."**

FACT of this case is that there is **NO "criminal action" on the part of the State** without a valid "indictment, complaint or information," **made out by a city or county "prosecutor."**

**28.    FACT OF LAW of State Criminal Charges as COUNT No. 24 under the Federal Rico Act in violation of, section 1503 (relating to obstruction of justice), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering).**

**Fact a claim remedied under Federal Law is that** of another Simple to read STATUTE for this criminal sydicate gang of **Defendant(s)** Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Todd Hourigan (detective for the City of Ventura California), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada) with the assistance of Richard Gammich (District Attorney of Washoe County Nevada), did "as an association" and **"in concert"** did violate **NRS 171.060, by the stealing of Affiant's note books, lap top computers and other personal effects under color of law and under color of official right.**

**NRS 171.060 provides in pertinent parts:** Burglary, robbery, larceny or embezzlement: Venue when property is taken in one county and brought into another.   When property taken in one county by burglary, robbery, larceny or embezzlement has been brought into another, the venue of the offense is

in either county, but if, at any time before the conviction of the defendant in the latter, the defendant is indicted in the former county, the sheriff of the latter county must, upon demand, deliver the defendant to the sheriff of the former.

**29.   FACT OF LAW Federal Criminal Charges as COUNT No. 25 under the Federal "R.I.C.O." Act, TREASON, REBELLION OR INSERRECTION in violation of 18 U.S.C. § 2384 – Seditious Conspiracy.**

**ALL named Defendants** [included but not limited through discovery] Harvey Whittemore, Annette Whittemore (Pres., CEO of WPI), Richard Gammich (District Attorney of Washoe County Nevada), Ann Hall, Carli Kinne-West (neice of Harvey and Annette Whittemore; in house counsel to WPI), Todd Hourigan (detective for the City of Ventura California), Jaime Mcquire (University of Nevada-Reno Police department), John W. Helzer (Asst. District Attorney of Washoe County Nevada), Jeremy Faith (U.S. Bankruptcy Trustee, Santa Barbara California) J. Scott Bovits, Lisa Fenning (Attorneys for WPI during the bankruptcy proceedings) **and in concert, did in fact violate Federal Law** in violations of 18 U.S.C. § 2383 - Rebellion or insurrection; 18 U.S.C. § 2384 - Seditious conspiracy.
**Sedition:**

   *The organized incitement of rebellion or civil disorder against authority or the state. An insurrectionary movement tending towards treason, but wanting an overt act; attempts made by meetings or speeches, or by publications, to disturb the tranquility of the state.* (Referenced Black's Law Dictionary 6th edition.
See also 18 U.S.C.A. § 2283 et seq. See also *The Smith Act.* 18 U.S.C.A. § 2383 provides in pertinent parts:

*Whoever incites, sets on foot, assists, or engages in any rebellion or insurrection against the authority of the United States or the laws thereof, or gives aid or comfort thereto, shall be fined under this title or imprisoned not more than ten years, or both; and shall be incapable of holding any office under the United States.*

**30.   JUDICAL NOTICE:**
The U.S. Supreme Court has stated that "No state legislator or executive or judicial officer can war against the Constitution without violating his

undertaking to support it. *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401 (1958).

However, since *Ex parte Young,* 209 U. S. 123 (1908), it has been settled that the Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law.

*Ex parte Young* teaches that, when a state officer acts under a state law in a manner violative of the Federal Constitution, he "comes into conflict with the superior authority of that Constitution, and he is, in that case, stripped of his official or representative character, and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States."

AS QUOTED: **"Under RICO, a person who is a member of an enterprise that has committed any two [2]** of the 62 crimes— [In this immediate case Defendant(s) did in fact violate and commit 62 federal crimes and state crimes] —**within a 10-year period can be charged with racketeering.** Those found guilty of racketeering **can be fined up to $25,000 and sentenced to 15 to 20 years in prison** **per racketeering count.** In addition, the racketeer must forfeit all ill-gotten gains and interest in any business gained through a pattern of "racketeering activity."

Judicial Notice to all involved in this judicial matter. . .

As Quoted . .

**RICO also permits a private individual harmed by the actions of such an enterprise to file a civil suit;** if successful, **the individual can collect treble damages (damages in triple the amount of actual compensatory damages** as stated as 1, 2, and No. 3 of the remedies listed directly below.)" end of quote. https://en.wikipedia.org/wiki/Racketeer_Influenced_and_Corrupt_Organizat ions_Act

**The following is the Stipulations for "REMEDY or RELIEF" in this "redress of grievances" for violations of Federal and State Law is stated as follows . . .**

1. An immediate Federal Grand Jury indictment by this "information."
b. Arrest warrants issued and All Defendant(s) arrested by a group of Federal Marshals.
c. Then and only then a full and fair Trial by an "fully informed" jury.

2  And then Punishment of the Federal Sentence Guidelines to the fullest extent of ALL the 62 Counts of Federal Felony Statutes listed above with every Count of State Felony crimes punished, at the fullest extent of the LAW, with all sentences running consecutive.

3. Eight Million ($8,000,000.00) USD with all <u>TAXES PAID</u> of the Triple damages paid in full for Federal RICO Violations paid in full directly paid to this Affiant/ Plaintiff. Or as a required stipulation, just No. 3 of this list, to forgo any civil suite "with prejudice," for an "out of court settlement," with TAXES PAID, on stated amount (stated above,) PAID IN FULL.

    In order for JUSTICE to Reign in this country against above stated 62 Federal Criminal Rico Violations and related State Felonies, this Affiant / Plaintiff should NOT have to endure, more pain and suffering, nor should "the citizens" of this country have to pay for a "civil" suit against this criminal syndicate" of "Organized Crime members," DBA as the "Organized Crime Division (OCD,) of Reno, Nevada, associated with "justice of the peace courts" of Reno, Nevada, as I do rely that true Justice prevailing, by the relief being granted post haste.

Notice: Hand Signature of this FEDERAL AFFIDAVIT NEXT PAGE ATTACHED.

1. Prayer for Additional Relief,

2. Affiant request this court order him protective custody; and, a federal investigation from the Department of Justice to thoroughly investigate the crimes as alleged in this affidavit pursuant to 18 U.S.C. § 3332(a).

3. Further affiant saith naught.

*Please see attached
certificate for Notary

Dr. Judy Mikovits, Victim and Witness

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of __Ventura__

Subscribed and sworn to (or affirmed) before me on this __11th__ day of __April__, 20 __19__, by __Judy Mikovits__ _____,

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.



(Seal)                          Signature_____

# EXHIBIT "A"

# Original Patent of Dr. Mikovits / Dr. Ruscetti Inventors

49



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 61/321,147 | 04/06/2010 | | 110 | 40000377-0001Var | | |

**CONFIRMATION NO. 7100**

26263
SONNENSCHEIN NATH & ROSENTHAL LLP
P.O. BOX 061080
WACKER DRIVE STATION, WILLIS TOWER
CHICAGO, IL 60606-1080

**FILING RECEIPT**


*OC000000041244580*

Date Mailed: 04/23/2010

Receipt is acknowledged of this provisional patent application. It will not be examined for patentability and will become abandoned not later than twelve months after its filing date. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Applicant(s)**

        Judy A. Mikovits, Reno, NV;
        Francis W. Ruscetti, New Market, MD;

**Power of Attorney:**
Saul Zackson--52391

**If Required, Foreign Filing License Granted:** 04/22/2010
The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 61/321,147**
**Projected Publication Date:** None, application is not eligible for pre-grant publication
**Non-Publication Request:** No
**Early Publication Request:** No
**\*\* SMALL ENTITY \*\***
**Title**

        Diagnostic Identification of Variants of Xenotropic Murine Leukemia Virus-Related Virus

**PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES**

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international

72 of 268

patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4158).

## LICENSE FOR FOREIGN FILING UNDER

### Title 35, United States Code, Section 184

### Title 37, Code of Federal Regulations, 5.11 & 5.15

**GRANTED**

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and

Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign Assets Control, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

**NOT GRANTED**

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

PTO/SB/16 (12-08)
Approved for use through 06/30/2010. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

**PROVISIONAL APPLICATION FOR PATENT COVER SHEET – Page 1 of 2**

This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(c).

Express Mail Label No. _____

| INVENTOR(S) | | |
|---|---|---|
| Given Name (first and middle [if any]) | Family Name or Surname | Residence (City and either State or Foreign Country) |
| Judy  A | Mikovits | Reno, NV |
| Francis W. | Ruscetti | New Market, MD |
| | | |
| | | |
| | | |

Additional inventors are being named on the _____ separately numbered sheets attached hereto.

| TITLE OF THE INVENTION (500 characters max): |
|---|
| Diagnostic  Identification  of Variants of Xenotropic Murine Leukemia Virus-Related Virus |

Direct all correspondence to:          **CORRESPONDENCE ADDRESS**

[X] The address corresponding to Customer Number:          `26263`

**OR**

[ ] Firm or
Individual Name

Address

| City | State | Zip |
|---|---|---|
| Country | Telephone | Email |

**ENCLOSED APPLICATION PARTS (check all that apply)**

[ ] Application Data Sheet. See 37 CFR 1.76          [ ] CD(s), Number of CDs _____

[X] Drawing(s)  Number of Sheets _____ 19 _____          [ ] Other (specify) _____

[X] Specification (e.g. description of the invention) Number of Pages _____ 20 _____

Fees Due: Filing Fee of $220 ($110 for small entity). If the specification and drawings exceed 100 sheets of paper, an application size fee is also due, which is $270 ($135 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s).

**METHOD OF PAYMENT OF THE FILING FEE AND APPLICATION SIZE FEE FOR THIS PROVISIONAL APPLICATION FOR PATENT**

[X] Applicant claims small entity status. See 37 CFR 1.27.

[ ] A check or money order made payable to the Director of the United States Patent and Trademark Office
is enclosed to cover the filing fee and application size fee (if applicable).          `$110.00`

[X] Payment by credit card. Form PTO-2038 is attached.          **TOTAL FEE AMOUNT ($)**

[ ] The Director is hereby authorized to charge the filing fee and application size fee (if applicable) or credit any overpayment to Deposit
Account Number: _____

*USE ONLY FOR FILING A PROVISIONAL APPLICATION FOR PATENT*

This collection of information is required by 37 CFR 1.51. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 8 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA  22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

### PROVISIONAL APPLICATION COVER SHEET
### Page 2 of 2

PTO/SB/16 (12-08)
Approved for use through 06/30/2010. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.

☐ No.

☒ Yes, the name of the U.S. Government agency and the Government contract number are: **NCI/NIH  CA104943,**
**USPHS HHSN26120080001E, DoD Prostate Cancer Program W81XWH-07-1338**

## WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

SIGNATURE  /Saul L. Zackson/                          Date  4/6/2010

TYPED or PRINTED NAME  Saul L. Zackson              REGISTRATION NO.  52,391
                                                     *(if appropriate)*

TELEPHONE  (314) 259-5817                            Docket Number:  40000377-0001Var

# Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

Diagnostic Identification of Variants of Xenotropic Murine Leukemia Virus-Related Virus

Judy Mikovits

Francis Ruscetti

Summary

The present inventors disclose the following aspects herein:

1.      A method of diagnosing an XMRV-related disease other than prostate cancer, comprising:

        a) providing a sample from a subject comprising, or suspected of comprising, at least one XMRV subgroup;

        b) determining at least one sequence of at least one XMRV nucleic acid, if any, comprised by the sample,

wherein the at least one sequence can be diagnostic for an XMRV-related disease other than prostate cancer if the at least one sequence i) differs in sequence identity by at least 2% with a homologous sequence of reference sequence VP62 and ii) has at least 90% sequence identity with the homologous sequence.

2.      A method in accordance with Aspect 1, wherein the at least one sequence can comprise at least 50 contiguous nucleotides of an XMRV nucleic acid sequence.

3.      A method in accordance with Aspect 1, wherein the at least one sequence can comprise at least 60 contiguous nucleotides of an XMRV nucleic acid sequence.

4.      A method in accordance with Aspect 1, wherein the at least one sequence can comprise at least 70 contiguous nucleotides of an XMRV nucleic acid sequence.

5.      A method in accordance with Aspect 1, wherein the at least one sequence can comprise at least 80 contiguous nucleotides of an XMRV nucleic acid sequence.

6.      A method in accordance with Aspect 1, wherein the at least one sequence can comprise at least 90 contiguous nucleotides of an XMRV nucleic acid sequence.

7.      A method in accordance with Aspect 1, wherein the at least one sequence can comprise at least 100 contiguous nucleotides of an XMRV nucleic acid sequence.

8.      A method in accordance with Aspect 1, wherein the at least one sequence can comprise at least 1 mutation compared to VP62.

9.      A method in accordance with Aspect 1, wherein the at least one sequence can comprise at least 1 SNP compared to VP62.

10.     A method in accordance with Aspect 1, wherein the at least one sequence can comprise at least 2 SNPs compared to VP62.

11.     A method in accordance with any one of Aspects 8, 9. and 10, wherein a mutation or SNP can be a mutation or SNP set forth in table 3.

12.     A method in accordance with Aspect 1, wherein the sample comprises a body fluid.

13.     A method in accordance with Aspect 12, wherein the body fluid can be selected from the group consisting of blood, plasma, serum, cerebrospinal fluid, saliva, urine, and a combination thereof.

14.     A method in accordance with Aspect 12, wherein the body fluid can be selected from the group consisting of blood, plasma, serum, cerebrospinal fluid and a combination thereof.

15.     A method in accordance with Aspect 12, wherein the body fluid can be selected from the group consisting of blood, plasma, serum and a combination thereof.

16.     A method in accordance with Aspect 12, wherein the body fluid can be peripheral blood.

17.     A method in accordance with Aspect 12, wherein the sample can be selected from the group consisting of a blood sample, a serum sample, a plasma sample, and a cerebrospinal fluid sample.

18.     A method in accordance with Aspect 12, wherein the sample comprises peripheral blood.

19.     A method in accordance with Aspect 1, wherein the determining at least one sequence can comprise a polymerase chain reaction amplification.

20.     A method in accordance with Aspect 19, wherein the polymerase chain reaction amplification can comprise a nested RT-PCR.

21.     A method in accordance with Aspect 1, wherein the determining at least one sequence can comprise pyrosequencing.

22.     A method in accordance with Aspect 1, wherein the determining at least one sequence can comprise a hybridization assay.

23.     A method in accordance with Aspect 1, wherein the at least one XMRV nucleic acid can comprise at least 10 contiguous nucleotides encoding an amino acid sequence of an XMRV gag protein.

24.     A method in accordance with Aspect 23, wherein the at least 10 contiguous nucleotides encoding an amino acid sequence of an XMRV gag protein can comprise at least 10 contiguous nucleotides encoding an amino acid sequence of the core protein matrix (MA).

25.     A method in accordance with Aspect 1, further comprising assigning the at least one XMRV to an XMRV subgroup, wherein the XMRV subgroup can be selected from the group consisting of XMRV subgroup A, XMRV subgroup B and XMRV subgroup C.

26.     A method in accordance with Aspect 25, wherein if the sample comprises at least one of XMRV subgroup B and XMRV subgroup C, the subject can be diagnosed with an XMRV-related neuroimmune disease or an XMRV-related cancer other than prostate cancer.

27.     A method in accordance with Aspect 26, wherein the XMRV-related neuroimmune disease can be selected from the group consisting of fibromyalgia, Chronic Fatigue Syndrome (CFS), Multiple Sclerosis (MS), Parkinson's Disease, Amyotrophic Lateral Sclerosis (ALS) and autism.

28.     A method in accordance with Aspect 27, wherein the Multiple Sclerosis can be Atypical Multiple Sclerosis.

29.     A method in accordance with Aspect 26, wherein the XMRV-related cancer can be an XMRV-related lymphoma.

30.     A method in accordance with Aspect 29, wherein the XMRV-related lymphoma can be selected from the group consisting of an XMRV-related Mantle Cell Lymphoma (MCL) and an XMRV-related Chronic Lymphocytic Leukemia lymphoma (CLL).

In various aspects of the present teachings, a sequence of an XMRV detected in a sample from a subject can be compared to XMRV strain VP62, comprising a nucleic acid of the following sequence:

```
  1 gcgccagtca tccgatagac tgagtcgccc gggtacccgt gttcccaata aagccttttg
 61 ctgtttgcat ccgaagcgtg gcctcgctgt tccttgggag ggtctcctca gagtgattga
121 ctacccagct cggggggtctt tcatttgggg gctcgtccgg gattcggaga ccccgcccca
181 gggaccaccg acccaccgtc gggaggtaag ccggccggcg atcgttttgt ctttgtctct
241 gtctttgtgc gtgtgtgtgt gtgccggcat ctaatcctcg cgcctgcgtc tgaatctgta
301 ctagttagct aactagatct gtatctgcgg gttccgcgga agaactgacg agttcgtatt
361 cccggccgca gccctgggag acgtcccagc ggcctcgggg gccgtttttg tggcccattc
421 tgtatcagtt aacctacccg agtcggactt tttggagtgg ctttgttggg ggacgagaga
481 cagagacact tcccgccccc gtctgaattt ttgctttcgg ttttacgccg aaaccgcgcc
541 gcgcgtctga tttgttttgt tgttcttctg ttcttcgtta gttttcttct gtctttaagt
601 gttctctgaga tcatgggaca gaccgtaact acccctctga gtctaacctt gcagcactgg
661 ggagatgtcc agcgcattgc atccaaccag tctgtggatg tcaagaagag gcgctgggtt
721 accttctgtt ccgccgaatg gccaactttc aatgtaggat ggcctcagga tggtactttt
781 aatttaggtg ttatctctca ggtcaagtct agagtgtttt gtcctggtcc ccacggacac
841 ccggatcagg tcccatatat cgtcacctgg gaggcacttg cctatgaccc ccctccgtgg
901 gtcaaaccgt ttgtctctcc taaacccccct cctttaccga cagctcccgt cctcccgccc
961 ggtccttctg cgcaacctcc gtcccgatct gcccttacc ctgcccttac ccctctata
```



```
1021 aagtccaaac ctcctaagcc ccaggttctc cctgatagcg gcggacctct cattgacctt
1081 ctcacagagg atcccccgcc gtacggagca caaccttcct cctctgccag ggagaacaat
1141 gaagaagagg cggccaccac ctccgaggtt tccccccctt ctcccatggt gtctcgactg
1201 cggggaagga gagacccctcc cgcagcggac tccaccacct cccaggcatt cccactccgc
1261 atgggggggag atggccagct tcagtactgg ccgtttcct cctctgattt atataattgg
1321 aaaaataata accttcctt ttctgaagat ccaggtaaat tgaccgcctt gattgagtcc
1381 gtcctcatca cccaccagcc cacctgggac gactgtcagc agttgttggg gaccctgctg
1441 accggagaag aaaagcagcg ggtgctccta gaggctagaa aggcagtccg gggcaatgat
1501 ggacgcccca ctcagttgcc taatgaagtc aatgctgctt ttcccccttga gcgcccgat
1561 tgggattaca ccactacaga aggtaggaac cacctagtcc tctaccgcca gttgctctta
1621 gcgggtctcc aaaacgcggg caggagcccc accaatttgg ccaaggtaaa agggataacc
1681 cagggaccta atgagtctcc ctcagccttt ttagagagac tcaaggaggc ctatcgcagg
1741 tacactcctt atgaccctga ggacccaggg caagaaacca atgtgtccat gtcattcatc
1801 tggcagtctg ccccggatat cggacgaaag ttagagcggt tagaagattt aaagagcaag
1861 accttaggag acttagtgag ggaagctgaa aagatctta ataagcgaga aaccccggaa
1921 gaaagagagg aacgtatcag gagagaaata gaggaaaaag aagaacgccg tagggcagag
1981 gatgagcaga gagagagaga aagggaccgc agaagacata gagagatgag caagctcttg
2041 gccactgtag ttattggtca gagacaggat agacaggggg gagagcggag gaggccccaa
2101 cttgataagg accaatgcgc ctactgcaaa gaaaagggac actgggctaa ggactgccca
2161 aagaagccac gagggccccg aggaccgagg cccagacct ccctcctgac cttaggtgac
2221 tagggaggtc agggtcagga gcccccccct gaacccagga taaccctcaa agtcgggggg
2281 caacccgtca ccttcctggt agatactggg gcccaacact ccgtgctgac ccaaaatcct
2341 ggacccccta gtgacaagtc tgcctgggtc caaggggcta ctggaggaaa gcggtatcgc
2401 tggaccacga atcgcaaagt acatctggct accggtaagg tcacccactc tttcctccat
2461 gtaccagact gcccctatcc tctgctagga agagacttgc tgactaaact aaaagcccaa
2521 atccactttg agggatcagg agctcaggtt gtgggaccga tgggacagcc cctgcaagtg
2581 ctgacagtaa acatagaaga tgagtattgg ctacatgata caggaaaga gccagatgtt
2641 cctctagggt ccacatggct ttctgatttc cttcaggcct gggcggaaac cggggggcatg
2701 ggactggcag ttcgccaagc tcctctgatc atacctctga aggcaacctc taccccgtg
2761 tccataaaac aataccccat gtcacaagaa gccgacttgg ggatcaagcc cccacatacag
2821 aggctgttgg accaggaat actggtaccc tgccagtccc cctggaaac gcccctgcta
2881 cccgttaaga aaccagggac taatgattat aggcctgtcc aggatctgag agaagtcaac
2941 aagcgggtgg aagacatcca ccccaccgtg cccaaccctt acaacctctt gagcgggctc
3001 ccaccgtccc accagtggta cactgtgctt gatttaaagg atgccttttt ctgcctgaga
3061 ctccacccca ccagtcagcc tctcttcgcc tttgagtgga gagatccaga gatgggaatc
3121 tcaggacaac tgacctggac cagactccca cagggtttca aaaacagtcc caccctgttt
3181 gatgaggcac tgcacagaga cctagcagat ttccggatcc agcacccaga cttgatcctg
3241 ctacagtacg tggatgactt actgctggcc gccacttctg agcaagactg ccaacgaggt
3301 actcgggccc tattacaaac cctagggaac ctcgggtatc gggcctcggc caagaaagcc
```



```
3361 caaatttgcc agaaacaggt caagtatctg gggtatctcc taaaagaggg acagagatgg
3421 ctgactgagg ccagaaaaga gactgtgatg gggcagccca ctccgaagac ccctcgacaa
3481 ctaaggggagt tcctagggac ggcaggcttc tgtcgcctct ggatccctgg gtttgcagaa
3541 atggcagccc ccttgtaccc tcttaccaaa acggggactc tgtttaattg gggcccagac
3601 cagcaaaagg cctatcaaga aatcaaacag gctcttctaa ctgcccccgc cctgggattg
3661 ccagatttga ctaagccctt tgaactcttt gtcgacgaga agcagggcta cgccaaaggc
3721 gtcctaacgc aaaaactggg accttggcgt cggcctgtgg cctacctgtc caaaaagcta
3781 gacccagtgg cagctgggtg gcccccttgc ctacggatgg tagcagccat tgccgttctg
3841 acaaaaaatg caggcaagct aactatggga cagccgctag tcattctgat cccccatgcg
3901 gtagaagcac tggtcaaaca accccctgac cgttggctat ccaatgcccg catgacccac
3961 tatcaggcaa tgctcctgga tacagaccgg gttcagttcg gaccggtggt ggccctcaac
4021 ccggccaccc tgctcccccct accggaaaag gaagcccccc atgactgcct cgagatcttg
4081 gctgagacgc acggaaccag accggacctc acggaccagc ccatcccaga cgctgattac
4141 acttggtaca cagatgtgaag cagcttccta caagaaggac aacggagagc tggagcagcg
4201 gtgactactg agaccgaggt aatctgggcg agggctctgc cggctggaac atccgcccaa
4261 cgagccgaac tgatagcact cacccaagcc ttaaagatgg cagaaggtaa gaagctaaat
4321 gtttacactg atagccgcta tgccttcgcc acggcccatg tccatggaga aatatatagg
4381 aggcgagggt tgctgacctc agaaggcaga gaaattaaaa acaagaacga gatcttggcc
4441 ttgctaaaag ctctctttct gcccaaacga cttagtataa ttcactgtcc aggacatcaa
4501 aaaggaaaca gtgctgaggc cagaggcaac cgtatggcag atcaagcagc ccgagaggca
4561 gccatgaagg cagttctaga aacctctaca ctcctccatg aggactcaac cccgtatacg
4621 cctcccatt tccattacac cgaaacagat ctcaaaagac tacgggaact gggagccacc
4681 tacaatcaga caaaaggata ttgggtccta caaggcaaac ctgtgatgcc cgatcagtcc
4741 gtgtttgaac tgttagactc cctacacaga ctcacccatc tgagccctca aaagatgaag
4801 gcactcctcg acagagaaga aagcccctac tacatgttaa accgggacag aactatccag
4861 tatgtgactg agacctgcac cgcctgtgcc caagtaaatg ccagcaaagc caaaattggg
4921 gcaggggtgc gagtacgcgg acatcggcca ggcacccatt gggaagttga tttcacggaa
4981 gtaaagccag gactgtatgg gtacaagtac ctcctagtgt ttgtagacac cttctctggc
5041 tgggtagagg cattcccgac caagcgggaa actgccaagg tcgtgtccaa aaagtcgtta
5101 gaagacattt ttccaggatt tggaatgccg caggtattgg gatctgataa cgggcctgcc
5161 ttcgcctccc aggtaagtca gtcagtggcc gatttactgg ggatcgattg gaagttacat
5221 tgtgcttata gaccccgagg ttcaggacag gtagaaagaa tgaatagaac aattaaggag
5281 actttgacca aattaacgct tgcatctggc actagagact gggtactcct actccccttta
5341 gcccctctacc gagccggaa tactccggcc cccaacggac tgactccgta tgaaattctg
5401 tatgggcac cccgccccct tgtcaatttt catgatcctg aaatgtcaaa gttaactaat
5461 agtccctctc tccaagctca cttacaggcc ctccaagcag tacaacaaga ggtctggaag
5521 ccgctggccg ctgcttatca ggaccagcta gatcagccag tgataccaca cccccttccgt
5581 gtcggtgacg ccgtgtgggt acgccggcac cagactaaga acttagaacc tcgctggaaa
5641 ggaccctaca ccgtcctgct gacaaccccc accgctctca aagtagacgg catctctgcg
```

```
5701 tggatacacg ccgctcacgt aaaggcggcg acaactcctc cggccggaac agcatggaaa
5761 gtccagcgtt ctcaaaaccc cttaaagata agattaaccc gtggggcccc ctgataatta
5821 tggggatctt ggtgagggca ggagcctcag tacaacgtga cagccctcac caggtcttta
5881 atgtcacttg gaaaattacc aacctaatga caggacaaac agctaatgct acctccctcc
5941 tggggacgat gacagacact ttccctaaac tatattttga cttgtgtgat ttagttggag
6001 acaactggga tgacccggca cccgatattg gagatggttg ccgctctccc gggggaagaa
6061 aaaggacaag actatatgat ttctatgttt gccccggtca tactgtatta acagggtgtg
6121 gaggggccgag agagggctac tgtggcaaat ggggatgtga gaccactgga caggcatact
6181 ggaagccatc atcatcatgg gacctaattt cccttaagcg aggaaacact cctaagggtc
6241 agggccctg ttttgattcc tcagtgggct ccggtagcat ccagggtgcc acacggggg
6301 gtcgatgcaa cccctagtc ctagaattca ctgacgcggg taaaagggcc agctgggatg
6361 cccccaaaac atggggacta agactgtatc gatccactgg ggccgacccg gtgaccctgt
6421 tctctctgac ccgccaggtc ctcaatgtag ggccccgcgt ccccattggg cctaatcccg
6481 tgatcactga acagctaccc ccctcccaac ccgtgcagat catgctcccc aggactcctc
6541 gtcctcctcc ttcaggcgcg gcctctatgg tgcctggggc tcccccgcct tctcaacaac
6601 ctgggacggg agacaggctg ctaaacctgg tagaaggagc ctacctagcc ctcaacctca
6661 ccagtcccga caaaaccaa gagtgctggc tgtgtctagt atcgggaccc ccctactacg
6721 aagggtggc cgtcctaggt acttactcca accatacctc tgcccgggct aactgctccg
6781 tgacctccca cacacaagctg accctgtccg aagtgaccgg gcagggactc tgcataggag
6841 cagttcccaa aacccatcag gccctgtgta ataccaccca gaagacgagc gacgggtcct
6901 actatttggc ctctcccgcc gggaccattt gggcttgcag caccgggctc actcctgtc
6961 tatctactac tgtgcttaac ttaaccactg attactgtgt cctggttgaa ctctggccaa
7021 aggtaaccta ccactcccct aattatgttt atggccagtt tgaaaagaaa actaaatata
7081 aaagagagcc ggtgtcatta actctggccc tgctgttggg aggacttact atgggcggca
7141 tagctgcagg agttggaaca gggactacag ccctagtggc caccaaacaa ttcgagcagc
7201 tccaggcagc catacataca gaccttgggg ccttagaaaa atcagtcagt gccctagaaa
7261 agtctctgac ctcgttgtct gaggtggtcc tacagaaccg gagggggatta gatctactgt
7321 tcctaaaaga aggaggatta tgtgctgccc taaaagaaga atgctgtttt tacgcggacc
7381 acactggcgt agtaagagat agcatggcaa agctaagaga aaggttaaac cagagacaaa
7441 aattgttcga atcaggacaa gggtggtttg agggactgtt taacaggtcc ccatggttca
7501 cgaccctgat atccaccatt atgggccctc tgatagtact tttattaatc ctactcttcg
7561 gaccctgtat tctcaaccgc ttggtccagt ttgtaaaga cagaatttcg gtagtgcagg
7621 ccctggttct gacccaacag tatcaccaac tcaaatcaat agatccagaa gaagtggaat
7681 cacgtgaata aaagatttta ttcagtttcc agaaagaggg gggaatgaaa gacccccacca
7741 taaggcttag cacgctagct acagtaacgc cattttgcaa ggcatggaaa agtaccagag
7801 ctgagttctc aaaagttaca aggaagttta attaaagaat aaggctgaat aacactggga
7861 caggggccaa acaggatatc tgtagtcagg cacctgggcc ccggctcagg gccaagaaca
7921 gatggtcctc agataaagcg aaactaacaa cagtttctgg aaagtcccac ctcagtttca
7981 agttccccaa aagaccggga aatacccca gccttatttg aactaaccaa tcagctcgct
```

```
8041 tctcgcttct gtacccgcgc tttttgctcc ccagtcctag ccctataaaa aaggggtaag
8101 aactccacac tcggcgcgcc agtcatccga tagactgagt cgcccgggta cccgtgttcc
8161 caataaagcc ttttgctgtt tgcaa
```

In various embodiments, a sequence of an XMRV comprised by a sample can be compared to the sequence of XMRV VP62. In various configurations, homologous sequences of the XMRV sample and XMRV VP62 can be identified using methods well known to skilled artisans. In some configurations, a comparison of homologous sequences can reveal if the sequences are identical or contain one or more differences. Using the sequence of XMRV VP62 as a standard for comparison, in various configurations, a difference between a sequence of a sample XMRV and that of XMRV VP62 can be an insertion of one or more nucleotides, a deletion of one or more nucleotides, an inversion, or a substitution of one or more nucleotides such as a single nucleotide polymorphism (a "SNP").

In various embodiments, based on the differences between a sample XMRV sequence and the sequence of XMRV VP62, an XMRV comprised by a sample can be assigned to an XMRV subgroup, such as XMRV subgroup A, XMRV subgroup B, or XMRV subgroup C. In various configurations, a subject having one or both of XMRV subgroup B and XMRV subgroup C can be considered to be at risk or can be diagnosed with a neuroimmune disease and/or a cancer other than prostate cancer. In some configurations, a neuroimmune disease can be selected from the group consisting of fibromyalgia, Chronic Fatigue Syndrome (CFS, or Myalgic Encephalomyelitis, or ME/CFS), Multiple Sclerosis (MS), Parkinson's Disease, Amyotrophic Lateral Sclerosis (ALS) and autism. In some aspects, the Multiple Sclerosis can be Atypical Multiple Sclerosis.

In some aspects, an XMRV-related cancer can be an XMRV-related lymphoma. In some configurations, an XMRV-related lymphoma can be selected from the group consisting of an XMRV-related Mantle Cell Lymphoma (MCL) and an XMRV-related Chronic Lymphocytic Leukemia lymphoma (CLL).

In some embodiments, the identification of XMRV subgroups infecting a subject can influence choice of treatment. For example, a person infected with subgroups B and C, or subgroups A, B, and C, can require more aggressive treatment compared to a subject infected with only subgroup B or subgroup C. In some configurations, a subject infected with only XMRV subgroup may not be a candidate for any treatment.

Detailed Description

The experiments utilize standard laboratory techniques and equipment, such as those set forth in Sambrook, J., et al., Molecular Cloning: A Laboratory Manual, 3rd ed. Cold Spring Harbor Laboratory Press, Cold Spring Harbor, NY, 2001; Spector, D. L. et al., Cells: A Laboratory Manual, Cold Spring Harbor Laboratory Press, Cold Spring Harbor, NY, 1998; and Ausubel, F. M., et al., ed., Current Protocols in Molecular Biology, or as described in a reference cited herein.

DNA and RNA isolation. Whole blood can be drawn from subjects by venipuncture using standardized phlebotomy procedures into 8-mL greencapped Vacutainers containing the anti-coagulant sodium heparin (Becton Dickinson). Plasma can be collected by centrifugation, aspirated and stored at -80 °C for later use. The plasma can be replaced with PBS and the blood resuspended and further diluted with an equal volume of PBS. PBMCs can be isolated by layering the diluted blood onto Ficoll-Paque PLUS (GE Healthcare), centrifuging for 22 min at 800 g, aspirating the PBMC layer and washing it once in PBS. The PBMCs (approximately 2 x $10^7$ cells) can be centrifuged at 500 g for 7 min and either stored as frozen unactivated cells in 90% FBS and 10% DMSO at -80 °C for further culture and analysis or resuspended in TRIzol (Invitrogen) and stored at -80 °C for DNA and RNA extraction and analysis. DNA can be isolated from TRIzol according the to manufacturer's protocol and also can be isolated from frozen PBMC pellets using the QIAamp DNA Mini purification kit (QIAGEN) according to the manufacturer's protocol and the final DNA can be resuspended in RNase/DNase free water and quantified using the Quant-iTTM Pico Green dsDNA Kit (Invitrogen). RNA can be isolated from TRIzol according to the manufacturer's protocol and quantified using the Quant-iT Ribo Green RNA kit (Invitrogen). cDNA can be made from RNA using the iScript Select cDNA synthesis kit (Bio-Rad) according to the manufacturer's protocol.

[0037] PCR. Nested PCR can be performed with separate reagents in a separate laboratory room designated to be free of high copy amplicon or plasmid DNA. Negative controls in the absence of added DNA can be included in every experiment. Identification of XMRV gag and env genes can be performed by PCR in separate reactions. Reactions can be performed as follows: 100 to 250 ng DNA, 2 μL of 25 mM MgCl2, 25 μL of HotStart-IT FideliTaq Master Mix (USB Corporation), 0.75 μL of each of 20 μM forward and reverse oligonucleotide primers in reaction volumes of 50 μL. For identification of gag, 419F (5'-

ATCAGTTAACCTACCCGAGTCGGAC-3') (SEQ ID NO: 5) and 1154R (5'-GCCGCCTCTTCTTCATTGTTCTC-3') (SEQ ID NO: 6) can be used as forward and reverse primers. For env, 5922F (5'- GCTAATGCTACCTCCCTCCTGG-3') (SEQ ID NO: 7) and 6273R (5'-GGAGCCCACTGAGGAATCAAAACAGG-3') (SEQ ID NO: 8) can be used. For both gag and env PCR, 94 °C for 4 min initial denaturation can be performed for every reaction followed by 94 °C for 30 seconds, 57 °C for 30 seconds and 72 °C for 1 minute. The cycle can be repeated 45 times followed by final extension at 72 °C for 2 minutes. Six microliters of each reaction product can be loaded onto 2% agarose gels in TBE buffer with 1 kb+ DNA ladder (Invitrogen) as markers. PCR products can be purified using Wizard SV Gel and PCR Clean-Up kit (Promega) and sequenced. PCR amplification for sequencing full-length XMRV genomes can be performed on DNA amplified by nested or semi-nested PCR from overlapping regions from PBMC DNA. For 5' end amplification of R-U5 region, 4F (5'-CCAGTCATCCGATAGACTGAGTCGC-3') (SEQ ID NO: 9) and 1154R can be used for first round and 4F and 770R (5'-TACCATCCTGAGGCCATCCTACATTG-3') (SEQ ID NO: 10) can be used for second round. For regions including gag-pro and partial pol, 350F(5'-GAGTTCGTATTCCCGGCCGCAGC-3') (SEQ ID NO: 11) and 5135R (5'-CCTGCGGCATTCCAAATCTCG-3') (SEQ ID NO: 12) can be used for first round followed by second round with 419F and 4789R (5'-GGGTGAGTCTGTGTAGGGAGTCTAA-3'). (SEQ ID NO: 13) For regions including partial pol and env region, 4166F (5'-CAAGAAGGACAACGGAGAGCTGGAG-3') (SEQ ID NO: 14) and 7622R (5'-GGCCTGCACTACCGAAAT TCTGTC-3') (SEQ ID NO: 15) can be used for first round followed by 4672F (5'GAGCCACCTACAATCAGACAAAAGGAT-3') (SEQ ID NO: 16) and 7590R (5'- CTGGACCAAGCGGTTGAGAATACAG-3') (SEQ ID NO: 17) for second round. For the 3' end including the U3-R region, 7472F (5'-TCAGGACAAGGGTGGTTTGAG-3') (SEQ ID NO: 18) and 8182R (5'-CAAACAGCAAAAGGCTTTATTGG-3') (SEQ ID NO: 19) can be used for first round followed by 7472F and 8147R (5'-CCGGGCGACTCAGTCTATC-3') (SEQ ID NO: 20) for second round. The reaction mixtures and conditions can be as described above except for the following: For larger fragments, extension can be done at 68 °C for 10 min instead of 72 °C. All second round PCR products can be column purified as mentioned above and overlapping sequences can be determined with internal primers. Nested RT-PCR for gag sequences can be done as described (5) with modifications. GAG-O-R primer can be used for 1st



strand synthesis; cycle conditions can be 52 °C annealing, for 35 cycles. For second round PCR, annealing can be at 54 °C for 35 cycles.

[0038] Phylogenetic Analysis  Sequences can be aligned using ClustalX Clustal alignments can be imported into MEGA4 to generate neighbor-joining trees using the Kimura 2-parameter plus $\Gamma$ distribution (K80+$\Gamma$) distance model. Free parameters can be reduced to the K80 model, and $\alpha$ values can be estimated from the data set using a maximum likelihood approach in PAUP*4.0 (Sinauer Associates, Inc. Publishers, Sunderland, MA, USA). The bootstrap consensus tree inferred from 1000 replicates is taken to represent the evolutionary history of the taxa analyzed. Accession numbers from GenBank (http://www.ncbi.nlm.nih.gov/Genbank): FLV (NC_001940), MoMLV (NC_001501), XMRV VP35 (DQ241301), XMRV VP42 (DQ241302) XMRV VP62 (EF185282). Genomic Nonecotropic MLV Provirus Sequences can be downloaded from PLOS Genetics 3(10): e183 .

We previously reported the first direct isolation of infectious xenotropic murine leukemia virus-related virus (XMRV). In that study, we used a combination of biological amplification and molecular enhancement techniques to detect XMRV in more than 75% of 101 patients with chronic fatigue syndrome (CFS). Since our report, controversy arose after the publication of two studies from England that failed to detect XMRV infection in their CFS patient populations. In this addenda, we further detail the multiple detection methods we used in order to observe XMRV infection in our CFS cohort. Our results indicate that PCR from DNA of unstimulated peripheral blood mononuclear cells is the least sensitive method for detection of XMRV in subjects' blood. We advocate the use of more than one type of assay in order to determine the frequency of XMRV infection in patient cohorts in future studies of the relevance of XMRV to human disease.

Patient selection poses a challenge to any study of myalgic encephalomyelitis/chronic fatigue syndrome (ME/CFS). In our October 2009 paper, samples banked from 2006 to 2008 were selected for our study from severely disabled patients who fulfilled the 1994 CDC Fukuda Criteria for chronic fatigue syndrome (1) as well as the 2003 Canadian Consensus Criteria (CCC) for ME/CFS (2). The CCC requires post-exertional malaise, which many clinicians feel is the sine qua non of ME/CFS. Furthermore the CCC further requires that patients exhibit post exertional fatigue, unrefreshing sleep, pain and neurological/cognitive manifestations, rather than these being optional symptoms (3). Many clinicians interested in CFS are switching to the

Canadian criteria because they feel it is more descriptive of the clinical entity being defined. The Fukuda criteria have the advantage of a longer period of usage and existence of many publications that have added modifications. Suffice it to say that the clinician author of the Science paper elected to use both criteria, thus by passing the argument of which criteria were better. Moreover, the emphasis in the Science paper was directed toward the virology, not the clinical description of ME/CFS.

In our October 2009 publication (Lombardi, V.C., et al., Science 326: 285, 2009) we established XMRV infection in the blood products of our patient population by four different methods. Of these methods, single-round PCR on DNA from peripheral blood mononuclear cells (PBMCs), the least sensitive method, required us to use samples from a subset of chronically ill patients we had observed to have persistent viremia. In Fig 1A of our Science paper, we showed that DNA of 7 of 11 patients exhibited the expected gag and env PCR amplification products from single-round PCR with XMRV primers. We included this figure to demonstrate that nested PCR, which inevitably raises questions of contamination, is not essential to detect XMRV in highly viremic ME/CFS patients. Of the other 90 samples described in the paper, very few exhibited XMRV-specific PCR products following single round DNA PCR. Only 11% of the 101 DNA samples from PBMCs exhibited products by nested PCR. In contrast, when cDNA was prepared from PBMCs, sixty of the 90 other samples exhibited gag products upon nested PCR, though PCR with nested env primers did not result in detectable products from these samples (Table 1).

Samples that are negative for XMRV by one of our PCR assays are sometimes positive by other assays. For example, in Figure 1 A of the Science paper, patient 1118 was negative by single round PCR on DNA from unstimulated PBMCs, but positive in other assays (Science Fig 2A, 2D, 4A, S5). Of the 34 patients whose PBMCs were negative for XMRV by DNA or cDNA PCR, 17 were positive for infectious virus when co- cultured with indicator cell lines, as XMRV gag and env PCR products were detected in the cell lines following their infection with XMRV from the patient PBMCs (Table 2). Both gag and env products obtained from either single-round or nested PCR were sequenced and shown to be 99% identical to XMRV VP62. Subsequent to our October 2009 publication, two papers from the United Kingdom have appeared in which the authors report the lack of detection of XMRV PCR products from DNA of unstimulated PBMCs, using patient populations selected by only the Fukuda criteria rather than both Fukuda and CCC criteria. We regret that these authors did not request positive control



samples of our patients who exhibit XMRV PCR products even when assayed by the least sensitive detection method, namely PCR of DNA from unstimulated PBMCs. Given that only 11% of our 101 patients' PBMCs exhibit products upon DNA PCR, and that a number of patients were included in the UK studies who do not fulfill the CCC criteria, very few, if any, of the samples would be expected to be positive by DNA PCR. We also note that both studies followed different methods than ours for blood collection, DNA quantities and isolation and PCR, possible sources of the disparate results.

The reports of negative PCR tests for XMRV in two UK patient cohorts has raised questions whether our findings could be due to contamination of our PCR experiments by mouse genomic DNA, which contain gag and env sequences highly similar to XMRV. We point out that positive PCR results for XMRV were obtained independently in multiple laboratories led by co-authors of the Science paper. In the summer of 2006, prior to work on XMRV at the Reno Whittemore-Peterson Institute (WPI), 30 mL of heparinized peripheral blood samples were obtained from patients residing in the U.S., Canada, and Europe coming to be treated at the well-known Sierra Internal Medicine practice, located in Incline Village, Nevada. Once collected, 45 of these blood samples were shipped directly to NCI where cDNA was prepared for planned microarray experiments. After the WPI observed an XMRV PCR product from a patient sample in 2009, the NCI began testing these stored samples by PCR. cDNA from 42 of the 45 samples sent to the NCI lab in February 2007 tested positive for XMRV gag by nested PCR. Neither the WPI nor NCI labs where PCR was performed had ever worked with mouse tissues or had been exposed to XMRV from other sources. The env sequences amplified from

LNCaP cells infected by patient PBMCs exhibit less similarity to mouse genomic DNA than to XMRV VP62, further indicating the presence of XMRV infection rather than mouse genomic DNA contamination. After we developed a sensitive cell culture assay for detection of XMRV, we assayed our cell lines and patient material with a highly sensitive assay (developed and kindly provided by Bill Switzer, CDC) to detect the presence of mouse tissue contamination by the identification of murine mitochrondial cytochrome oxidase by real time PCR. All of the cell lines and 101 patient materials were negative for mouse contamination.

In our experience, the most sensitive blood-based assays for detection of XMRV in decreasing order are: 1) performing nested PCR for gag sequences from LNCaP cells that have been co-cultured with subject's plasma or activated PBMCs, 2) detection of viral proteins expressed by

activated PBMCs with appropriate antisera, 3) the presence of antibodies to XMRV Env in subject's plasma, 4) nested RT-PCR of plasma nucleic acid or PCR from cDNA from unactivated PBMCs and nested PCR of DNA from unactivated PBMC prepared from subject's blood.

Despite association with both prostate cancer and CFS, many questions remain regarding the prevalence of XMRV in the human population, the incidence of XMRV in disease, and the extent of genetic variation between XMRV isolates. The genetic variation between XMRV isolates currently identified is only 0.03%, despite the fact that the viral sequences were obtained from isolates from two vastly different diseases in patients from geographically distinct areas. This variation is smaller than the variation observed between HTLV-1 isolates (4). As in the case with HTLV, the lack of diversity implies that XMRV recently descended from a common ancestor (5). The high degree of similarity to xenotropic murine leukemia virus suggests that a cross-species transmission event was likely involved in evolution of XMRV (6). Further examination of XMRV from human subjects may reveal more extensive sequence variation, which also may confound its detection unless PCR primers are designed with this possibility in mind.

References cited herein are incorporated by reference, each in its entirety.

Table 1   XMRV detection using cDNA from 20 unstimulated PBMCs

| GAG Gene | | | | ENV Gene | | | |
|---|---|---|---|---|---|---|---|
| Lane | 1st | 2nd | | Lane | 1st | 2nd | |
| 1 | | | | 1 | | | |
| 2 | - | + | 1104 | 2 | - | - | 1104 |
| 3 | + | + | 1110 | 3 | - | - | 1110 |
| 4 | - | - | 1113 | 4 | - | - | 1113 |
| 5 | - | - | 1114 | 5 | - | - | 1114 |
| 6 | - | + | 1115 | 6 | - | - | 1115 |
| 7 | - | - | 1117 | 7 | - | - | 1117 |
| 8 | - | + | 1125 | 8 | - | - | 1125 |
| 9 | - | + | 1130 | 9 | - | - | 1130 |
| 10 | + | + | 1135 | 10 | - | - | 1135 |
| 11 | - | - | 1142 | 11 | - | - | 1142 |
| 12 | + | + | 1150 | 12 | - | - | 1150 |
| 13 | - | - | 1155 | 13 | - | - | 1155 |
| 14 | - | + | 1161 | 14 | - | - | 1161 |
| 15 | - | + | 1165 | 15 | - | - | 1165 |
| 16 | - | + | 1166 | 16 | - | - | 1166 |
| 17 | + | + | 1168 | 17 | - | - | 1168 |
| 18 | - | + | 1169 | 18 | - | - | 1169 |
| 19 | - | + | 1177 | 19 | - | - | 1177 |
| 20 | +?- | + | 1178 | 20 | - | - | 1178 |
| 21 | - | - | 1182 | 21 | - | - | 1182 |
| 22 | - | - | 1199 | 22 | - | - | 1199 |

Table 2   Co-culture with LNCaP of PBMCs from 14 patients PCR negative

| GAG Gene | | | | ENV Gene | | | | |
|---|---|---|---|---|---|---|---|---|
| Lane | 1st | 2nd | | Lane | 1st | 2nd | | Type |
| 6 | - | - | 1169 | 26 | + | + | 1169 | (RNA) |
| 7 | + | + | 1221 | 27 | + | + | 1221 | (RNA) |
| 8 | - | + | 1150 | 28 | + | + | 1150 | (RNA) |
| 9 | - | + | 1199 | 29 | - | + | 1199 | (RNA) |
| 10 | + | + | 1220 | 30 | + | + | 1220 | (RNA) |
| 11 | - | - | LNCaP | 31 | - | - | LNCaP | (RNA) |
| 12 | - | - | 1186 | 32 | - | - | 1186 | (RNA) |
| 13 | - | + | 1150 | 33 | - | - | 1150 | (DNA) |
| 14 | - | + | 1132 | 34 | - | + | 1132 | (DNA) |
| 15 | - | + | 1111 | 35 | - | - | 1111 | (DNA) |
| 16 | - | + | 1186 | 36 | - | - | 1186 | (DNA) |
| 17 | - | + | 1189 | 37 | + | + | 1189 | (DNA) |
| 18 | - | + | 1172 | 38 | + | + | 1172 | (DNA) |
| 19 | - | + | 1173 | 39 | - | + | 1173 | (DNA) |
| 20 | - | + | 1103 | 40 | + | + | 1103 | (DNA) |

**Sequence variations of the gag gene of XMRV form three distinct subgroups**

To investigate the diversity of XMRV, peripheral blood mononuclear cells (PBMCs) from XMRV-infected individuals were isolated, and the sequence of the region of gag that encodes the core protein matrix (MA) was determined using nested RT-PCR. (Figure 1A). This protein is the most diverse of the gag proteins of gammaretroviruses: sequence analysis of several different murine, feline, and primate gammaretroviruses have revealed low sequence and residue identity (Supplemental Figure 1). In contrast, the MA sequences of XMRV available on GenBank show significant conservation, differing by 0-2 of 387 ( <1%) nucleotides.

To further investigate the genetic diversity of additional XMRV isolates, RNA was isolated directly from the PBMCs of XMRV-infected individuals and regions encoding the MA protein were amplified by nested RT-PCR. Comparison of the sequences amplified from 17 individuals revealed a significant amount of variation in this region (Figure 1B). All sequences analyzed directly from XMRV-infected subjects differed by at least one nucleotide from the XMRV reference strain VP62 (Fig. 1B, line 1). Overall, 15/327 residues had nucleotide substitutions relative to VP62, and all but two of these changes were observed in two or more of the isolates examined. In addition, 7 of the 17 samples had a 21 bp deletion from nt 127- 147.

Analysis of the MA sequences revealed the variants could be classified into three subgroups (Figure 1B). These subgroup delineations are supported by unrooted neighbor-joining analysis of the MA nucleotide sequence fragment (Figure 1C). Seven of the sequences, which fell into subgroup A, are closely related to the previously published sequences of XMRV in this region (Fig. 1B, lines 2-8, compare with line 1). At most, this group differed by 3 nucleotides from the reference strain VP62; one resulted in a synonymous change (i.e., the same residue was encoded). and two were non-synonymous (Table 1). The non-synonymous substitution, nt 178: G→A, is present in all of the sequences in subgroup A (G178A), and has also been previously reported to be present in other XMRV sequences (Table 1).

Eight of the seventeen (8/17) sequences analyzed fell into a second group (subgroup B), all of which had a 21 bp deletion, resulting in an in-frame deletion of seven amino acid residues. All sequences in subgroup B also had seven specific nucleotide substitutions relative to the sequence of the XMRV reference strain (nt 75: C→T, nt 85: G→A, nt 91: A→G, nt 92: A→G, nt 304: C→G, nt 315: C→T, and nt 316: C→T) (Fig. 1B lines 9-17), of which were four were synonymous and three were non-synonymous changes (Table 1).

Subgroup C contained two sequences and was characterized by three unique nucleotide

substitutions (nt 106: G→A, nt 175: G→A, and nt 192: C→T) (Fig. 1B, lines 17 and 18 and Table 1), of which two were synonymous and one was a non-synonymous change. This group also had three nucleotide substitutions relative to VP62 that were in common with members of groups A and B (nt 92: A→G, nt 178: G→A, nt 325: A→G).

   To gain insight into whether the variation observed in the XMRV sequences could be tolerated by the MA protein and persist in nature, we examined the MA protein sequences of gammaretroviruses from other mus muculus and other species. Alignment of MA proteins of other members gammaretrovirus genus revealed that 5 of the 6 amino acid changes in the XMRV variants are present in other infectious gammaretroviruses (Table 2 and Fig. S1).

### Analysis of XMRV MA sequences in lymphocytes following ex vivo culture

   XMRV RNA could not always be detected in the PBMCs of subjects from which infectious virus had been isolated from plasma. This suggests that the virus is expressed at very low frequency in PBMCs isolated directly from infected individuals. We have observed that culturing these PBMCs under conditions that induce activation of T cells (Lombardi) increases the frequency of XMRV detected by RT-PCR in the cells maintained in culture. This increase appears to be dependent on the spread of the virus, since the addition of a reverse transcriptase inhibitor to the cultures prior to activation prevents the increase XMRV expression, as measured by cell surface expression of Env (Fig. S2). To biologically increase the level of XMRV and increase the probability that XMRV sequences could be detected by PCR, PBMCs were cultured under conditions that activated T cells for 7-10 days, the RNA isolated, and nested RT-PCR analysis performed as described above.

   All the MA sequences amplified following ex vivo culture could be classified into two out of the three subgroups observed in the analysis of RNA from unactivated PBMCs. Sequences for 4/11 individuals were similar to the previously published sequences (subgroup A) (Figure 2A, lines 2-5). Sequences amplified from another 6 individuals fell into subgroup C. (Figure 2A, lines 6-12). Unrooted neighbor-joining analysis of nucleotide sequences direct from subject PBMCs and after ex vivo culture reflected the variability noted in the sequence analysis and confirmed that post-culture, only variants A and C can be detected (Figure 2B).

### Evidence for multiple variants in XMRV-infected individuals.

   None of the sequences amplified following ex vivo culture were similar to the sequences

of subgroup B. One explanation for this would be that the PBMCs contained multiple strains of XMRV and, because of differences in replication capacity and/or tropism, the major variant present following spread in the cultures differed from the major variant present in unstimulated PBMCs of infected individuals. Reexamination of direct sequencing data obtained from unactivated PBMCs suggested that several of the sequence chromatograms *which did not give a clear sequence* might reflect the presence of more than one virus. Analysis of samples from three individuals indicated that they were infected with both subgroup B and C viruses (Fig. 2D). For all three of these individuals, the sequences detected following ex vivo activation and culture of T cells all subgroup C consistent with the hypothesis that the subgroup B variants have a decreased replicative capacity (Figure 2A, lines 6 and 10, and supplemental 3).

### Identification of endogenous polytropic MLVs highly homologous to MA of subgroups B and C

Previous analyses of the major coding regions of XMRV with ecotropic and non-ecotropic MLV sequences indicated that, while the pol and env sequences of XMRV cluster with xenotropic viruses, the gag region of XMRV is more similar to the to polytropic and modified polytropics viruses than xenotropic viruses. In the current study, comparison of XMRV MA subgroup A sequences with sequences in Genbank indicates that, similar to the previously published XMRV sequences, subgroup A is most closely related to endogenous MLVs (i.e., AY349138.1 and S80082.1) and differ in 5 of the 327 nucleotides.

In contrast, analysis of XMRV MA sequences from subgroup B with sequences in Genbank revealed a 100% identity with a recently characterized murine endogenous polytropic retrovirus, clone 51 (Evans JV 2009) (Figure 3A). Although, clone 51 contains several deletions and is not infectious, it is expressed in certain strains of mice. Clone 51 genomes in mice infected with an infectious ecotropic MLV (Fr-MLV) can be packaged into the Fr-MLV virions and transferred to other cells.

Subgroup C sequences are also most highly related to the MA of a polytropic murine leukemia virus sequence. This virus, the Rmcf provirus, is an expressed endogenous MLV with large deletions in gag and pol (Christine). One variant in subgroup C (1281) was identical to the on a nucleotide level; the others in this group differed by 1-6 nucleotides (Fig. 3B). However, the protein sequence of the different members of subgroup C differed at most by 1 residue from the Rmcf provirus.

Thus, XMRV subgroup B and C appear to be more closely related to known endogenous MLV sequences than the XMRV subgroup A viruses.

References:

1.      Fukuda K, Straus S, Hickie I, et al. The chronic fatigue syndrome: a comprehensive approach to its definition and study. Ann Intern Med 1994;121: 953-9

2.      Carruthers B, Jain A, DeMeirlier K, et al. Myalgic encephalomyelitis/chronic fatigue syndrome: Clinical working case definition. diagnostic and treatment protocols. J Chronic Fatigue Syndrome 2003; 11:1-12.

3.      Jason L, Torres-Harding S, Jurgens A, Helgerson J. Comparing the Fukuda et al. criteria and the Canadian definition for chronic fatigue syndrome. J Chronic Fatigue S 2004; 12:37-52

4.      Ratner L, Philpott T.and DB Towbridge. Nucleotide sequence analysis of isolates of Human T - lymphotropic virus type 1 of diverse georgraphical regions. AIDS Rs Hum Retroviruses. 1991 Nov: 7(11): 923-41

5.      Verdonck K, Gonzalez E, Van Dooren S, Vandamme AM, Vanham G and Gotuzzo E (2007) Human Tlymphotropic virus 1: recent knowledge about an ancient infection. Lancet Infect Dis 7(4):266-281.

6.      Yan Y, Liu Q and Kozak CA (2009) Six host range variants of the xenotropic/polytropic gammaretroviruses define determinants for entry in the XPR1 cell surface receptor. Retrovirology 6:87.

# Figure 1A. Schematic diagram of the XMRV genome and the gag region examined in this study



# Supplement A

XMRV (VP62)
AKV (MLOCG)
X-MLV (RU#353300)
Ampho-MLV (AF411814);
Cas-Br-E (X57540)
Mo-MLV (NC_001501)
Fr-MLV (NC_001362)
FeLV-A (AF052723) MA extra...
CaLV (NC_001885) extraction 2
KoRV (Q9TTC2)

XMRV (VP62)
AKV (MLOCG)
X-MLV (RU#353300)
Ampho-MLV (AF411814)
Cas-Br-E (X57540)
Mo-MLV (NC_001501)
Fr-MLV (NC_001362)
FeLV-A (AF052723) MA extra...
GaLV (NC_001885) extraction 2
KoRV (Q9TTC2)

# Figure 1B. Variation in MA in published XMRV sequences



*Note that EK2, which was isolated from an infected cell line, has a deletion.*



Fig. 1C. Alignment of gag sequences from individuals with XMRV

# Table 1. Changes seen (reference is VP62)

| Location | Substitution(s) | Groups with change | aa change |
|---|---|---|---|
| C75 | T | B | None |
| G85 | A | B | None |
| A91 | G | B | Lys (31)-Gly |
| A92 | G | A,B,C | Lys (31)-Arg |
| G106 | A | C | Val (36)- Ile |
| A132-152 | 21 bp deletion* | B | 7 aa deletion* |
| T168 | C | C | None |
| G175 | A | C | Gly (59)-Ser |
| G178# | A | A,B,C | Val (60)-Ile |
| C192 | T | C | None |
| C242 | T | C | None |
| C303 | T | C | None |
| C303 | G | B | None |
| C314 | T | B | Pro (105)-Leu |
| C315 | T | B,C | None |
| T321 | C | B,C | None |
| A324 | G | A,B,C | None |

* because of repeat (starts and ends TGGCCT), this could be moved up 5 bp from where Clustal put it. AA WPTFNVGWP...

# place where VP42, EK1 and EK2 have same substitutions relative to the other published

Table 2. Amino acid substitutions of XMRV MA found in other gammaretroviruses

| aa change | aa identical to substitution |
|-----------|------------------------------|
| Lys (31)-Arg/Gly | FeLV, Fr-MLV, KoRV (Arg); none (Gly) |
| Val (36)- Ile | FeLV |
| Gly (59)-Ser | GaLV, KoRV, |
| Val (60)-Ile | AKV-MLV, Ampho-MLV,Cas-BrE, Fr-MLV, Mo-MLV,X-MLV |
| Pro (105)-Leu | AKV-MLV, X-MLV |

Accession numbers: AKV MLV (MLOCG), Amphotropic MLV (AF411814), Cas-BrE (X57540), FeLV (AF052723) Friend MLV (Fr-MLV) (NC 001362), GaLV (NC 001885), KoRV (QT9TTC2), Moloney-MLV (NC 001501), and xenotropic MLV (X-MLV)(EU035300).

103 of 268

Supplemental Figure 2:



## Figure 1A.



Fig. 1B.



Table 1.

| Location | Substitution(s) | Groups with Change | aa Change |
|----------|-----------------|--------------------|-----------|
| C75 | T | B | None |
| G85 | A | B | None |
| A91 | G | B | Lys (31)->Gly |
| A92 | G | A,B,C | Lys (31)->Arg |
| G106 | A | C | Val (36)- Ile |
| A132-152 | 21 bp deletion* | B | 7 aa deletion* |
| T168 | C | C | None |
| G175 | A | C | Gly (59)->Ser |
| G178# | A | A,B,C | Val (60)-Ile |
| C192 | T | C | None |
| C242 | T | C | None |
| C303 | T | C | None |
| C303 | G | B | None |
| C314 | T | B | Pro (105)->Leu |
| C315 | T | B,C | None |
| T321 | C | B,C | None |
| A324 | G | A,B,C | None |

# This substitution is present in other XMRV sequences available in GenBank:   VP42, EK1 and EK2 [ksj will add accession #]

*Table 2.*

| aa Change | aa Identical to Substitution |
|---|---|
| Lys (31)-Arg/Gly | FeLV, Fr-MLV, KoRV (Arg); none (Gly) |
| Val (36)- Ile | FeLV |
| Gly (59)-Ser | GaLV, KoRV, |
| Val (60)-Ile | AKV-MLV, Ampho-MLV,Cas-BrE, Fr-MLV, Mo-MLV,X-MLV |
| Pro (105)-Leu | AKV-MLV, X-MLV |

Accession numbers: AKV MLV (MLOCG), Amphotropic MLV (AF411814), Cas-BrE (X57540), FeLV (AF052723) Friend MLV (Fr-MLV) (NC 001362), GaLV (NC 001885), KoRV (Q19TTC2), Moloney-MLV (NC 001501), and xenotropic MLV (X-MLV)(EU035300).

108 of 268





Figure 2A.

109 of 268

*Fig. 2C.*

| | B | C | |
|---|---|---|---|
| 991 | ~50% | ~50% | |
| 1468 | ~80% | ~20% | |
| 1156 | ~20% | ~80% | |
| | | | |

110 of 268

# Figure 3A and B



# Supplement 1



Supplemental Figure 3:



Red arrow denotes where the deletion begins

# Supplement A

```
                                              1          10         20         30         40         50         60         70
XMRV (VP62)                               MGQTVTTPLS LTLQHWGDVQ RIASNQSVDV KKRRWVTFCS AEWPTFNVGW PQDGTFNLGV ISQVKSRVFC
AKV (M1.OCG)                              MGQTVTTPLS LTLEHWEDVQ RIASNQSVDV KKRRWVTFCS AEWPTFGVGW PQDGTFNLDI ILQVKSRVFS
X-MLV (EU035300)                          MGQTVTTPLS LTLEHWGDVQ RIATNQSVDV KKRRWVTFCS AEWPTFDVGW PQDGTFNLDI ILQVKSKVFS
Ampho-MLV (AF411814)                      MGQTVHTPLS LTLDHWKDVE RTAEHQSVDV KKRRWVTFCS AEWPTFNVGW PQDGTFNRDI ISQVKIKVFS
Cas-Br-E (X57540)                         MGQTVTTPLS LTLDHWKDVE RTAEHQSVDV KKRRWVVFCS VEWPTFNVGW PQDGTFNRDI ITQVKIKVFS
Mo-MLV (NC_0015011)                       MGQAVTTPLS LTLGHWKDVE RIAEHQSVDV KKRRWVTFCS AEWPTFNVGW PRDGTFNRDL ITQVKIKVFS
Fr-MLV (NC_001362)                        MGQTITTPLS LTLDHWKDVE RTAHNLSVEV RKRRWVTFCS AEWPTFNVGW PRDGTFNPDI ITQVKIKVFS
FeLV-A (AF052723) MA extra...             MGQTITTPLS LTLDHWSEVR ARAHNQGVEV RKKKWITLCE AEWVMMNVGW PRSGTFSLDN ISQVEKKIPA
CaEV (NC_0018651) extraction 2            MGQDNSTPIS LTLNHWRDVR TRAHNLSVEI RKGKWQTFCS SEWPTFGVGW PPEGTFNLSV IFAVKKIVFQ
KoRV (Q9TTC2)                             MGQGESTPLS LTLDHWKDVK TRAHNLSVEI RKGKWQTFCS SEWPTFEVGW PPEGTFNPSI ISAVKKIVFQ

                                              80         90         100        110        120        131
XMRV (VP62)                               PGPHGHPDQV PYIVTWEALA YDPPPWVKPF VSPKPP--PL PTAPVLPGP SAQPPSRSAL Y
AKV (M1.OCG)                              PGPHGHPDQV PYIVTWEALA YEPPPWVKPP VSPKLS--PS PTAPILPSGP STQPPRSAL Y
X-MLV (EU035300)                          PGPHGHPDQV PYIVTWEALA YEPPPWVKPP VSPKLS--PS PTAPILPSGP STQPPRSAL Y
Ampho-MLV (AF411814)                      PGPHGHPDQV PYIVTWEALA FDPPPWVKPF VHPKPP--LP PSAPSLLPEP PLSTPPRSSL Y
Cas-Br-E (X57540)                         PGPHGHPDQV PYIVTWEALA FDPPPWVKPF VHPKPP--LP PSAPSLPEP PLSTSPRSSL Y
Mo-MLV (NC_0015011)                       PGPHGHPDQV PYIVTWEALA FDPPPWVKPF VHPKPPPLLP PSAPSLPLEP PRSTPRSSL Y
Fr-MLV (NC_001362)                        PGPYGHPDQV PYIVTWEALA VDPPPWVRPF VHPKPLGSLP PSAPSLPEP PLSTPPQSSL Y
FeLV-A (AF052723) MA extra...             PGPYGHPDQV PYITTWRSLA VDPPSWVRPR LPPPKP---- PSAPSLPEP PLSTPQSSL Y
CaEV (NC_0018651) extraction 2            E-NGGHPDQV PYIVWQDLLA QNPPPWVPAS AKVAVVS--- DTRRPVAGRP QP SAPRPPI Y
KoRV (Q9TTC2)                             E-TGGHPDQV PYIIVWQDLKS NSPPPWVPFL AKIAVASGQD NGRXSAGGRP --SAPSRLPI Y
```

*Supplemental Figure 3:*



arrow denotes where the deletion begins

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | |
| **Filing Date:** | |
| **Title of Invention:** | Diagnostic Identification of Variants of Xenotropic Murine Leukemia Virus-Related Virus |
| **First Named Inventor/Applicant Name:** | Judy A Mikovits |
| **Filer:** | Saul L. Zackson |
| **Attorney Docket Number:** | 40000377-0001Var |
| Filed as Small Entity | |

### Provisional Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| Provisional Application filing fee | 2005 | 1 | 110 | 110 |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

117 of 268

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| **Total in USD ($)** | | | | **110** |

# Electronic Acknowledgement Receipt

| EFS ID: | 7356333 |
|---|---|
| Application Number: | 61321147 |
| International Application Number: | |
| Confirmation Number: | 7100 |
| Title of Invention: | Diagnostic Identification of Variants of Xenotropic Murine Leukemia Virus-Related Virus |
| First Named Inventor/Applicant Name: | Judy A Mikovits |
| Customer Number: | 26263 |
| Filer: | Saul L. Zackson |
| Filer Authorized By: | |
| Attorney Docket Number: | 40000377-0001Var |
| Receipt Date: | 06-APR-2010 |
| Filing Date: | |
| Time Stamp: | 06:10:39 |
| Application Type: | Provisional |

## Payment information:

| Submitted with Payment | yes |
|---|---|
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $110 |
| RAM confirmation Number | 6313 |
| Deposit Account | |
| Authorized User | |

## File Listing:

*119 of 268*

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

| 1 | Provisional Cover Sheet (SB16) | sb0016_fill.pdf | 978584 | no | 3 |
| | | | cc:156cbx6fcf8fb34aac58e8c94bbfbf382c24b0 | | |

**Warnings:**

This is not a USPTO supplied Provisional Cover Sheet SB16 form.

**Information:**

| 2 | Specification | XMRV_variants_spec_f.pdf | 2579762 | no | 20 |
| | | | 9e064738c840dfb6a1127097246795e9616ebb38 | | |

**Warnings:**

**Information:**

| 3 | Drawings-other than black and white line drawings | XMRV_variants_figs_f.pdf | 3495852 | no | 19 |
| | | | d03bb2c28a9379e062f9b113d99550f6f806ddea | | |

**Warnings:**

**Information:**

| 4 | Fee Worksheet (PTO-875) | fee-info.pdf | 29167 | no | 2 |
| | | | 794a97259d799540b830002135f852ba3b8a2d15 | | |

**Warnings:**

**Information:**

| | **Total Files Size (in bytes):** | | 7083365 | | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable.  It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

120 of 268

EXHIBIT "B"

Affiant's emails of Wed, July 27, 2011

124 — 268



Judy Mikovits <jamikovits@gmail.com>

# Removal of reagents and samples from WPI research lab

1 message

**Judy Mikovits <jamikovits@gmail.com>**                                                **Wed, Jul 27, 2011 at 11:00 AM**
To: "Dr. Vincent Lombardi" <vclombardi@wpinstitute.org>
Cc: annettew8@gmail.com, Harvey Whittemore <HW1952@aol.com>, Carli Kinne <ckinne@wpinstitute.org>

Vinnie

It has come to my attention that Svetlana and others are removing WPI research reagents and samples from the lab when research personnel and not around. This situation has been occurring for several months and it compromising our ability to do our work and more importantly the security of our research samples and data. Research samples are missing from the freezers and data has been manipulated on the desktop computer. Max came to work on Monday and every single gel was gone limiting his ability to complete his work this week.

This is unacceptable. Neither you nor anyone else may remove anything from the WPI research program without my permission. I am asking that key card access be removed from you or every  member of the clinical lab.

Judy
—
Judy A Mikovits, PhD
Research Director
Whittemore Peterson Institute
University of Nevada, Reno MS 0552
1664 N Virginia St
Reno NV 89557-0552
phone: 775-682-8264
fax 775-996-7159

122 of 268

EXHIBIT "C"

Concerns over the mistreatment of Affiant
by the Whittmores as well as the
fraudulent XMRV study
The Fraudulent XMRV Study

# Re: Frank Interview Today?

Frank Ruscetii

4:15 AM

To: Kent Heckenlively



Dear Kent:  got your three areas was working them until

1) Judy's new helpers wanted to meet us on wednesday july 2 and I have been searching to document the evidence they want - don't have to tell you how important the element of surprise is

2) the evidence you uncovered about the HW sentencing has me sick (this is written at 2AM, little sleep

3) I will get back to your request on Thursday - will sent you a written email and we can talk over the 4th weekend
we are in carlsbad until the 8th (we will be in frederick 9-16 for one last time) but let me briefly say

a) item 1 is most important  it is totally unheard for a scientist to be denied access to the NIH (us govt) grounds without some due process.  Why this poor women was and still is being persecuted by big brother is resonant with reader
it clearly was not a replication study without full participation

b) more about 2 and 3 later

regards frank

On Thu, Jun 26, 2014 at 2:19 PM, Kent Heckenlively <kheckenlively@hotmail.com> wrote:

*124 of 268*

Frank:

I think there are just three areas I want to go over. I don't envision anything more than a 30-45 minute interview. You have given me an abundance of material to work with and I am so thankful to you. It's clear to me that you have always fought for Judy and for the integrity of science, even if it hasn't always be appreciated.

Here are the three areas:

1. Given the Lipkin e-mail which shows that Lipkin, Varmus, and Faucci allowing Judy to work as a scientist at the NCI, but not allowed to enter the grounds or be escorted away by security, could you comment on whether this is a normal practice in scientific investigations, and additionally, what were the challenges in working with Judy on the Lipkin study. For example, she has told me that you needed to e-mail pictures to her that she would need to see on a laptop, rather than being in the lab. I'd like to get that kind of detail.

2. I'd love to get your take on the methylation explanation for why the virus can sometimes be detected, and other times cannot.

3. Judy has told me that at times you felt some pressure to put your name on certain scientific papers. I understand this is a sensitive area, and one which we do not absolutely need, but I wanted to specifically ask you whether you would be willing to discuss it.

All the best,
Kent.

---

Date: Thu, 26 Jun 2014 13:36:04 -0700
Subject: Re: Frank Interview Today?
From: fwruscetti@gmail.com
To: kheckenlively@hotmail.com
CC: jamikovits@me.com

Dear Kent: today is too hectic, please tell me what you want to discuss I can go over the emails and other documents. At this stage I do not want today anything incorrect. any day after that be fine.

regards
frank

On Thu, Jun 26, 2014 at 9:16 AM, Kent Heckenlively <kheckenlively@hotmail.com> wrote:

125 of 268

I'm watching soccer as well.  It's my son's birthday today.  I'll try to call Frank around 3 today.  I'll e-mail him as well.

All the best,
Kent.

Sent from my iPad

> On Jun 26, 2014, at 9:00 AM, "Judy Mikovits" <jamikovits@me.com> wrote:
>
> Hi kent
> Frank lives in Carlsbad now
> His new email is Fwruscetti@gmail.com
> His Phone is 805-827-3516
> He is
> Best after noon
> Watching soccer now
>
> Sent from my iPhone
>
>> On Jun 26, 2014, at 8:51 AM, Kent Heckenlively <kheckenlively@hotmail.com> wrote:
>>
>> Judy,
>>
>> Is the Frank interview going to work today?  If so, what time and what number?
>>
>> All the best,
>> Kent.
>>
>> Sent from my iPad

© 2014 Microsoft
Terms
Privacy & cookies
Developers
English (United States)

Frank Ruscetii

View contact

Content from
Learn more|Turn off

127 of 268

materials related to your questions

Frank Ruscetii

12:11 AM

To: Kent Heckenlively
Cc: Judy Mikovits



Dear Kent: here is the scenario of my authorship of the multiple contamination paper

In August 2010, blood samples were drawn from the homes of patients and controls were

sent to my lab at NCI where plasma were drawn and to the Drug resistance program (DRP) (directed by Coffin). They reported that on Aug 23rd that all four CFS patient plasma had MLV and mouse DNA by three tests but no XMRV while 2/5 normal had XMRV but no MLV or mouse DNA. these patients had not been found to be XMRV positive.  When pressed Coffin said that data should not be published until its was reproduced. Nothing was said about this data until after the SOK meeting where Dr. Alter stated that there was no evidence of contamination at the WPI. The meeting continued in April with Mary Kearny, Stuart Le Grice and others joining the meeting with My NCI supervisor. I was never allowed to see any of the data before my bosses (It smelled like an inquisition).  On April 29, it was found the viruses growing in tissue were identical to XMRV-silverman and thus were laboratory contaminants. Since papers has been published showing that XMRV could jump to uninfected cultures in vitro,  I accepted that this could be a reasonable explanation. I was aghast when I saw a draft of the paper, the original 2010 data was in the paper without any replication and the tone of the paper placed most of the blame for multiple contamination on the WPI and Dr. Mikovits. Since there is no evidence in this paper supporting that contamination and my belief the XMRV presence in the normal patients came for the making of

DNA in the Coffin lab, I declined to be an author. On October 6, 2011, I was told that it would good for my career if I was a co-author.

Since there was an internal review of my program looming and a reevaluation of funding in two years instead of the usual four, I relented and consented. Since Dr. Mikovits had just been fired it was a particularly ruthless attack.


here is the scenario involving the banning of Mikovits from the NIH campus

On November 15, 2011, Dr. Lipkin emailed that Dr. Mikovits would be the study PI in my lab at NCI. Her participation was considered essential for the accuracy of the replication study. On november 17, 2011 I was notified of an official internal review of my laboratory conduct of there XMRV affair. On November 30, Lipkin had notified me that NIH supervisors had banned her from the NIH campus and security would uphold the ban. It was so absurd that they would not let her fly to IAD (NIH airspace?) to visit her mother on her 75 birthday. Such actions without any attempt at due process are stunning in their cruelty. In addition, the failure to have Dr. Mikovits' full participation meant to me that it was not a full replication study that the NIH wanted.


Please have judy answer the methylation question , she is one of the world's experts

regards frank

129 of 268

© 2013 Microsoft

Terms

Privacy

Developers

English (United States)

Bottom of Form

false



Kent Heckenlively

kheckenlively@hotmail.com

EXHIBIT "D"
Publications from "Science" the Journal, and
email correspondence by Affiant expressing
her grave concerns about the fraudulent
XMRV study proposed by the Whittemores



14

# Political Influence on Scientific Research and the Impact it has on us ALL

## HIV -1 Isolation- 1982



## November 7,1991



SILENCE=DEATH

**THE CLASSIC BESTSELLER**

## AND THE BAND PLAYED ON

POLITICS, PEOPLE, AND THE AIDS EPIDEMIC

## RANDY SHILTS

## MANY DEATHS BEFORE ESTABLISHMENT BELIEVED IN RETROVIRAL CAUSE

132 of 268

# Workshop, July 22, 2009 – Public Health Implications of XMRV Infection

## Center for Cancer Research (CCR)

## Center of Excellence in HIV/AIDS & Cancer Virology (CEHCV)

**Introduction** – In 2006, the human retrovirus XMRV (xenotropic murine leukemia virus-related virus) was identified and reported to be associated with certain cases of prostate cancer. More recently, this virus has been found in the blood of patients suffering from categories of prostatic or health-related diseases. At the most recent Cold Spring Harbor Laboratory meeting on retroviruses provided additional support for this linkage and suggested that the number of individuals infected with XMRV is significant enough to be a cause for public concern. In view of these developments, it was deemed appropriate for NCI to convene a small group of intramural and extramural scientists and clinicians with expertise in this area to provide the NCI leadership with recommendations on future directions. The following summarizes the scientific presentations and resulting round-table discussion among workshop participants.

### Organizers

Stuart Le Grice, Ph.D.
CEHCV

John Coffin, Ph.D.
CCR

### Participants

Carlos Cordon-Cardo, M.D., Ph.D.

Stephen Goff, Ph.D.

Eric Klein, M.D.

Robert Silverman, Ph.D.

A. Dusty Miller, Ph.D.

Ila Singh, M.D., Ph.D.

Judy Mikovits, Ph.D.

nevada

Stephen Hughes, Ph.D.

Vineet KewalRamani, Ph.D.

Douglas Lowy, M.D.

John Schiller, Ph.D.

Chris Buck, Ph.D.

William Dahut, M.D.

James Gulley, M.D., Ph.D.

Jeffrey Schlom, Ph.D.

Biology, NCI

W. Marston Linehan, M.D.

Charles Rabkin, M.D.

Genetics, NCI

HIV Drug Resistance Program & Head,

Tufts University & Office of the Director,

Columbia University

Columbia University

Cleveland Clinic

Cleveland Clinic

Fred Hutchinson Cancer Research Center

University of Utah

Whittemore Peterson Institute, University of

HIV Drug Resistance Program, NCI

HIV Drug Resistance Program, NCI

Laboratory of Cellular Oncology, NCI

Laboratory of Cellular Oncology, NCI

Laboratory of Cellular Oncology, NCI

Medical Oncology Branch, NCI

Medical Oncology Branch, NCI

Laboratory of Tumor Immunology and

Laboratory of Tumor Immunology and

Urologic Oncology Branch, NCI

Division of Cancer Epidemiology &

133 of 268

# Summary of Next Steps following the July 22nd Invitation Only Meeting!

The Center of Excellence for HIV/AIDS and Cancer Virus Research proposed
To the National Cancer Institute a program for XMRV reagent development
With a budget for over $800,000

It is important to note that only a link to prostate tumor patients had then
been published

When the link of XMRV to prostate cancer  and CFS was not reproducible,
The expenditure of this funds had to be explained so the Science concerning
CFS research and not prostate cancer research whose poor science started it
was attacked.   Why?

134-268

HARRY REID
NEVADA

**United States Senate**
WASHINGTON, D.C. 20510

MAJORITY LEADER

November 17, 2009

Dr. Frank Ruscetti
Head, Leukocyte Biology Section
Senior Investigator
The National Cancer Institute
Laboratory of Experimental Immunology
The National Cancer Institute
Building 567, Room 251
Frederick, Maryland 21702

Dear Dr. Ruscetti:

Thank you for taking the time out of your busy schedule to meet with me recently.

I appreciated the opportunity to learn more about the Whittemore-Peterson Institute's breakthrough discovery. I look forward to continuing to work with you to ensure that work is being done at a federal level to support the advancement of this important discovery.

If I can be of any assistance to you in the future, please do not hesitate to contact me.

You have my best wishes.

Sincerely,

Harry Reid
United States Senator

---

**United States Senate**
OFFICE OF THE MAJORITY LEADER
WASHINGTON, D.C. 20510

Harry E. Reid
U.S.S.



Dr. Frank Ruscetti
Head, Leukocyte Biology Section
Senior Investigator
The National Cancer Institute
Laboratory of Experimental Immunology
The National Cancer Institute
Building 567, Room 251
Frederick, Maryland 21702

SINGLE

# Assured by Senate majority leader's support Whittemores remove Ruscetti/NCI as an inventor on patent of variant strains of XMRV

United States Patent Application: 0110311484

## US PATENT & TRADEMARK OFFICE

### PATENT APPLICATION FULL TEXT AND IMAGE DATABASE



Page 1 of 68

(1 of 18)

**United States Patent Application**
**Kind Code**                                                      20110311484
**Milkovits, Judy A.; et al.**                                     A1
                                                                    December 22, 2011

STRAINS OF XENOTROPIC MURINE LEUKEMIA-RELATED VIRUS AND METHODS FOR DETECTION THEREOF

**Abstract**

Provided are novel strains of Xenotropic Murine Leukemia Virus-Related Virus (XMRV), or polynucleotides or polypeptides thereof. Identified herein are nucleic acid changes or amino acid changes identified in XMRV strains isolated from subjects. Also provided are methods of detecting such XMRV strains based at least in part on the identified nucleic acid changes or amino acid changes.

Inventors: **Milkovits, Judy A.**; (Reno, NV) ; Lombardi; Vincent C.; (Reno, NV)
Assignee: Whittemore Peterson Institute for Neuro-Immune Disease
            Sparks
            NV

Serial No.: 081209
Series
Code: 13
Filed: April 6, 2011

Current U.S. Class: 424/88.6; 435/194; 435/5; 530/350; 536/23.2; 536/23.72
Class at Publication: 424/88.6; 536/23.72; 435/194; 435/5; 536/23.2; 530/350
International Class: A61K 39/21 20060101 A61K039/21; A61P 31/14 20060101 A61P031/14; C12Q 1/70 20060101 C12Q001/70; C07K 19/00 20060101 C07K019/00; C07H 21/04 20060101 C07H021/04; C12N 9/12 20060101 C12N009/12

Government Interests

---

--------- Forwarded message ---------
From: **Harney, Dennis J.** <dennis_harney@snrdenton.com>
Date: Tue, Apr 5, 2011 at 8:57 PM
Subject: Revised draft Variant application due April 6 (Whitt Variant/NPA ; SNR 40000377-0022)
To: Vinnie <vclombardi@gmail.com>, Judy Mikovits <jamikovits@gmail.com>
Cc: Carli West Kinne <ckinne@wpinstitute.org>, "Nemeth, Drenda K." <drenda.nemeth@snrdenton.com>, "Bock, Joel N." <joel.bock@snrdenton.com>, "Filatov, Diane" <diane.filatov@snrdenton.com>, Annette Whittemore <annette.whittemore@wpinstitute.org>, Harvey Whittemore <hw1952@aol.com>, "Matthews, Stafford" <stafford.matthews@snrdenton.com>

Vinnie and Judy,

Attached is a revised draft of the Variant application we propose filing tomorrow as a US and PCT application. All feedback you provided earlier today has been entered into the document. Further subject matter was added to the specification and claims. For your convenience, also attached is a redline comparison showing all changes made compared to the last version you reviewed.

We will file after about 3PM CT tomorrow April 6, 2011. Please provide any additional feedback in advance of this time.

Thank you for all your assistance in preparation of this Application.

Regards,

Dennis

Dennis J. Harney, Ph. D.
SNR Denton US LLP
D +1 314 259 5818
F +1 314 259 5959
dennis.harney@snrdenton.com
Assistant: Drenda K. Nemeth [ +1 314 259 5853]

# Career CDC Employee made Advocacy Organization Head. Never ANY question who she was defending!

## Suzanne Vernon: "Agency heads are scared to death...if XMRV works out"

Discussion in 'About Ampligen Advocacy' started by CBS, Feb 28, 20...

Page 1 of 4   1   2   3   4   Next >

**CBS**
Senior Member
Messages  1,484
Likes  760

"Agency heads are scared to death of how the patient population will react if XMRV works out." - Suzanne Vernon, September 11th, Lobby of the Salt Lake City Downtown Hilton – During a break at the 2010 OFFER Utah Patient Education Conference

.

I've been struggling with what I ought to do with this for almost six months. Suzanne Vernon said this during a conversation she was having with me and Cort. She just sort of interjected it. No real need nor was there much of a segue. She said that it should not be repeated. Yet I wondered why I earth she would say something like that to someone she had just met.

I was troubled by Dr. Vernon's words. I wished I had not heard it. I discussed the comment at length with my wife. I've asked Cort about it on a couple of occasions. He responded that he does not recall having heard her say it. And so I approached Jennie Spotila and I asked her what Dr. Vernon might have meant. That conversation took place on December 10, 2010. Jennie said she would check with Dr. Vernon and get back to me. I haven't heard back from Jennie on this topic and so I'm assuming that there won't be a reply. Why can't this be shared with the patient community? Who am I protecting and who is being harmed? I have not felt that it was right to keep this from the patient community.

I was reading Hillary Johnson's recent post about "FRENEMIES". Hillary stated " Whatever these two [Suzanne Vernon and Kim McCleary] tell you they're doing, you can assume it's about one-twentieth of what they're doing behind the scenes and, given the lessons of history, you can bet it's not on your behalf." I was reminded of Dr. Vernon's comments.

137-268

# Dr Busch tells Whittemores that they should reimburse patients for test in order to save the institute, all grant money, they need a scapegoat

From: "Busch, Dr. Michael" <mbusch@bloodsystems.org>
To: "Ruscetti, Francis (NIH/NCI) [E]" <ruscettf@mail.nih.gov>
CC: "Jamikovits@gmail.com" <Jamikovits@gmail.com>
Date: Sat, 8 Oct 2011 21:05:00 -0400
Subject: RE: VIPdx response

-----env-senvy-venv------

Frank and Judy,

As I mentioned to Judy last week Annette sent me the email below and attached letter shortly after my visit to WPI, during which she and Harvey were clearly trying to discriminate the testing you performed on the BWG panel from the XMRV testing performed in their reference lab run by Vince. I was under-impressed with Vince to say the least, and what I saw and understood in terms validation and QC of the XMRV assays in the reference lab was disturbing.

I replied with the email copied below, and never heard further from Annette. If they have stopped offering XMRV testing as stated in the blogs and I understand on the web site, then the issue is how to inform/counsel the 1/3 of patients who they reported to be XMRV infected interpret their results and should they be reimbursed for invalid testing. What do you recommend we do to address these issues, and particularly to assure that future XMRV/H-IGRV testing by the WPI reference lab does not occur without proper oversight, validation and QC?

Please keep this exchange, including the letter from Annette, confidential.

Judy - what is the status of you participating in the Lipkin study, either performing testing at WPI or elsewhere?

Frank - did you ever get sequence data on the positive cultures detected on samples from the BWG panel? If so we would like to receive the sequences and compare them with other XMRV and MLV sequences to see if the positive results were due to contamination, as you seem to have suspected given the further experiments re cross contamination you described in the supplemental on line content for the Science paper.

Mike

138-268

From: Judy Mikovits <jamikovits@gmail.com>
Date: August 31, 2011 8:24:00 PM PDT
To: "Glynn, Simone (NIH/NHLBI) [E]" <glynnsa@nhlbi.nih.gov>
Cc: Frank Ruscetti <fruscetti@gmail.com>
Subject: Re: SRWG-lab subgroup

That's impossible

...IRB protected data that I cannot even access until the 6th. I...to Graham yesterday and he indicated that was fine. Given...complexities and limitations of this study, many of which were not...recognized at the time the (flawed) experimental design was agreed...upon, to have one day to agree upon a manuscript, a holiday at that...totally unacceptable. This is NOT good science or the appropriate...process. What is the rush?

...afraid the truth!?? how many of these viruses were introduced into the...human population and are now threatening a lot more than the blood...supply??!because a few declared it "impossible" 40 years ago and JC...himself was the most vociferous!

how many XMRVs??

...am sending this to only Simone and Frank because I will make this...US a public relations nightmare for the entire US govt..

...have integration data and variants of many new strains!! Did those...ignorant SOBs introduce these into humans and now are trying to cover...it up

...then pedigree the negatives with a test with a cutoff so high it...could not find a willing roman in a whore house???

I wonder if anyone will listen to a press conference from me??Asking how...many new recombinants from Vaccines? From lab workers?? doctors?

The first ever contagious Human retrovirus.???? Spread like...mycoplasma?? Are you kidding me???

It happened once!!! How many xenograft cell lines were created?? How...many vaccines contained mouse tissue??

139-268

# This Email Brought a Phone Call and a Threat!

These sick people lost their entire lives and this travesty of justice will not be carried out at their expense.. Not again

If we have to write and publish online a dissenting opinion, we will and I will not coauthor any paper that misrepresents our findings..

Not will our data be included .. You can simply say we all found nothing ..totally expected ANC we'll prove them all wrong.

Our assays may not be sensitive or reproducible given the complexity and lack of knowledge of reservoirs etc

Nothing about these data say anything about Lombardi et al of Lo et al

Except that their are likely many strains of XMRVs and only God knows the impact on chronic disease but nothing about this study says anything about our original discoveries

And if this is rushed to print without a fair and balanced discussion of its limitations, I will spend every minute of my life exposing the fraud that has been perpetrated against this patient population.

Judy Mikovits

140 - 268

Scientific Fraud: Blood working group charged with assay development to detect XMRVs



NEWSFOCUS

XMRV POSITIVE

# False Positive

23 SEPTEMBER 2011   VOL 333   **SCIENCE**   www.sciencemag.org

*Science* started this and *Science* is going to End This"

John Coffin to Frank Ruscetti November 2010

# Failure to Confirm XMRV/MLVs in the Blood of Patients with Chronic Fatigue Syndrome: A Multi-Laboratory Study

Graham Simmons,[1] Simone A. Glynn,[2] Anthony L. Komaroff,[3] Judy A. Mikovits,[4] Leslie H. Tobler,[1] John Hackett Jr.,[5] Ning Tang,[5] William M. Switzer,[6] Walid Heneine,[6] Indira K. Hewlett,[7] Jianqin Zhao,[7] Shyh-Ching Lo,[8] Harvey J. Alter,[9] Jeffrey M. Linnen,[10] Kui Gao,[10] John M. Coffin,[11] Mary F. Kearney,[12] Francis W. Ruscetti,[12] Max A. Pfost,[4] James Bethel,[13] Steven Kleinman,[14] Jerry A. Holmberg,[15] Michael P. Busch,[1]* for the Blood XMRV Scientific Research Working Group (SRWG)†

12 September 2011; accepted 20 September 2011
Published online 22 September 2011;

Mikovits said she hopes to have full sequences of her new viruses "in a couple of weeks."

**—JON COHEN**

VIROLOGY

## The Waning Conflict Over XMRV And Chronic Fatigue Syndrome

OTTAWA, CANADA—Less than a day after a new study dealt what many consider a lethal blow to the controversial theory that a newly detected virus, XMRV, is linked to chronic fatigue syndrome (CFS), proponents and skeptics of the theory squared off in a meeting here.

In one corner was Judy Mikovits, research director at the Whittemore Peterson Institute for Neuro-Immune Disease (WPI) in Reno, Nevada, and the main champion of the idea that XMRV and its relatives play a role in CFS. Her opponent, an erstwhile supporter, was heavyweight retrovirologist John Coffin of the Tufts University Sackler School of Graduate Biomedical Sciences in Boston. When Mikovits and Coffin took the stage at the meeting, which was organized by IACFS/ ME (an international associa- tion devoted to the disease) and attracted 460 researchers and patients, they sat on oppo- site sides of the lectern. Dur- ing their introductions, Coffin clasped his hands in front of his mouth, looking like a man in

had asserted—explained the XMRV DNA it found in some patient samples.

In Ottawa, Mikovits came out swing- ing. But she didn't make the case for XMRV, which stands for xenotropic murine leukemia virus–related virus. Instead, she offered new evidence that people with CFS (known as myalgic encephalomyelitis in some countries) had a virus "highly related" to XMRV.

Unlike the original study that appeared in *Science* that showed entire sequences of XMRV and infection of fresh cells, Mikovits revealed only partial viral sequences that she



**Pro and con.** Judy Mikovits (*left*) argued for the link between human gammaretro-

for the Blo[o]d works at the tute in San F was "jealou can set are c Knox of the in Milwauke ing." Knox, had a falling "this is obfu to be discus gist at the U who like Kn Two othe the data," B support for

142 - 268

# Negotiations with Tony Fauci and Harold Varmus NOVEMBER 14th 2011

**Ian Lipkin, 03:37 PM 11/21/2011, Re: Replication study**

On Nov 15, 2011, at 12:03 PM, Judy A Mikovits wrote:

> Dear Ian
>
> Thank you for giving me the opportunity to do the replication study in Frank Ruscetti's lab at the NCI. I understand that no money can be given for these studies but that you can provide resources, reagents such as PCR and culture supplies and sequencing or other services (contracted though a third party). Frank will need to get permission for me to work as a special volunteer from Drs Fauci and Varmus in order for me to work in his lab. I will provide a budget for the resources needed today.
>
> As originally designed, I will do the replication by PBMC culture followed by Western and/or PCR as well as sequencing of PCR products and appropriate contamination assays. Serology by Flow with Western confirmation.
>
> Kind regards,
>
> Judy A Mikovits, PhD

Dear Harold,

Frank Ruscetti and I just spoke. He also spoke to JM.
1. JM is eager to complete the study via a strategy whereby the work is done in Frank's lab.
2. FR and JM understand that JM cannot enter the NCI campus and that security will ensure that she abides by this proscription.
3. I will cover the costs described in previous transmissions.
4. JM and FR will visit Columbia on 16 Dec. JM will arrive NYC on 15 Dec, spend the 16th at Columbia with our staff discussing logistics, consulting agreements, and protocols for experiments. I'm scheduled for a lecture and university senate meeting that day but will see them at the beginning and close of their visit to ensure we are on track to meet milestones. This is the only day I can do meet with them in NYC before 2012. Judy will return to CA on Sat 17 Dec.

Tony-
Cathy Laughlin has been terrific during these negotiations.

All the best,

Ian

143 - 268

# Apparently, stopping at Dulles Airport to visit one's mother, ruins the integrity of NCI studies!

On Dec 2, 2011, at 12:53 PM, "Allison M. Kanas" <amk2203@columbia.edu> wrote:

Dear Judy,

In order to maintain this study's integrity, we are unable to support an itinerary that includes a stop in DC. I am happy to book you a direct flight from LAX to NYC. If you will be stopping in Washington DC unfortunately we will not be able to host you at Columbia.

Regards,

Allison M. Kanas
Project Manager
Center for Infection & Immunity
Mailman School of Public Health
Columbia University
amk2203@columbia.edu
Direct: 212-304-5689 Main: 212-342-9031
Fax: 212-342-9044
www.cii.columbia.edu

144-268

## Ebola In The Air: What Science Says About How The Virus Spreads

DECEMBER 01, 2014  12:29 PM LT

MICHAELEEN DOUCLEFF



3 feet

6 feet

Ebola can spread through the air in two ways. Inside large droplets that hit quickly to the ground (red), or inside tiny droplets that float in the air (gray). In the first mode, called droplet transmission, the virus can spread only about 3 to 6 feet from an infected person. In the second mode, called airborne transmission, the virus can travel 30 feet or more.

Alan Flippin/NPR

Here's an Ebola puzzle for you: If the virus isn't airborne, why do doctors and nurses need to wear full protective suits, with face masks, while treating patients?

Varmus was in charge of the implementation of xenotransplantation (to include xenografts). Varmus set up a subcommittee and appointed John Coffin.

Many infectious diseases of animals can be transmitted to humans via routine exposure to or consumption of animals (e.g., rabies). Viruses that are not pathogenic in their natural host reservoirs may, in some cases, be **highly pathogenic when transmitted to a new host species.** Several zoonotic viruses have produced significant outbreaks when introduced into human hosts under normal circumstances of exposure (e.g., Ebola, Hanta Virus, Influenza).

**Consequently, the recipient of a xenotransplant is potentially at risk for infection with infectious agents already known to be transmissible from animals to humans as well as with infectious agents, which may become transmissible only through xenotransplantation and which may not be readily identified with current diagnostic tools. Infected xenograft recipients could then potentially transmit these infectious agents to their contacts and subsequently to the public at large.**

145-268

EXHIBIT "E"
Email from Affiant's attorney, Robert J.
Liskey to Assistant United States Attorney
Troy K. Flake dated July 15, 2016

146 — 268

5

Robert J. Liskey
The Liskey Law Firm
1308 East Colorado Blvd., # 232
Pasadena, CA 91106
626-319-5817
robliskey@liskeylawfirm.com
www.liskeylawfirm.com

July 15, 2016

Dear Mr. Flake:

In June we were copied on an email correspondence from Dr. Mikovits' attorney David Follin to
FBI agent Josh Kipp. Mr. Follin has been representing Dr. Mikovits since 2012 when the FBI
began investigating illegal conduit campaign contribution schemes of F. Harvey Whittemore.
Mr. Follin's letter and accompanying exhibits, details additional federal crimes of Bankruptcy
fraud under codes 18 U.S.C. §§ 152(4) and 3571. The revelations made in this correspondence
support and extend additional fraud committed by the Whittemores, WPI and its principals not
known to Dr. Mikovits upon her initial FCA filing of November 19, 2014. Thus, I am writing to
update you regarding ongoing criminal activities our additional research has uncovered.

As detailed in Mr. Follin's letter, retaliation against Dr. Mikovits began when she refused to
allow misappropriation of federal funds from NIH grants or the marketing of an unvalidated
blood test by the Whittemores privately held company RED Labs DBA VIPDx. The retaliation
against Dr. Mikovits did not end with her wrongful termination of September 29, 2011, instead it
escalated to false arrest and imprisonment in November of 2011 and the bankruptcy fraud of
March 2014 detailed in the June 8th correspondence and continues while the FCA has been held
under seal to include non-profit 990 tax fraud, additional years of extensive Medicare fraud by
Redlabs/VIPdx; additional misappropriation of federal funds using fraudulent data to support
unvalidated clinical lab testing done by RED Labs and patent fraud, all done to cover up the
extensive crime network of the Whittemore's, WPI, RED Labs/VIPdx, other privately owned
companies, and the UNR foundation defrauding the taxpayers of tens of million each year, which
dates back to at least 2004 before Dr. Mikovits met the Whittemores.

Ongoing Non –profit tax fraud

Annette Whittemore filed nonprofit status for an entity known as Neuro-Immune Research
Foundation also doing business as Nevada CFS Foundation in February 2005. Her niece Carli
West Kinne signed up as registered agent. Ms. Kinne was also the grants administrator of the
WPI.  Annette Whittemore's nonprofit organizations were set up to take in State and Federal
Legislative and other funds.  There are reported Guidestar nonprofit 990 tax records from 2005
to present available. There are discrepancies on all the 990 tax records filed both regarding funds
and several statements answered fraudulently. The false statements are highlighted on the
included exhibits for 2006, 2007 2008 and 2009. All 990's can be supplied for review.

The inquiries included if a management company was handling the Nonprofit. They answered
"No" on all records. Another question on their 990's tax forms was if any key employees are

147-268

related to the president (Annette Whittemore), or if relatives have any business dealings with her or with any other for-profit companies the president is also associated with. The answer given on the tax record was "NO" to all. Attorney Carli West Kinne is Annette Whittemore's niece, an officer, and legal counsel for most of the Whittemores' sham for-profit organizations. Carli West-Kinne was listed as a key employee on 2007 and 2008 Non profit tax records, while also working for Wingfield Nevada Group from whom she was also receiving salary. West-Kinne is also listed as holding records for the nonprofit for 2009 and is listed as a key employee who applied for the non-profit status for WPI non-profit in 2007, but was not listed on the WPI 2007 990 form as a key employee, while she actually worked and was paid by received salary from Wingfield Nevada Group. West-Kinne also was the registered agent and worked for several other companies own by her aunt Annette Whittemore, and other companies owned by Harvey Whittemore. Another question asked is whether any other nonprofit organization was affiliated with any exempt or non-exempt organizations. Mrs. Whittemore checked "No" on all tax records. In fact, she was using her other for-profit companies including "WP Biotechnologies," established as a holding companies for intellectual property generated in the federally funded research lab of WPI, which was established and directed by Dr. Mikovits. The 990 also asks the question if "any key employees were compensated by any other exempt or non-exempt company". WPI answered "no," yet Mikovits and Carli West-Kinne were in fact under contract and compensated by Wingfield Nevada Group.  (See attached 990s and explanation sheet).

The fraudulent claim and resulting bankruptcy "settlement" of March 2014 enabled the Whittemores unfettered access to repackage six-years-worth of data generated in Drs. Mikovits' and Ruscetti's laboratories. (See the 3 attached WPI recently published papers where they used R01 funds and reported the data as new when it was simply repackaged and previously paid for by NIH funds). This misappropriation included US RO1 and DOD tax funds given internationally to Redlabs Belgium, a co-company with Redlabs USA and Kenny DeMeirleir (De Meirleir and several of his companies and family members are currently involved in a lawsuit with a Texas company). See  http://law.justia.com/cases/federal/distric courts/texas/txsdce/4:2013cv01723/1090520/18/
– also see FOIA documents previously sent in FCA exhibits related to De Meirleir, and his approval of (Vincent Lombardi, who was unqualified to be a Principle Investigator on government grants, and (Lombardi) gave false employment and qualification information to fraudulently obtain the NIH RO1 and DOD grant funds from Dr. Mikovits who was the PI and would have retained the funds had the fraudulent activities of the WPI, Lombardi and De Meirleir not occurred, also in the FCA exhibits. The data in recent publications attached, listing Lombardi and DeMeirleir as co-authors came as a result of grants paid for by more than 10 million dollars of extramural and intramural NIH and DOD funds, which was published without appropriate citation or review in order to misrepresent data and cover up the 2009-2011 federal misappropriations by Lombardi and the Whittemore's in their holdings listed under the identity of VIPDx/RED labs USA/Belgium.

In January 2016 R.E.D labs Belgium announced a new lab in Reno, NV as did the WPI under their new name "Nevada Center for Biomedical Research." The announcement inaccurately stated that they would be opening a new R.E.D laboratory in Reno, when in reality R.E.D labs had already been bought into by the Whittemores and had been running in Reno and selling various tests since 2004, thirteen years earlier.  When it was discovered by organizers of the national advocacy and educational awareness organization, Autism One, at that group's annual

148-268

conference that they had repackaged Mikovits/Ruscetti's work and in fact were selling additional unvalidated tests to desperate patients who were looking for any viable treatment plan to help their neurologically impaired children, Autism One revoked their participation. R.E.D labs officials threatened the Autism One director with lawsuits, destruction of their foundation and the very game heavy handed intimidating retaliatory mob-like practices which they had employed in order to economically destroy Dr. Mikovits. (See attached 3 WPI recently published papers showing Redlabs Belgium and De Meirleir were allocated part of the RO1 US and DOD grant funds).

In her original FCA complaint Dr. Mikovits only knew a fraction of the ongoing Medicare fraud. Since then we have learned details of the extensive nature of the Medicare fraud which now extends to the Nevada Center for Biomedical research. Harvey and Annette Whittemore, as well as Vincent Lombardi have all been listed as owners of Redlabs/VIPDx entities since 2004. They have several entities named or associated with or as Redlabs USA listed in the State of Nevada business listings. (see also previously sent in FCA exhibits Lombardi Research foundation which was housed in the same room as Redlabs/VIPdx).

Various tests were implemented and sold as early as 2004 and spreadsheet records for billing and receiving reimbursements for Medicare can be provided as early as 2008. (See attached excel spreadsheet) Details in these spreadsheets including the 2009 VIPDx spreadsheet showing receipt of $80,000 in Medicare payments. Patients were charged and paid full price for XMRV tests but were not reimbursed for the Medicare reimbursements in 2010-2011. It is unclear how the prior years of 2004 through 2009 Medicare payments were handled as spreadsheets referenced them as income and in the attachment titled (THE L.A.B. Sept 20091 of 3 Medicare doc which came on the attached e-mail from M. Ross called "e-mail with these attachement VIP YTDstats doc", and the "vipdx sales Medicare 2009 spreadsheet"). It is claimed that the majority of patients, 95% sent to Redlabs by Dr. Dan Peterson were Medicare patients during 2004 through 2008-9. These Medicare payments were being claimed as loss revenue for Redlabs by administrator M. Ross). Since test payments were required in full prior to testing, any Medicare payment received would not be a loss as tests had already been pain in full. Were Dan Peterson's patients ever reimbursed since he has been aligned with Redlabs and Lombardi since 2004 and the WPI formed in 2006 bears his name to this day.   All Medicare billing, payable and receivable records from Redlabs/VIPdx to Medicare, and to Dan Peterson's office and Simmaron and Simaron should be reviewed for Medicare reimbursement returned to patients (as Stated by Dr. Michael Busch, head of the Blood Systems Research Institute who stated this when Dr. Mikovits uncovered the unvalidated testing for XMRV in 2011. Next, a detailed description on the attached document titled (THE L.A.B. Sept 20091 of 3 medicare doc) claimed Redlabs/vipdx had "re-worked" log books as state here: (**The VIP Dx team diligently has re-worked all log books**). In that same e-mail from Marguerite.Ross@wingfieldnevada.com, one of the Directors of VIPDx, states that WPI namesake Dr. Daniel L. Peterson provides (95% of their Medicare patients ordering tests).  Dr. Daniel L. Peterson of Sierra Internal Medicine and the company SIMMARON have participated and benefitted from misuse and repackaging of Mikovits/Ruscetti data receiving NIH grants since 2011. Dr. Peterson has also been listed as an owner of RED labs entities. Moreover, pathologists, MD's and others from UNR Pathology and the University of Nevada School of Medicine (UNSOM) were holding "electronic signature signing parties" for reimbursement on several unvalidated tests. These UNR UNSOM and

149 - 268

Pathology professors' electronic signatures (seen on previously sent redlabs/vipdx invoices) were often used without their participation in inspecting the lab facility or lab processes. All benefitted and continue to benefit from the NIH and DOD funding misappropriation, dating back to discovery of fraudulent XMRV blood tests uncovered by Dr. Mikovits in August 2011, and the initial retaliation of the wrongful termination of September 29, 2011, when Dr. Mikovits was fired for insolence and insubordination. That act of insubordination which lead to her termination was her refusal to participate or be silent about crimes being committed by the Whittemores, Kinne, Lombardi, Peterson and UNR professors. Crimes which continued and escalated in 2016 culminated in threats against the organizers of the Autism One conference as mentioned above.

Finally, the Whittemores continue to commit patent fraud obtaining patents for intellectual property of Mikovits, Ruscetti and the NIH. These acts include the removing of legitimate inventors and substituting Lombardi who was not an inventor on any patent. Dr. Ruscetti protested as did Dr. Mikovits as – in fact – the WPI own zero intellectual property. (an additional e-mail will be sent with details showing additional patent fraud)

In addition to the Medicare fraud and Non-profit 990 tax fraud information provided, here is a list of additional items to investigate on WPI, Redlabs/VIPdx and associated organizations, Non-profits and affiliations:  In piecing together online financial information, documents and exhibits some already provided to you and the FBI, other sources of information, and various records of others and their recollections, there emerges patterns of concerted criminal conduct. This includes the following:

Briefly, the statutory violations by the Whittemore's include: Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a); the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310; as well as state statutes regarding charitable solicitations and prohibiting deceptive and unfair trade practices; the Racketeer Influenced and Corrupt Organizations Act, commonly referred to as RICO; the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"); Falsifying 990 Non Profit Tax records; falsifying tax returns; personnel tax records, the Clinical Laboratory Improvement Amendments of 1988 (CLIA) regulations at 42 USC 263a; 42 CFR Part 493 of the Public Health Service Act; Mail Fraud; Wire Fraud; Bank Fraud; Theft; Embezzlement; Forgery;18 U.S. Code § 1347 Health Care Fraud; Campaign Fraud. Obstruction of Justice/Witness Intimidation, and Conflicts of Interest (mixing employees, funds and exempt/non-exempt orgs both for-profit and non-profit together, and falsifying of records to defraud several government agencies of taxpayer NIH, DOD grant funds, Medicare, IRS Non-profit tax exemptions/other taxes and associated funds).

There are also several state violations: NRS §§ 598.1305: Solicitations for or on Behalf of Charitable Organizations Prohibited acts; jurisdiction of Attorney General; violation constitutes deceptive trade practice, NEV. REV. STAT. §§ 598.0915(15), 598.096, and 598.0963. This includes additional information regarding several years of Medicare fraud. Medicare fraud statute of limitations on pathology tests retention is 10 years.

Based on the above, and additional information of further criminal conduct by the Whittemore's not enumerated here, Mr. Follin and Dr. Mikovits have requested to meet again with Mr. Kipp of the FBI and I am writing you, not only to inform you of additional information discovered for the FCA case and of the June 8th Follin letter to Mr. Kipp, but also to allow you the opportunity to

150 - 268

participate with us in a meeting with The FBI, Mr. Follin, and Drs. Mikovits and Ruscetti.

Please advise me if your office is interested in participating in such a meeting.

Respectfully,


Robert J. Liskey

151 - 268

# EXHIBIT "F"
Fraudulent Affidavits and Fraudulent Charging Documents

# NOTICE OF COUNTERFEIT SECURITIES
# -  18 U.S.C. 513(a)

1. Counterfeit Securities, 2 Criminal Complaints filed against Affiant one dated 11/17/11. See attached Exhibit F.;
2. Counterfeit Security, Affidavit in Support of Second Complaint and Warrant of Arrest Filed 11/17/11. See attached Exhibit F;
3. Counterfeit Security, Ventura County Search Warrant issued on 11/29/11. See attached Exhibit F;
4. Counterfeit Security, Notice of Dismissal filed on 06/11/12. See attached Exhibit F.
5. Counterfeit Security, Form B-10 Claim against Affiant in Bankruptcy proceedings by WPI for $5,565,745.52 submitted by J. Scott Bovitz on 03/01/13 Amended on 07/25/13, submitted by Lisa Fenning, signed by Carli Kinne-West with attached affidavits from Annette Whittemore, Vicent Lombardi and Harvey Whittemore under Exhibit G.
6. Counterfeit Security dated 11/07/11, Affidavit by Annette Whittemore under Exhibit G.
7. Counterfeit Security dated 11/07/11, Affidavit by Vincent Lambardi under Exhibit G.
8. Counterfeit Security dated 11/07/11, Affidavit by Harvey Whittemore under Exhibit G.
9. Counterfeit Security dated 02/13/14, Doc 64, under Exhibit H.

All the above referenced documents are "counterfeit securities" because they fail to comply with evidence of law or procedure under Nevada, California or United States law.

152 — 268

20

Notice To The Court of Return of Counterfeit Securities
Notice Given Pursuant to Fed. Rule of Evidence 201
and Federal Rule of Civ. Proc. 17,

1

**Exhibit Index**

2   Exhibit 1    Second Criminal Complaint filed November 17, 2011

3   Exhibit 2    Affidavit in Support of Second Complaint and Warrant of Arrest

4                Filed November 17, 2011

5   Exhibit 3    Ventura County Search Warrant issued on November 29, 2011

6   Exhibit 4    Notice of Dismissal filed on June 11, 2012

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Refused, Denied and Returned For Fraud
Pursuant to F.R.C.P. 9(b)
— Counterfeit Securities —
18 U.S.C. 513(a)

**Exhibit Index**

153 — 268

**CERTIFICATE OF SERVICE**

1
2
Pursuant to FRCP 5(b), I certify that I am an employee of the Office of the

3
District Attorney of Washoe County, over the age of 21 years and not a party to

4
nor interested in the within action. I certify that on this date, I deposited for

5
mailing in the U.S. Mails, with postage fully prepaid, a true and correct copy of the

6
foregoing document in an envelope addressed to the following:

7
Judy Anne Mikovits
140 Acacia Avenue #5
8
Carlsbad, CA  92008

9
Dated this 3rd day February, 2015.

10
_/s/ C. Mendoza_
C. Mendoza
11
12
13
— Counterfit Security —
14
18 U.S.C. 513(a)
15
16
17
18
19
20
21
22
23
24
25
26
P:\Civil\MK\LITIGATION\MIKOVITS V. GAMMICK\Mtn To Dismiss Mikovits.Doc

154-268